UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| Rodney Brisco, as Administrator for the Estate of Michael Brisco, <br><br> Plaintiff; <br><br> v. <br><br> **City of Lancaster, Texas, et al.,** <br><br> Defendants. | Case No. 3:20-cv-00643-E |

### APPENDIX TO OFFICER BEAUCHAMP'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

| NO. | DESCRIPTION | APPENDIX PAGE NO. |
|---|---|---|
| 1. | AFFIDAVIT OF ZACHARY BEAUCHAMP | APPX 00001 – APPX 00003 |
| 2. | AFFIDAVIT OF SHANE LEMOINE | APPX 00004 – APPX 00005 |
| 3. | ELECTRONIC AUDIO-VISUAL FILE FROM UNIT 1481 OF THE SUBJECT INCIDENT ON MARCH 18, 2018 | APPX 00006 |
| 4. | DEPOSITION OF ZACHARY BEAUCHAMP | APPX 00007 – APPX 00082 |
| 5. | LANCASTER POLICE DEPARTMENT INVESTIGATIVE FINDINGS FOR OIS INQUIRY 18-002 | APPX 00083 – APPX 00084 |
| 6. | GRAND JURY NO-BILL | APPX 00085 |
| 7. | TEXAS RANGERS REPORT OF INVESTIGATION | APPX 00086 – APPX 00129 |
| 8. | ELECTRONIC AUDIO FILE FROM THE LANCASTER POLICE DEPARTMENT OF RADIO COMMUNICATIONS ON MARCH 18, 2018 | APPX 00130 |

Respectfully submitted,

By: /s/ *Christopher A. Klement*

    DARRELL G-M NOGA
    Texas Bar No. 00785326
    darrell@brownfoxlaw.com
    CHRISTOPHER A. KLEMENT
    Texas Bar No. 24090212
    chris@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    Telephone:  (214) 327-5000
    Facsimile:   (214) 327-5001

**ATTORNEYS FOR DEFENDANT
ZACHARY BEAUCHAMP**

## CERTIFICATE OF SERVICE

On March 4, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

By: /s/ *Christopher Klement*
    CHRISTOPHER KLEMENT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| Rodney Brisco, as Administrator for the Estate of Michael Brisco, | |
| Plaintiff; | Case No. 3:20-cv-00643-E |
| v. | |
| City of Lancaster, Texas, et al., | |
| Defendants. | |

---

### AFFIDAVIT OF

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned Notary Public, on this date personally appeared Janet Beesley, and after first being duly sworn upon his oath by me stated the following:

1.      My name is Janet Beesley. I am over 18 years of age, of sound mind, have never been charged with or convicted of a felony or crime of dishonesty or moral turpitude, and am fully competent and qualified to make this Affidavit and testify here in all respects. I have read this Affidavit and have personal knowledge of all facts set forth herein, and they are all true and correct.

2.      I am a Lieutenant in Internal Affairs for the City of Lancaster Police Department. As part of my responsibilities as a Lieutenant in Internal Affairs, I oversee and am responsible for the

custody of records for the Lancaster Police Department. Attached to the Officer Beauchamp's

Motion for Summary Judgment are true and correct copies of:

    a.    Exhibit 3: Electronic audio-visual file from Unit 1481 of the subject incident on March 18, 2018;

    b.    Exhibit 5: Lancaster Police Department Investigative Findings for OIS Inquiry 18-002; and

    c.    Exhibit 8: Electronic audio file from the Lancaster Police Department of radio communications on March 18, 2018.

These records are incorporated into this affidavit as is fully set forth herein.

3.    These records are true and correct copies of records that are kept by the City in the

regular course of business. It was and is in the regular course of business for an employee or

representative of the City, with knowledge of the acts, events, conditions, opinions, or diagnosis

recorded, to make such records or to transmit information thereof to be included in these

records. These records were made or received at or near the time of the acts, events, conditions,

opinions, or diagnoses recorded, or reasonably soon thereafter. These records are exact

duplicates of the originals.

_JRB ᴇꜱꜱꜱ4127_
Janet Beesley, Affiant

SWORN AND SUBSCRIBED TO before me on March 4, 2021, to certify which witness

my hand and official seal.

_Denetrica Green Hatten_
Notary Public, in and for the State of Texas

DENETRICA MARIEA GREEN-HATTEN
Notary Public, State of Texas
Comm. Expires 03-09-2022
Notary ID 131483777

My Commission Expires:

_03-09-2022_

# Exhibit **1**

Affidavit of Zachary Beauchamp

**THE STATE OF TEXAS**
**COUNTY OF DALLAS**

## DATE AND TIME: March 23, 2018 at *2:44* PM
## LOCATION: 350 W. Interstate 30, Garland, Texas 75043

**BEFORE ME**, the undersigned authority, on this day personally appeared, **Zachary Beauchamp**, who being duly sworn on oath states:

My date of birth is ▊▊▊▊▊ I currently work as a police officer for the city of Lancaster, Texas. My telephone number is ▊▊▊▊▊▊▊

I am voluntarily submitting this statement to Ranger David Armstrong. I am giving this statement without any threats or promises and on my own free will. He may use this statement for whatever purpose he or the State of Texas deem necessary. **(INITIALS: ZB )**

My name is **Zachary Beauchamp.** I am a police officer with the city of Lancaster, Texas. I have been with the Lancaster Police Department for approximately 3 years. I am currently assigned to the patrol division.

On Sunday, March 18, 2018, I was assigned as a patrol officer. My duty hours were 6P-6A. I was wearing my full issued Lancaster Police Department uniform that clearly identified me as a Lancaster police officer. I was patrolling the city with Recruit Officer Shane Lemoine. Recruit Officer Lemoine was in his third phase of training. He had one more phase remaining. I was responsible for training Recruit Officer Lemoine during his third phase. We were driving a fully marked Lancaster Police Department Chevrolet Tahoe which was equipped with emergency lights and an in-dash camera system.

I began the shift by taking our normal vehicle (1487) to our fleet maintenance facility for repair. Recruit Officer Lemoine followed in vehicle 1481 to pick me up. We got into vehicle 1481. I was planning on going back to the station to grab my duty bag and other equipment.

As we were headed back to the station, a criminal mischief call came out in the 600 block of W. Pleasant Run Road. We told the dispatcher that we would go to the call. We were able to quickly clear the call.

After we cleared the call, I observed a male who looked to be Zane Pugh, a suspected aggravated robbery suspect, walk into the OK Food Mart (701 W. Pleasant Run) across the street. I also saw Javier Martinez and the Cooks brothers in the parking lot. Pugh, Martinez, and the Cooks are known to associate with each other and are known to engage in criminal activity. I told Recruit Officer Lemoine to pull into a nearby church with a view of the OK Food Mart's back door. Other officers quickly arrived in the area. After a few moments at the church, Recruit Officer Lemoine and I relocated to the 7-11 across the street so we could watch the front door of the OK Food Mart. When we got to the 7-11 moments later, Martinez and the Cooks brothers were gone. A short time later, Sergeant Logan, RO Lemoine, and I went into the store to see if we could locate Pugh. The suspect was not there and we could not locate him.



INITIALS: ZB

We left the OK Food Mart and drove northbound on Dewberry towards the station. We were following Officer Pate. As we were following Officer Pate northbound on Dewberry, I noticed a white SUV illegally parked in a fire lane at the Dewberry Apartments. The Dewberry Apartments is a well known location for storing and selling dangerous narcotics. The driver was on the phone and appeared to be very concerned to see Officer Pate drive by. The suspect was fixated on Officer Pate, and turned his head almost all the way around to track where Officer Pate was headed. Officer Pate came over the radio to ask me if I observed the white SUV. I told him that I did and that we would circle back and make contact with the driver.

I instructed Recruit Officer Lemoine to turn right on Arbor Lane, right on Elm Street, and right again on Pleasant Run Road. We pulled into a parking lot to the south of the suspect's location to see if we could observe him. Our view was blocked by a privacy fence.

Recruit Officer Lemoine continued a short distance north on Dewberry and pulled into the south entrance of the complex. The suspect was still parked in the fire lane. We circled around to pull up behind the suspect vehicle. As we were pulling behind him he pulled front first into a parking spot. We got out of the car to make contact with the suspect.

Recruit Officer Lemoine approached the vehicle on the driver side and made contact with the suspect. I observed the suspect was fixated on RO Lemoine as he approached. I approached the vehicle on the passenger side and observed that the front passenger side window was partially rolled down. I don't think the suspect knew I was there. I immediately smelled the odor of marijuana and observed what appeared to be a marijuana cigar right above the gear shifter.

While staring at Recruit Officer Lemoine, the suspect handed him his ID with one hand while carefully and gradually reaching for the center console with the other. The suspect was able to open the center console. A moment later, the suspect reached into the center console. I was concerned that the suspect may be retrieving a pistol. I instructed Lemoine to get the suspect out of the SUV. The suspect looked up and stared right at me. I could tell he was surprised to see me. He immediately and quickly backed out of the spot.

My instinct was to run back to our squad car to pursue the suspect. As I was running towards our squad car, I heard the suspect rev the engine of his SUV. The next thing I know the suspect put the car in drive and hit me with the SUV knocking me off of my feet. I landed on the hood. The suspect continued to drive while I was stuck on the hood. I looked the suspect straight in the eye. The suspect distinctly and intentionally gunned the engine and accelerated the vehicle. I was convinced if I fell off the hood the suspect was going to run me over and kill me.

As the suspect continued to increase his speed, I thought that I was about to die. I thought I was never going to see my wife or two children again. I was somehow able to retrieve my department issued pistol and fire at the suspect to try and stop him from continuing to accelerate and killing me. I don't know if he swerved or hit the curb, but all of a sudden my momentum shifted and I fell off the side of the hood. As I fell off the hood, the suspect missed running me over by just a few inches.

I immediately experienced excruciating pain throughout my entire body. I experienced severe sharp shooting pains in my shoulder, ribs, elbows, and knees.

INITIALS: _____

Other officers quickly came to my aid. I was quickly transported by ambulance to the emergency room at Baylor Scott and White Hospital in Waxahachie.

**END OF STATEMENT**          **TIME:** _2:44_ **PM**          **DATE: 3/23/2018**

I would like to state that everything I have stated to Ranger David Armstrong is true and correct to the best of my knowledge. **(INITIALS:** _ZB_ **)**

_Ja Briley 4024_

**SIGNATURE OF PERSON GIVING STATEMENT**

Subscribed and sworn to before me, Ranger David Armstrong, a peace officer of the State of Texas and pursuant to 602.002 Texas Government Code, on this the 23rd day of March, 2018.

**SIGNATURE OF PEACE OFFICER**

INITIALS: _ZB_

# Exhibit 2

Affidavit of Shane Lemoine

## THE STATE OF TEXAS
## COUNTY OF DALLAS

## DATE AND TIME: March 23, 2018 at 2:46 PM
## LOCATION: 350 W. Interstate 30, Garland, Texas 75043

**BEFORE ME,** the undersigned authority, on this day personally appeared, **Shane Lemoine**, who being duly sworn on oath states:

I was born on [redacted] I currently work as a police officer for the city of Lancaster, Texas. I started working for the Lancaster Police Department in December 2017. I am currently in my third (of four) phase of training. My telephone number is [redacted]

I am voluntarily submitting this statement to Ranger David Armstrong. I am giving this statement without any threats or promises and on my own free will. He may use this statement for whatever purpose he or the State of Texas deem necessary. (**INITIALS:** _SL_ )

On March 18, 2018, I was patrolling the City of Lancaster with my training officer, Officer Zac Beauchamp. I was wearing my fully issued Lancaster Police Department uniform that clearly identified me as a police officer. I was driving a fully marked Lancaster Police Department Chevrolet Tahoe (1481) while Officer Beauchamp rode in the passenger seat. Our vehicle was equipped with emergency lights and a dash camera.

After detail my trainer and I took a marked vehicle to fleet services to be repaired. We then answered a criminal mischief call at Pleasant Run and Dewberry. Shortly after we cleared the call, my trainer observed someone he believed to have an arrest warrant go in the OK Food Mart on the northeast corner of Pleasant Run and Dewberry. We briefly parked at a nearby church behind the OK Food Mart with a view of the OK Food Mart's back door. Other Lancaster officers arrived in the area as well. We then moved to the 7-11 so we could see the front door of the OK Food Mart. Shortly thereafter, I went into the store with Officer Beauchamp and Sergeant Logan to see if the wanted suspect was still inside or hiding. It appeared that the wanted suspect was no longer in the area.

At approximately 7PM we began to leave the area. I was driving northbound on Dewberry with Officer Beauchamp. We passed the OK Food Mart. As we were passing the church, I observed a white SUV illegally parked in a fire lane at the apartments located at 1600 Dewberry. There were still police vehicles in the area. The driver was on the phone and appeared to be relaying our location and activity to someone on the other end of the phone. Officer Beauchamp instructed me to circle around and head back towards the apartment complex.

I made right turns on Arbor, Elm, and Pleasant Run and then a right turn back on Dewberry. I entered the apartment complex through the south entrance and noticed the suspect was still parked in the fire lane at the north entrance. I drove around the building. As we were coming up behind the suspect vehicle, the suspect pulled into a parking spot.

We exited the patrol vehicle and approached the suspect. I approached on the driver side while Officer Beauchamp approached on the passenger side. I made contact with the suspect and asked for his driver's license. The suspect appeared very nervous and was shaking as he attempted to remove his license from his wallet. The suspect then handed me a Texas identification card. I heard

INITIALS: _SL_

Officer Beauchamp instruct me to have the suspect exit the vehicle. I ordered the suspect out of the vehicle. As I was opening the driver's door, the driver quickly backed out of the spot. I had to move out of the way of the open door to avoid getting knocked over.

The suspect backed up straight into a vacant spot on the other side of the parking lot. I ran back towards our patrol vehicle because I thought we were about to pursue the suspect. The suspect put his SUV in drive and drove directly at Officer Beauchamp. I could no longer see Officer Beauchamp. Almost immediately, I heard a thud which I believe was the suspect hitting Officer Beauchamp with the SUV. I observed Officer Beauchamp on the hood of the suspect's SUV as the suspect turned right on Dewberry. The suspect appeared to be accelerating. I was afraid the suspect was going to continue accelerating north on Dewberry. I was terrified that I was about to watch Officer Beauchamp die. I heard multiple gun shots and wasn't sure if the suspect was shooting at Officer Beauchamp or if Officer Beauchamp was shooting to try and save his own life. As I turned right on Dewberry, I saw Officer Beauchamp kneeling in pain on the pavement.   The suspect continued driving north on Dewberry at a very high rate of speed. I observed the suspect swerve and flip over.

Several Lancaster officers arrived on scene almost immediately. I stayed with Officer Beauchamp until he was taken away in an ambulance. I then went back to the police station to wait for further instructions.

**END OF STATEMENT**          **TIME:** _2:16_ **PM**          **DATE: 3/23/2018**

I would like to state that everything I have stated to Ranger David Armstrong is true and correct to the best of my knowledge. **(INITIALS:** _SL_ **)**

**SIGNATURE OF PERSON GIVING STATEMENT**

Subscribed and sworn to before me, Ranger David Armstrong, a peace officer of the State of Texas and pursuant to 602.002 Texas Government Code, on this the 23rd day of March, 2018.

**SIGNATURE OF PEACE OFFICER**

INITIALS: _SL_

# Exhibit **3**

Dash Cam Video

# Exhibit 4

Excerpts from the
Deposition of
Zachary Beauchamp

```
 1              THIS UNEDITED ROUGH DRAFT OF THE PROCEEDING WAS

 2   PRODUCED IN REALTIME AND IS NOT CERTIFIED.

 3

 4              THIS ROUGH DRAFT TRANSCRIPTION MAY NOT BE CITED

 5   OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR

 6   CONTRADICT THE CERTIFIED TRANSCRIPTION OF PROCEEDINGS.

 7   THERE WILL BE DISCREPANCIES IN THIS FORM AND THE FINAL

 8   FORM, BECAUSE THIS REALTIME TRANSCRIPTION HAS NOT BEEN

 9   EDITED, PROOFREAD, CORRECTED, FINALIZED, INDEXED, OR

10   CERTIFIED.

11

12              THERE WILL ALSO BE A DISCREPANCY IN PAGE

13   NUMBERS APPEARING ON THE UNEDITED ROUGH DRAFT AND THE

14   EDITED, PROOFREAD, CORRECTED, AND CERTIFIED FINAL.

15

16              THIS ROUGH DRAFT TRANSCRIPTION MAY CONTAIN

17   UNTRANSLATED STENO, MISSPELLINGS, AND/OR NONSENSICAL

18   WORD COMBINATIONS.  ALL SUCH ENTRIES WILL BE CORRECTED

19   ON THE FINAL CERTIFIED TRANSCRIPT.

20

21              THIS ROUGH DRAFT TRANSCRIPTION IS NOT TO BE

22   USED TO CITE IN ANY COURT PROCEEDING.

23                        * * * * * * * * * * * * *

24

25
```

```
 1                  ** UNCERTIFIED DRAFT **

 2                UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
 3

 4   RODNEY BRISCO, as Administrator for )
     the ESTATE OF MICHAEL BRISCO,        )
 5                                        )
             Plaintiffs,                  ) Case No.
 6                                        ) 3:20-cv-00643-E
     v.                                   )
 7                                        )
     CITY OF LANCASTER, TEXAS, et al.,    )
 8                                        )
             Defendants.                  )
 9

10

11

                  ********************************
12                ROUGH DRAFT DEPOSITION OF
                  OFFICER ZACHARY BEAUCHAMP
13                     February 24, 2021
                  ********************************
14

15

16           ROUGH DRAFT DEPOSITION OF

17    OFFICER ZACHARY BEAUCHAMP, produced as a witness

18    at the instance of the Plaintiff, and duly sworn,

19    was taken in the above-styled and numbered cause

20    on February 24, 2021, from 2:02 p.m. to 3:25 p.m.,

21    remotely before Rebecca A. Graziano, CSR, RPR,

22    CRR, in and for the State of Texas, reported by

23    machine shorthand, pursuant to the Federal Rules

24    of Civil Procedure and the provisions stated on

25    the record.
```

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 17 of 141 PageID 193

```
  1                    ** UNCERTIFIED DRAFT **

  2                       PROCEEDINGS

  3               (On the record at 2:02 p.m.)

  4                  THE VIDEOGRAPHER:  We are now on
02:02
  5            the record.  Today's date is

  6            February 24th, 2021, and the time is

  7            2:02 p.m. central.

  8                  This is the recorded video

  9            deposition of Officer Zachary Beauchamp in
02:02
 10            the matter of Estate of Michael Brisco

 11            versus city of Lancaster, Texas, et al.,

 12            in the United States District Court,

 13            Northern District of Texas,

 14            Case Number 3:20-cv-00643-E
02:02
 15                  My name is Mark Santos from Everest

 16            Court Reporting, and I am the video

 17            specialist.  The court reporter today is

 18            Becky Graziano, also from Everest Court

 19            Reporting.  All counsel appearing today
02:02
 20            will be noted on the stenographic record.

 21                  Will the court reporter please

 22            swear in the witness.

 23                  (Witness duly sworn.)

 24                  OFFICER ZACHARY BEAUCHAMP,
02:03
 25        being first duly sworn, testified as follows:
```

Deposition of Officer David Beauchamp Brought on behalf of Plaintiff of Mesquite Police City of Mesquite, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 18 of 141 PageID 194

```
                    ** UNCERTIFIED DRAFT **

  1

  2

  3                    EXAMINATION

  4     BY MR. COYLE:

02:03  5      Q     Good afternoon, Officer Beauchamp.  My

  6     name is John Coyle.  I represent the estate of

  7     Michael Brisco in litigation arising out of the

  8     officer involved shooting from March 23rd of --

  9     I'm sorry -- from March 18th of 2018.

02:03 10            Have you ever had a deposition taken

 11     before?

 12      A     No, sir.

 13      Q     This is your first one?

 14      A     Yes, sir.

02:03 15      Q     Okay.  So I'm going to go through a series

 16     of instructions that will just make this go as

 17     quickly and smoothly as possible.

 18            So first and for most, just like a

 19     court of law, our sworn in and obligated to tell

02:03 20     the truth; do you understand?

 21      A     Yes, sir.

 22      Q     Second, the court reporter here is taking

 23     a written record of everything we say, so I want

 24     you to keep two things in mind:  First, normal

02:04 25     forms of communication like nods of the head,
```

```
              1              ** UNCERTIFIED DRAFT **
              2      shrugs of the shoulders, saying "huh-uh" and
              3      "uh-huh," the way we usually communicate.  They
              4      don't translate very well to a written record so
02:04         5      try to say things like "yes" and "no."  Okay?
              6       A      Yes, sir.
              7       Q      All right.  Second, you know, because it's
              8      a written record, it's very much human nature to
              9      anticipate my question and want to jump in and
02:04        10      answer it.  Just try to wait until I finish my
             11      question before you give your answer.  That way
             12      when we go back and read the transcript, it's nice
             13      and neat for us.  All right?
             14       A      Yes, sir.
02:04        15       Q      Okay.  I don't think we'll be here too,
             16      too long today.  Probably under two hours.  But if
             17      at any point in time you need to take a break, use
             18      the restroom, talk to counsel, stretch your legs,
             19      whatever it may be, that's perfectly fine.  Just
02:04        20      let me know.  I only ask that if I've posed a
             21      question, you answer it before we take a break;
             22      fair enough?
             23       A      Yes, sir.
             24       Q      Okay.  If you don't remember anything, you
02:05        25      can't recall anything, that's a perfectly
```

Deposition of Officer Zachary Beauchamp, in the Matter of McAdams, et al. v. City of Lancaster, Texas, et. al.

Case 3:20-cv-00643-E   Document 31   Filed 03/04/21   Page 20 of 141   PageID 196

```
        1              ** UNCERTIFIED DRAFT **

        2    acceptable answer.  Just -- just say that.  All

        3    right?

        4    A      Yes, sir.

02:05   5    Q      All right.  And is there any reason --

        6    physical condition, medications, drug, alcohol or

        7    any other reason -- why you can't testify

        8    truthfully and accurately here today?

        9    A      No, sir.

02:05   10   Q      Okay.  Do you have any questions for me

        11   before we get started?

        12   A      No, sir.

        13   Q      Okay.  Have you had time to speak with

        14   counsel and prepare for this deposition?

02:05   15   A      Yes, sir.

        16   Q      All right.  Great.

        17          What's your full name, for the record?

        18   A      Zachary, Z-a-c-h-a-r-y; Beauchamp,

        19   B-e-a-u-c-h-a-m-p.

02:05   20   Q      Okay.

        21   Q      And who's your current employer?

        22   A      City of Lancaster.

        23   Q      And you are a police officer?

        24   A      Yes, sir.

02:05   25   Q      And how long have you been a police
```

```
                    ** UNCERTIFIED DRAFT **

  1

  2     officer with the city of Lancaster?

  3      A     Roughly six years.

  4      Q     And how old are you, sir?

  5      A     32.  Or about to be 32.

  6      Q     What's your highest level of education you

  7     completed?

  8      A     High school.

  9      Q     Okay.  What high school did you go to?

 10      A     Ferris high school.

 11      Q     And when did you graduate?

 12      A     2007.

 13      Q     Do you remember what year it was when you

 14     started with the Lancaster Police Department?

 15      A     I think it was 2013.

 16      Q     Okay.  Prior to that, had you been a

 17     police officer with a different police department?

 18      A     Yes, sir.

 19      Q     Where were you before that?

 20      A     City of Cockrell Hill.

 21      Q     And how far is that from Lancaster?

 22      A     20 -- I -- 20 miles, maybe.

 23      Q     Okay.  How long were you with them?

 24      A     Roughly 11 months.

 25      Q     What was the reason for your switch?
```

APPX 00013

```
               1                    ** UNCERTIFIED DRAFT **

               2     A       To accept the job at Lancaster.

               3     Q       Okay.  Closer to motion in limine?  Did it

               4   pay better?  What was the reason?

02:07          5     A       More money.

               6     Q       More money.  Always a good reason.

               7             Prior to copper hill, were you a

               8   police department anywhere -- were you a police

               9   officer anywhere else?

02:07         10     A       Yes, sir.

              11     Q       Where were you before that?

              12     A       City of Red Oak.

              13     Q       And where is that in reference to

              14   Lancaster?

02:07         15     A       One city south.

              16     Q       And how long were you with Red Oak?

              17     A       Two and a half years.

              18     Q       Why did you leave Red Oak?

              19     A       I was terminated.

02:08         20     Q       Okay.  Why were you terminated?

              21     A       For policy violations.

              22     Q       What type of policy violations?

              23     A       I pepper sprayed a guy that was in

              24   handcuffs.

02:08         25     Q       Were there any criminal charges as a
```

                          ** UNCERTIFIED DRAFT **

 2     result of that incident?

 3      A      No, sir.

 4      Q      Was there any civil litigation as a result

02:08  5     of that incident?

 6      A      No, sir.

 7      Q      Prior to the city of Red Oak, were you a

 8     police officer anywhere else?

 9      A      No, sir.

02:08 10      Q      Okay.  So before you started at Red Oak, I

 11     assume you went to the police academy; is that

 12     correct?

 13      A      I'm sorry.  You broke up.

 14      Q      Prior to starting with Red Oak, did you go

02:08 15     to the police academy?

 16      A      Yes, sir.

 17      Q      Okay.  What police academy?

 18      A      Navarro college.

 19      Q      I'm sorry?

02:09 20      A      Navarro college.

 21      Q      And when did you enroll there?

 22      A      20- -- it was sometime right after high

 23     school.  I want to say roughly around 2010.  2009

 24     to 2010.

02:09 25      Q      Did you hold any jobs between high school

                          ** UNCERTIFIED DRAFT **

2    and going to the police academy?

3       A      Yes, sir.

4       Q      What did you do?

02:09  5       A      Farming.  I worked at a Walgreens

6    distribution center for a little bit.  I worked as

7    a -- security at a bar, and odd and end jobs.

8       Q      Okay.  You've never been a prison guard or

9    anything like that?

02:09  10      A      No, sir.

11      Q      Okay.  Have you ever been the defendant in

12   a civil lawsuit other than this one?

13      A      Yes, sir.

14      Q      Okay.  When was that?

02:10  15      A      Roughly a month ago, I would say.  I got

16   served with another one.

17      Q      Okay.  And did that have to do with

18   something that happened while you were working as

19   a police officer?

02:10  20      A      Yes, sir.

21      Q      Can you just give me a brief overview of

22   what that lawsuit is -- involves?

23      A      Another city's SWAT team, they hit the

24   wrong house on executing a search warrant.

02:10  25      Q      How were you involved?

APPX 00016

** UNCERTIFIED DRAFT **

2    A    I was called there to block off the road

3    for the SWAT team.

4    Q    The house that was hit, was it in

02:11  5    Lancaster?

6    A    Yes, sir.

7    Q    Why was another city's SWAT team serving a

8    warrant in Lancaster?

9    A    From what I know of the deal, it was a

02:11  10    multi-agency task force, and they -- I don't know

11    why they used that SWAT team.  That wasn't...

12    Q    Okay.  Other than that lawsuit and this

13    one, have you been a defendant in any other civil

14    lawsuits?

02:11  15    A    No, sir.

16    Q    Prior to this incident on May 18th, 2018,

17    have you ever discharged your firearm at another

18    person?

19    A    No, sir.

02:12  20    Q    Since that, have you?

21    A    No, sir.

22    Q    My understanding is that on the date of

23    this incident, you were the training officer for

24    Officer Lemoine; is that correct?

02:12  25    A    Yes, sir.

APPX 00017

Deposition of Officer Zachary Champ 30 Roughton et al. of Maier vs. City of Lancaster, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 26 of 141 PageID 202

** UNCERTIFIED DRAFT **

Q      Is Officer Lemoine still with the police department?

A      Yes, sir, I believe so.

02:12  Q      Okay.  My understanding is that he's -- overseas right now?

A      I know he's in the military, but I couldn't tell you where he's at.

Q      Okay.  Is he -- is he a reservist?  Is he active duty?  Do you know?

A      No, sir, I don't know.

Q      Understood.

       How long have you been serving as a training officer for Lancaster prior to this incident?

A      I would probably say about a year.

Q      And how did you get tacked to be a training officer?

A      The training coordinator at the time approached me and asked me to train fellow officers and new officers coming up.

Q      How long had Officer Lemoine been on the -- am I pronouncing that name correctly?

A      Yes, sir, as far as I know.

Q      Okay.  How long had he been on the force

** UNCERTIFIED DRAFT **

1           ** UNCERTIFIED DRAFT **

2  before this incident on March 18th of 2018?

3     A    Not long.  I don't -- I couldn't give you

4  exact, but it wasn't long.

02:13  5     Q    Less than six months?

6     A    Yes, sir.  That would be fair to say.

7     Q    Okay.  I was reviewing some of the -- hold

8  on one second.  Let me see if I can pull it up.

9         I was reviewing some of the Lancaster

02:14  10  Police Department general orders.  Is the -- are

11  the general orders sort of your policies governing

12  your behavior at the police department?

13         MR. KLEMENT:  Objection; form.

14  BY MR. COYLE:

02:14  15     Q    You can answer.

16     A    Yes, sir.

17     Q    Okay.  There's a general order governing

18  body-worn cameras.  Were you equipped with a body

19  warn camera in 2018?

02:14  20     A    Yes, sir.

21     Q    Okay.  On March 18th of 2018, were you

22  wearing your body camera?

23     A    No, sir.

24     Q    Why not?

02:15  25     A    I gave it to my Recruit Officer Lemoine,

```
 1                    ** UNCERTIFIED DRAFT **

 2       because mine was not -- or his was not working.

 3        Q      So on the date of the incident, Officer

 4       Lemoine was wearing your body-worn camera?

02:15 5     A      To the best of my knowledge, yes, sir.

 6               MR. COYLE: Chris, as I went through

 7           everything, I didn't see any body camera

 8           footage that was produced to us.  So to

 9           the extent that Officer Lemoine was

02:15 10          wearing a body-worn camera, we'd just

 11          request that.

 12               MR. KLEMENT:  Right.  And we can

 13          speak about that outside the deposition.

 14               MR. COYLE:  Sure.

02:15 15               MR. KLEMENT:  We can talk through

 16          it.

 17               MR. COYLE:  Okay.

 18       BY MR. COYLE:

 19        Q      So, officer, have you given your body

02:15 20      camera to Officer Lemoine that day or days prior?

 21       A      No.  That day.

 22       Q      Was it at the beginning of the shift?

 23       A      Yes, sir.

 24       Q      Okay.  Where were you when you gave it to

02:16 25      him?
```

APPX 00020

Deposition of Officer Brandon Kemp - Douglas Lewis, individually and as heir of Michael Lewis, et al. v. City of Desoto, Texas, et. al.

Case 3:20-cv-00643-E   Document 31   Filed 03/04/21   Page 29 of 141   PageID 205

** UNCERTIFIED DRAFT **

    A     We were going to a criminal mischief complaint in the 600 block of West Pleasant Run.

    Q     So were you in the car when you gave it to him?

    A     Yes, sir.

    Q     And why did you decide to give him your body camera?

    A     Because he was in third phase of training, so he interacts with the public more, and I would stand back, and that way he's making contact with the public that he would have the audio and video of the body camera.

    Q     Okay.  How did you become aware that his body camera wasn't working?

    A     I think he told me it wasn't.  I -- I'm sure that's what the conversation was.

    Q     So you're en route to a criminal mischief complaint.  Are you driving or are you the passenger?

    A     He's third phase training, so I would have been passenger.

    Q     And how long before the shooting did you go to this criminal mischief complaint?

    A     I guess I don't understand what you're

Deposition of Officer Chew-Champ Dougherty of Melissa Police City of Melissa, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 30 of 141 PageID 206

1                    ** UNCERTIFIED DRAFT **

2        asking.

3         Q      Sure.

4                 So let me -- let me backtrack and we

02:17  5        can go [audio interference].

6                 THE REPORTER:

7        BY MR. COYLE:

8         Q      What time did your shift begin that day?

9        Do you remember?

02:18  10        A      6:00 p.m.

11        Q      6:00 p.m.

12                 And what time, if you can recall, did

13        the shooting occur?

14        A      I don't know the exact time.

02:18  15        Q      Was it towards the beginning of your shift

16        or the end of your shift?

17        A      Beginning.

18        Q      Okay.  This criminal mischief complaint

19        that you talked about, was that the first call you

02:18  20        went to on your shift?

21        A      Yes, sir.

22        Q      How long after you went to that criminal

23        mischief call did the shooting occur?

24        A      Not long.

02:19  25        Q      Not long -- an hour?  A half hour?

** UNCERTIFIED DRAFT **

1

2    A      I would say an hour tops.

3    Q      So my understanding is immediately before

4    your interaction with Mr. Brisco, you sort of -- I

02:19  5    don't want to say it was surveillance, but you saw

6    an individual who you believe to be Zane Pugh at a

7    Food Mart; is that correct?

8    A      Yes, sir.

9    Q      Yes, sir?

02:19  10    Q      Were you simply -- were you on the lookout

11    for Mr. Pugh?  Why did he stick out to you?

12    A      He -- I knew that he was currently wand

13    for an aggravate robbery out of our city.

14    Q      And you had prior interactions with him?

02:20  15    A      Yes, sir.

16    Q      Okay.  So you were able to recognize him?

17    A      Yes, sir.

18    Q      How far was this Food Mart from the

19    location where the shooting occurred?

02:20  20    A      Maybe 80 yards.

21    Q      So I listened to police audio surrounding

22    the shooting, and you -- it appears that you're

23    talking back and forth.  Do you know who you were

24    speaking to while you were investigating Mr. Pugh?

02:20  25    A      It would be several different officers,

```
                         ** UNCERTIFIED DRAFT **

  1

  2      but I don't remember which one directly.

  3        Q      Okay.  Were they in other vehicles?

  4        A      Yes, sir.

02:20  5        Q      So was there a planned operation to try to

  6      take Mr. Pugh into custody?

  7        A      If we could locate him, yes, sir.  I

  8      wouldn't say planned.

  9        Q      Were there simply a number of vehicles in

02:21 10      this same area that you were communicating with?

 11        A      Yes, sir.

 12        Q      Is that area heavily policed?

 13        A      Yes, sir.

 14        Q      Okay.  So the why are where you first

02:21 15      interacted with Mr. Brisco, it looks like it's

 16      sort of like an apartment complex facility; is

 17      that accurate?

 18        A      Yes, sir.

 19        Q      Okay.  Are they off the main road?  Can

02:21 20      you sort of explain to me how it's all set up?

 21        A      On the south side, you have pleasant run,

 22      which is a main thoroughfare in Lancaster.  And

 23      then that's where the Food Mart is.  And then

 24      Dewberry, it runs north and south, and the

02:22 25      apartment complex sits on the east side of
```

                    ** UNCERTIFIED DRAFT **

1
2    Dewberry.
3      Q      And so the apartment complex, it's a
4    number of small buildings with parking in front
02:22 5  and sort of small driveways in between; is that
6    fair to say?
7      A      Yes, sir.
8      Q      Okay.  So how did you come across
9    Mr. Brisco after you leave the Food Mart?
02:22 10     A      We saw a car parked in the fire lane, and
11   that's a violation.
12     Q      Okay.  Where were you when you observed
13   the car in the fire lane?
14     A      I was behind Officer Pate, who was going
02:23 15 up Dewberry.
16     Q      So you're driving on Dewberry?
17     A      Yes, sir.
18     Q      And this fire lane, is it in the apartment
19   complex?
02:23 20     A      Yes, sir.
21     Q      How far off of Dewberry is the fire lane?
22     A      It connects to Dewberry.
23     Q      Okay.  How far off of Dewberry was the car
24   that you observed in the fire lane?
02:23 25     A      Feet, maybe.

Deposition of Officer Robert Shamp Dustin Watt et al. vs. City of Mesquite, Texas, et al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 34 of 141 PageID 210

** UNCERTIFIED DRAFT **

1

2    Q     So, I mean, like, right off of Dewberry,

3    or 50 feet?  100 feet?  What do you mean by

4    "feet"?

02:23  5    A     I don't know how to describe it.  If it

6    turns out of the apartment, he was -- I would say

7    roughly 20 feet at the most from Dewberry, the

8    actual roadway.

9    Q     Okay.  When you're driving up Dewberry,

02:24  10   how fast are you going?

11   A     It just depends.

12   Q     Well, at this point in time, when you

13   observed the white SUV, how fast were you going?

14   A     Oh, probably under 10 miles an hour.

02:24  15   Q     Okay.  So you're sort of rolling along on

16   Dewberry?

17   A     Yes, sir.

18   Q     Okay.  Why were you driving so slow?

19   A     Looking for Zane Pugh.

02:24  20   A     Did Mr. Pugh frequent that apartment

21   complex.

22   A     Yes, sir.

23   Q     Is that apartment complex like a crime hot

24   spot, so to speak?

02:24  25   A     Yes, sir.

```
                        ** UNCERTIFIED DRAFT **

    1

    2       Q      So you're -- did you have any reason to

    3    believe that Mr. Pugh was driving this white

    4    vehicle that was in the fire lane?

02:24  5       A      No, sir.

    6       Q      Was there any reason that you wanted to

    7    stop the white vehicle other than it being in the

    8    fire lane?

    9       A      Yes, sir.

02:25  10       Q      What's that?

   11       A      When officers were driving around the

   12    area, like going up, Officer Pate passed by, on

   13    the occupant of the vehicle was watching the

   14    marked officers as they were driving around

02:25  15    looking for Mr. Pugh.

   16       Q      Okay.  When you say when they were driving

   17    around, are they driving around through the

   18    apartment complex?

   19       A      I can't speak on where every officer went.

02:25  20       Q      Okay.  Well, you said that the occupant of

   21    the white vehicle watched the marked vehicles go

   22    past.

   23       A      Yes, sir.

   24       Q      Did they -- the marked vehicles go past on

02:25  25    Dewberry, or did they go past through the
```

APPX 00027

Deposition of James Walker-Shemp Document 31    Filed 03/04/21 of McKinney McCree City of McKinney, Texas, et al.

Case 3:20-cv-00643-E   Document 31   Filed 03/04/21   Page 36 of 141   PageID 212

```
              1              ** UNCERTIFIED DRAFT **

              2     apartment complex?

              3      A       No.  Past on Dewberry.

              4      Q       Okay.  The white vehicle that -- is it

02:26         5     fair to say that the fire lane is perpendicular to

              6     Dewberry?

              7      A       Yes, sir.

              8      Q       Okay.  So in the fire lane, is the white

              9     vehicle facing towards Dewberry or facing away

02:26        10     from Dewberry?

             11      A       Facing towards Dewberry.

             12      Q       Okay.  The occupant who watched the

             13     officers go by would be looking out his front

             14     windshield to watch the cars go by; is that

02:26        15     accurate?

             16      A       Yes, sir.

             17      Q       Were the police vehicles -- did they have

             18     their lights on?

             19      A       No, sir.

02:26        20      Q       Was there anything else strange about the

             21     white vehicle or its occupant?

             22      A       You could tell he was on his phone, and

             23     just the way he turned to watch the vehicles was

             24     abnormal.

02:27        25      Q       Can you describe what you mean by that?
```

Deposition of Officer Benjamin Champion - In the Matter of Marcus Johnson v. City of Mesquite, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 37 of 141 PageID 213

```
                    ** UNCERTIFIED DRAFT **

  1

  2      A      He would -- as soon as he saw the marked

  3   vehicles, he would follow the first one -- it

  4   would strain my neck, but he would turn, like, his

02:27   5   whole body watching to see where that car went,

  6   that police vehicle went.

  7      Q      Okay.  So what about that stood out to

  8   you?

  9      A      That he was very cautiously watching where

02:27   10   the police went.

  11      Q      Okay.  Well, watching where the police

  12   went wouldn't create an independent basis to pull

  13   over that vehicle, would it?

  14      A      No, sir.

02:27   15            MR. KLEMENT:  Objection; form.

  16   BY MR. COYLE:

  17      Q      What was the basis for stopping the

  18   vehicle?

  19      A      Parked in the fire lane.

02:28   20      Q      Okay.  You see the occupant of the vehicle

  21   watch the cars go by.  What do you do next?

  22      A      We travel up Dewberry and make the block

  23   and come back around.

  24      Q      Okay.  When you come back around, is the

02:28   25   white vehicle still in the same spot?
```

** UNCERTIFIED DRAFT **

2    A      Yes, sir.

3    Q      Okay.  Does the white vehicle ever move?

4    A      Yes, sir.

02:28   5    Q      Where does it move to?

6    A      A parking spot after we pulled behind it.

7    Q      Okay.  So how far away is the parking spot

8    that it pulls into?

9    A      Pretty close.  I mean, guessing feet, I'd

02:29  10    say 25 to 50 feet, maybe.

11    Q      Okay.  When you pulled up behind it, what

12    was your intention?

13    A      To make contact with the occupant.

14    Q      For what reason?

02:29  15    A      To see what was going on.  The violation,

16    just like a traffic stop.

17    Q      Okay.  You were going to write him a

18    parking ticket for blocking the fire lane?

19    A      Yes, sir, possibly.

02:29  20    Q      Were there any other cars parked in the

21    fire lane?

22    A      Not that I remember.

23    Q      Walk me through what happens from when you

24    pull up behind the car until you discharge.  Just

02:30  25    one through it for me.

```
 1              ** UNCERTIFIED DRAFT **

 2      A       So I -- we pull around, pull behind and he

 3      pulls nose-in to a parking spot.  There's another

 4      vehicle parked on his passenger's side.  The

02:30  5      occupant of the vehicle opens the door.  I believe

 6      that Lemoine instructed him to have a seat back in

 7      the vehicle.  He was exact of acting very nervous.

 8      I walked to the passenger's side.  I don't

 9      think -- I don't know I don't believe he saw me.

02:30  10     I road dispatch and gave the plate of the vehicle.

 11     I don't think he saw me on the passenger's side,

 12     and I walked up and you could see -- it looked

 13     like marijuana -- marijuana next to the gear shift

 14     in the center console.  I couldn't hear all the

02:30  15     conversation between him and Lemoine, but I -- I

 16     was -- saw him reach to the door pocket and then

 17     go towards the center console area of the car, and

 18     that's when I instructed Officer Lemoine to pull

 19     him out of the vehicle, and he saw me, and then

02:31  20     the car went in reverse.  Well, then when the car

 21     went in reverse, I knew at that point that he was

 22     taking off to evade, so I go to run back to my

 23     squad car, and at that point when he turns, he

 24     turns the car and goes forward and he's -- he's --

02:31  25     struck me with the vehicle and I was on top of it,
```

```
                      ** UNCERTIFIED DRAFT **

  2   and then we go northbound.

  3    Q      Okay.  You're on top of the vehicle

  4   heading northbound.  How long until you discharge?

02:31  5    A      Seconds.

  6    Q      Okay.  At some point in time, you fall off

  7   the vehicle?

  8    A      Yes, sir.

  9    Q      How far down the road does that happen?

02:31 10    A      I don't have a tape measure, but it's --

 11   there's another set of apartment complex across

 12   the street that's down -- I would have to guess

 13   maybe 50 yards.

 14    Q      Okay.  Do you remember how many times you

02:32 15   discharged your firearm?

 16    A      No, sir.

 17    Q      Okay.  Were you on the hood of the vehicle

 18   when you discharged the firearm?

 19    A      Yes, sir.

02:32 20    Q      Okay.  It was after you were struck by the

 21   vehicle?

 22    A      Yes, sir.

 23    Q      Were you -- can you describe sort of your

 24   body positioning as you were discharging?

02:32 25    A      I remember my fingers were holding on to
```

1                    ** UNCERTIFIED DRAFT **

2       the hood, and he wasn't slowing down, and I

3       unholstered and shot.

4       Q       Okay.  I want to go back to something you

02:33  5       said.  You said you road dispatch with the license

6       plate.

7                    Are there two separate bands that you

8       can communicate on?

9       A       Are you calling bands channels?

02:33  10      Q       Yeah.  Sorry.  We call them bands up here.

11      Channels.  Two separate channels?

12      A       We only operate on one channel, but we

13      have multiple channels.

14      Q       Okay.  So if you're talking to another

02:33  15      officer in a different car about Mr. Pugh's

16      location, or you're radioing dispatch with the

17      plates, it would all be on the same channel?

18      A       Yes, sir.

19      Q       At any point in time while you were

02:34  20      observing Mr. Brisco in his vehicle or on the hood

21      of the vehicle, did you observe any weapons on

22      him?

23      A       No, sir.

24      Q       When he put his car into reverse, was it

02:34  25      your intention to get in front of his vehicle to

APPX 00033

                           ** UNCERTIFIED DRAFT **

 2      stop its path?

 3       A       No, sir.

 4       Q       What was your -- what was your intention?

02:34    5       A       To get back to my squad car.

 6       Q       Does Lancaster train you about how to deal

 7      with fleeing vehicles?

 8                  MR. KLEMENT:  Objection; form.

 9                  THE WITNESS:  Yes, would be the way

02:34   10          answer that.

11      BY MR. COYLE:

12       Q      Well, so you said you were running to get

13      into your squad car.  I'm just curious, you know,

14      why that was the decision that you made.  Is that

02:35   15      what you were trained to do?

16       A      We're trained that our -- like our squad

17      car is -- we can use it for hard cover, if

18      necessary.  We can use it -- our other equipment's

19      in there.  And that -- we use it to pursue

02:35   20      vehicles.

21       Q      Officer, I want to show you a video now.

22      It's from your dashcam of your vehicle.

23                  Have you seen that video before?

24       A      Yes, sir.

02:35   25       Q      Okay?

```
        1                    ** UNCERTIFIED DRAFT **
        2                    MR. COYLE:  I'm not going to mark
        3           it as an exhibit, Chris, but I'm -- it's
        4           the -- it was produced as Defense 0009.
02:36   5    BY MR. COYLE:
        6     Q      And, Officer, I'm just going to show this
        7    to you, and I want to ask you a couple questions
        8    about the timing based on the conversation we just
        9    had.  Okay?
02:36  10     A      Yes, sir.
       11     Q      All right.  I'm going to share my screen
       12    here.
       13              Okay.  Officer.  Can you see that?
       14     A      Yes, sir.
02:36  15     Q      All right.  I'm just going to play a few
       16    seconds, and then I have a couple questions that I
       17    want to ask you.  All right?
       18     A      Yes, sir.
       19                    MR. COYLE:  Okay.  So for the
02:36  20           record, we're starting Defense 0009.mp4 at
       21           0 minutes and 00 seconds.
       22              (Whereupon, video playback began.)
       23    BY MR. COYLE:
       24     Q      Okay, officer.  So I just played you the
02:37  25    first 37 seconds in this video, and we've gotten
```

** UNCERTIFIED DRAFT **

2  to the point where a white vehicle is in front of

3  your car with the door open.

4          Is that Mr. Brisco in his vehicle?

02:37  5   A     Yes, sir.

6   Q     Okay.  So I want to backtrack from here --

7  I just played you this much for some reference --

8  to the very beginning here at 0 minutes and

9  00 seconds.

02:38  10          (Whereupon, video playback began.)

11  BY MR. COYLE:

12   Q     Do you know what street this is you're on?

13   A     Yes, sir.

14   Q     Which street's that?

02:38  15   A     Dewberry.

16   Q     That's Dewberry.

17          So at this point in time, had you

18  already observed Mr. Brisco parked in the fire

19  lane?

02:38  20   A     Yes, sir.

21   Q     Okay.  Your dash camera, does that run

22  constantly while you're in the vehicle, or do you

23  have to turn it on?

24   A     You have to turn it on.

02:38  25   Q     Okay.  Is this when you turned it on?

APPX 00036

Deposition of Officer Zachary Champ on behalf of Mineola of City of Mineola, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 45 of 141 PageID 221

```
          1                  ** UNCERTIFIED DRAFT **

          2       A      Yes, sir.

          3       Q      Okay.  So there was no dash camera footage

          4       of you observing Mr. Brisco in the fire lane the

02:38     5       first time?

          6       A      No, sir.

          7       Q      Okay.  And so you said you were on

          8       Dewberry here.  Is this -- how long after you

          9       first observed Mr. Brisco in the fire lane do you

02:39    10       turn this camera on?

         11       A      I don't know.

         12       Q      Okay.  Well, when you first observe

         13       Mr. Brisco in the fire lane, is it further down

         14       this road in the direction you're heading now, or

02:39    15       is it behind you on this road?

         16       A      No.  It's right -- right -- right over

         17       there.  We -- if you could look to the left of

         18       this video, that okay Food Mart that we're at

         19       looking for Mr. Pugh right there is to the left.

02:39    20       Q      Okay.

         21       A      Just out of view -- just out of camera

         22       angle.

         23       Q      Okay.  And where is -- where is the fire

         24       lane you observed Mr. Brisco in?

02:39    25       A      He's in it right there in that white --
```

Deposition of Officer Ridge Stamp Document of Management of Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 46 of 141 PageID 222

```
                    ** UNCERTIFIED DRAFT **
 1
 2      Q      That's this white vehicle here?
 3      A      Yes, sir.
 4      Q      Okay.
02:39  5              (Whereupon, video playback began.)
 6   BY MR. COYLE:
 7      Q      Okay.  I stopped the video here at
 8   24 seconds.  That's Mr. Brisco's car, the white
 9   car right in front of the -- your vehicle at this
02:40 10   point?
11      A      Yes, sir.
12      Q      Okay.  Is that the fire lane that he's
13   driving out of?
14      A      It looks like he's coming out of a parking
02:40 15   spot right there.
16      Q      Okay.  So it's your belief that he moved
17   from the fire lane to a parking spot?
18      A      Yes, sir.
19      Q      Okay.  In the, I guess, 24 seconds it took
02:40 20   for you to get around the block?
21      A      Yes, sir.
22      Q      Okay.  I'm going to just stop it here for
23   a second.
24              From this angle, can we see the fire
02:41 25   lane that you thought Mr. Brisco was parked in?
```

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 47 of 141 PageID 223

```
                        ** UNCERTIFIED DRAFT **

        1

        2    A       I don't know if you could zoom in, but

        3    directly where that curb is.

        4    Q       About here, where my mouse is

02:41   5    (indicating)?

        6    A       Yes, sir, a little further down.

        7            No, that's the --

        8    Q       Oh, right here (indicating)?

        9    A       I'm sorry.  We're on Zoom and I'm

02:41   10   pointing.

        11   Q       You know, it -- the worst part about Zoom

        12   is it makes things like this really difficult.  I

        13   do usually ask, you know, to draw a picture on it?

        14   A       You can see the sign like that -- if you

02:41   15   follow the rear bumper of his car right there

        16   (indicating).

        17   Q       Okay.  It's this -- down here?  Let me

        18   play the video for a minute.  Maybe we'll get a

        19   better...

02:41   20           (Whereupon, video playback began.)

        21   BY MR. COYLE:

        22   Q       Okay.  Can you see it better from here?

        23   A       Yes, sir.  Right there where the grass is

        24   in that sign.

02:42   25   Q       Over here (indicating)?
```

Deposition of Officer David Champ Roughneen  48 of 141  City of Mesquite Texas, et. al.

Case 3:20-cv-00643-E   Document 31   Filed 03/04/21   Page 48 of 141   PageID 224

```
                        ** UNCERTIFIED DRAFT **

         1

         2      A       Right in there, yes, sir.

         3      Q       Okay.  So when you first observed him, he

         4      was parked over here (indicating) where this metal

02:42    5      box is on the edge, sort of the exit out so the

         6      street there?

         7      A       Yes, sir.

         8      Q       And so from the time you first observed

         9      him, he then backed up into a parking spot?

02:42   10      A       Yes, sir.

        11      Q       How long did it take you to go around the

        12      block?

        13      A       I'm not sure, but it shouldn't take more

        14      than five minutes, just because there's a couple

02:42   15      stop signs.

        16      Q       Okay.

        17              Okay.  I'm going to pull up some

        18      audio.

        19              MR. COYLE:  And this is, for the

02:43   20          record, Defense 00011 -- that's the PD

        21          radio -- And I want to play a section here

        22          for you, Officer.

        23              And for the record, I'm starting at

        24          1:04.  I'm not sure if this is exactly

02:43   25          where I want to start it, but 1:04.
```

```
 1                   ** UNCERTIFIED DRAFT **

 2                   Can you hear that, officer?

 3                   THE WITNESS:  No, sir.

 4                   MR. KLEMENT:  I also can't hear it,

02:43  5         John.

 6                   MR. COYLE:  Oh, I was afraid that

 7         was going to happen.

 8                   THE VIDEOGRAPHER:  I don't mean to

 9         interrupt, but if you'd like to share

02:43 10         audio, I believe when you go to the share

11         screen option, there should be an advanced

12         setting, and in there you should be able

13         to just strictly share audio, unless it's

14         the file itself.

02:44 15                   MR. KLEMENT:  Hey, John?  How about

16         this:  We're about 45 minutes in.  Why

17         don't we take a quick break and you can

18         kind of play around with that.

19                   MR. COYLE:  That sounds like a

02:44 20         great idea.  Let's go off the record now

21         and we'll try to get this squared away,.

22                   Officer, if you want to take five

23         minutes I'll try to get this figured out

24         for you.

02:44 25                   THE VIDEOGRAPHER:  The time is
```

```
         1                  ** UNCERTIFIED DRAFT **

         2          2:44 p.m.  We are now off the record.

         3              (Recess from 2:44 p.m. to 2:49 p.m.)

         4                  THE VIDEOGRAPHER:  We are now on

02:49    5          the record.  The time is 2:49 p.m.

         6      BY MR. COYLE:

         7       Q      Officer, I think we've -- we've at

         8      least -- you'll be able to hear the sound now.

         9      You might not be able to hear it well.  But I just

02:49   10      want to play a segment for you like I did with the

        11      video and then go back and ask you some questions

        12      about it.  All right?

        13       A      Yes, sir.

        14              MR. COYLE:  So for the record,

02:49   15          playing Defense 00011 starting at 2:24.

        16              (Whereupon, audio playback began.)

        17      BY MR. COYLE:

        18       Q      So, Officer, I just want to ask you a

        19      couple quick questions.

02:50   20              Were you able to hear that at all?

        21       A      Yes, sir.

        22       Q      Okay.  It sounded like -- was that your

        23      voice talking about the cook brothers?

        24       A      Yes, sir.

02:50   25       Q      Okay.  When was that conversation?
```

```
                        ** UNCERTIFIED DRAFT **

         1

         2      A      That was before we even noticed anything

         3     about Mr. Brisco.

         4      Q      Okay.  That was when you were sort of

02:50    5     checking out the market and surrounding areas

         6     looking for Mr. Pugh?

         7      A      Yes, sir.

         8      Q      Okay.  All right.  I'm going to keep

         9     playing now, and hopefully you'll hear there's a

02:50   10     reference to a white SUV, and then a little bit

        11     later on the incident itself.  Okay?  So I'm going

        12     to start playing again at 2:51.

        13             Okay.  Officer, I just want to stop it

        14     there for a second.  Were you able to hear that?

02:51   15      A      Yes, sir.

        16      Q      Okay.  It ends with watch that white SUV

        17     there.  Do you hear that?

        18      A      Yes, sir.

        19      Q      Is that the first time that you saw

02:52   20     Mr. Brisco's SUV?

        21      A      That was the first time attention was

        22     given over to his direction, yes, sir.

        23      Q      Okay.  So the moment, sort of, that

        24     started this whole process where you went around

02:52   25     the block and then pulled up behind him?
```

Deposition of Officer Douglas Champ Dougharty 2 of Motley vs. City of Brisco Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 52 of 141 PageID 228

```
                        ** UNCERTIFIED DRAFT **

  2    A     Yes, sir.

  3    Q     Okay.

  4          MR. COYLE:  So for the record, that
02:52  5        is at 342 on the recording, and I'm just

  6        going to play it from here.

  7          (Whereupon, audio playback began.)

  8    BY MR. COYLE:

  9    Q     I just want to pause it there for a
02:53 10    second, Officer.

 11          It sounds like that's your voice

 12    saying:  "Yeah.  He's watching us.  We're going to

 13    swing back around on his six."  Is that -- did I

 14    hear that correctly?

02:53 15    A     Yes, sir.

 16    Q     Okay.  Were you referring to Mr. Brisco

 17    when you made that statement?

 18    A     Yes, sir.

 19    Q     Okay.  And by "his six," you mean "we're
02:53 20    going to swing back around behind him"?

 21    A     Yes, sir.

 22    Q     All right.  I'm going to play it again

 23    from here.

 24          MR. COYLE:  And that -- I'm sorry.
02:53 25        For the record, I just stopped that at
```

                          ** UNCERTIFIED DRAFT **

 1

 2          4:14 after officer's statement.

 3              (Whereupon, audio playback began.)

 4                  MR. KLEMENT:  John, I don't know if

02:54  5        you're hearing anything, but I'm not.

 6                  THE WITNESS:  (Moving head side to

 7        side.)

 8                  MR. COYLE:  There's a -- there's a

 9        little break in the sound there.

02:54 10                  MR. KLEMENT:  Okay.

11                  MR. COYLE:  We were literally about

12        to get to the meat of it when -- right

13        now.

14              So I'm going to start again at

02:54 15        4:51.  And, Officer, you should hear

16        something in the next 15 seconds or so.

17        Okay?

18              (Whereupon, audio playback began.)

19        BY MR. COYLE:

02:55 20         Q      Okay.  I just stopped it again at 5:23,

21        and we just heard a voice come over saying,

22        officer down.  I need a medic.  Is that you?

23         A      Yes, sir.

24         Q      And a little bit prior to that, is sounded

02:55 25        like we heard a shots fired call out.  Did you

** UNCERTIFIED DRAFT **

2      hear that as well?

3       A      Yes, sir.

4       Q      And a little bit prior to that, "he's

02:55 5      running," or something to that effect?

6       A      Yes, sir.

7       Q      Okay.  Was that Officer Lemoine?

8       A      Yes, sir.

9       Q      Okay.  So at 4:14 was the first time you

02:56 10     observed the white SUV, and now at 5:23 it's after

11      the discharge and you're calling for a medic;

12      correct?

13      A      I -- if you say so.  Yes, sir.

14      Q      Let me -- I'll show you -- I'll show you

02:56 15     my screen.  Hold on.  And that way you can see the

16      timing as well.

17             So there you go.  I just stopped the

18      recording here at 5:23.

19             So it's about a little over a minute

02:56 20     from when you first go over radio discussing the

21      white SUV to the shots being fired; is that fair

22      to say?

23             MR. KLEMENT:  Objection; form.

24             THE WITNESS:  Yes, sir.

25

Deposition of Officer Robert Shamp Dougherty in the Matter of McAllen City of McAllen Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 55 of 141 PageID 231

```
            1                ** UNCERTIFIED DRAFT **

            2    BY MR. COYLE:

            3     Q      And it's probably less than half of a

            4    minute from the first time you hear over the radio

02:57       5    about the white SUV to when you pull your car up

            6    and initiate the traffic stop; is that fair to

            7    say?

            8              MR. KLEMENT:  Objection; form.

            9              THE WITNESS:  Yes, sir.

02:57      10    BY MR. COYLE:

           11     Q      Okay.  This recording, is this the police

           12    radio that you go over to get to dispatch?

           13     A      I have -- to be honest with you, I don't

           14    know where that recording comes from.

02:57      15     Q      Okay.  So when -- when you are being heard

           16    talking here, are you pressing a button to go over

           17    radio, or is it just constantly being recorded?

           18    Do you know how that works?

           19     A      I know you press a button to what we call

02:57      20    "mic up" the radio.

           21     Q      Okay.  It sounded like there was

           22    communication between you and some other officers

           23    nearby during what we listened to; is that fair to

           24    say?

02:58      25     A      Yes, sir.
```

Deposition of Officer Joshua Champ Document 31  Filed 03/04/21 of McKinney, a City of County, Texas, et. al.

Case 3:20-cv-00643-E  Document 31  Filed 03/04/21  Page 56 of 141  PageID 232

```
                        ** UNCERTIFIED DRAFT **
     1
     2      Q      To do that -- I'm not talking about this
     3   incident, but generally do you have to press a
     4   button on your radio to do that?
02:58  5      A      Yes, sir.
     6      Q      Okay.  So every time we hear your voice
     7   here, you're pressing a button and talking into
     8   your radio?
     9      A      Yes, sir.
02:58 10      Q      Is there -- if you wanted to communicate
    11   to dispatch, there a different button you press?
    12      A      No, sir.
    13      Q      Okay.  I didn't hear anything -- and
    14   granted, the recording is very soft, but, you
02:58 15   know, that's what we have.  I didn't hear anything
    16   in there about a license plate being read to
    17   dispatch.  Did you?
    18      A      No, sir.
    19      Q      Okay.  Is it possible that you didn't
02:58 20   radio dispatch with the license plate?
    21      A      No.  I read it to them.
    22      Q      Okay.  Did you hear anything in that
    23   recording about a fire lane?
    24      A      No, sir, that I can remember.
02:59 25      Q      All right.  Understood.
```

```
 1                  ** UNCERTIFIED DRAFT **

 2                  All right.  Let me -- I'm going to

 3       bring back up the surveillance video here, or

 4       the -- I'm sorry -- dashcam video.

02:59  5                  All right.  And I think we can just

 6       play it from here.  This is at 28 seconds.

 7               (Whereupon, video playback began.)

 8       BY MR. COYLE:

 9        Q      Okay.  There at about 35, 36 seconds, the

02:59 10       camera angle seems to switch.  Did you notice

11       that?

12        A      Yes, sir.

13        Q      Okay.  Do you do that manually?  Does that

14       happen automatically?

03:00 15        A      Manually.

16        Q      Okay.  So did you reach up and move the

17       camera?

18        A      Yes, sir.

19               (Whereupon, video playback began.)

03:00 20       BY MR. COYLE:

21        Q      Okay.  I'm going to stop it there.

22                  Can you hear the audio when I'm

23       playing that?

24        A      No.

03:01 25        Q      No.  Okay.
```

Deposition of Officer David Champagne - Brisco v. City of Mesquite, Texas, et al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 58 of 141 PageID 234

```
                        ** UNCERTIFIED DRAFT **

  1

  2                   Do you know -- I guess Officer Lemoine

  3       has just asked Mr. Brisco to get out of his car.

  4       Is that fair to say it happened somewhere around

03:01  5  this point?

  6        A      Yes, sir.

  7        Q      Did you instruct Officer Lemoine to order

  8       Mr. Brisco out of his car?

  9        A      Yes, sir.

03:01 10   Q      What was the basis for that?

 11        A      Because there was narcotics right there in

 12       plain view.

 13        Q      Okay.

 14               (Whereupon, video playback began.)

03:01 15  BY MR. COYLE:

 16        Q      You see the vehicle just backed up out of

 17       sight.  How far past the front edge of your squad

 18       car here does the vehicle back up?

 19        A      I don't know.

03:01 20   Q      When you take off running, are you trying

 21       to go around the passenger's side of Mr. Brisco's

 22       car to get to your squad car?

 23        A      I'm trying to get to my passenger's side

 24       of my squad car.

03:02 25   Q      Okay.  But as his vehicle's moving, you
```

Deposition of Michael Champ Deposition of Mason of Matagorda County, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 59 of 141 PageID 235

```
1                    ** UNCERTIFIED DRAFT **

2         know, are you intending to go directly to your car

3         around his car to your car, or are you having any

4         thoughts about that at the time?

03:02  5          A      I -- I remember my only thought was to

6         get -- get back to my squad car, and I don't know

7         any of the fine details on that.

8          Q      Okay.  So I guess -- let me edit my

9         sharing here.  We'll go back.

03:03  10                Let me know if you can hear the sound

11        now.

12                 (Whereupon, video playback began.)

13        BY MR. COYLE:

14         Q      Can you hear that?

03:03  15          A      Yes, sir.

16                 MR. KLEMENT:  I can hear it, but I

17             can tell you, John, on my end it's a

18             little bit echoey.  I don't know if Zach's

19             hearing it too.

03:03  20                 MR. COYLE:  All right.  Let me turn

21             it up some, see if that helps.

22                 (Whereupon, video playback began.)

23        BY MR. COYLE:

24         Q      Okay.  I'm stopping it at 1:21.

03:03  25                 At this point in time, it sounds like
```

```
                    ** UNCERTIFIED DRAFT **
 1

 2      someone goes off the radio and goes over the radio

 3      and says shots fired.  Did you hear that?

 4       A      Yes, sir.

03:03  5       Q      Okay.  Was that you?

 6       A      I don't know.

 7       Q      Okay.  Do you know if, at this point in

 8      time, you had discharged your weapon yet?

 9       A      Yes, sir.  After that call came out, I

03:04  10     already had.

11       Q      Okay.

12              (Whereupon, video playback began.)

13      BY MR. COYLE:

14       Q      Okay.  I stopped it again at 132.

03:04  15             This is you kneeling in a driveway?

16       A      Yes, sir.

17       Q      Okay.  Is this about where you fell off

18      the vehicle?

19       A      I couldn't per se -- I couldn't tell you

03:04  20     how far -- exactly where I fell off.

21       Q      Okay.  What injuries did you suffer as a

22      result of this incident?

23       A      Road rash on my arms, knees, and a

24      shoulder tear.

03:05  25       Q      What do you mean by "shoulder tear"?
```

APPX 00052

** UNCERTIFIED DRAFT **

2  A   It -- I don't know the exact -- I got,

3  like, a 10 percent tear in my shoulder.

4  Q   Okay.  And rotator cuff or something like

03:05  5  that?

6  A   Yes, sir.  I don't know the actual --

7  Q   Okay.

8  A   -- names.

9  Q   All right.  I'm going to take down this

03:05  10  video.

11       Officer, did you give a statement to

12  the Texas Rangers in relation to this incident?

13  A   Yes, sir.

14  Q   I want to show you this document now.

03:05  15  We'll mark this, actually, as -- how do you

16  pronounce your last name?  I'm so sorry.

17  A   "Beauchamp."

18  Q   "Beauchamp."  Every time I look at it, I

19  don't remember.  It just doesn't click for me.

03:06  20  I'm sorry.

21  A   I've lived with it my whole life.

22  Q   Okay.  So this is the typed version of

23  your statement included in the Texas Rangers

24  report.  I'd like to show it to you and have you

03:06  25  briefly read it.  Okay?

```
       1                  ** UNCERTIFIED DRAFT **

       2                  MR. COYLE:  And we're going to mark

       3             this as Beauchamp 1.  Becky, I will email

       4             that to you.

03:06  5                  (Beauchamp Exhibit 1 marked.)

       6        BY MR. COYLE:

       7         Q      Can you read that, Officer?

       8         A      I got to figure out how to move all these

       9        faces off of it.

03:06  10                 All right.  Yes, sir, I can see it.

       11        Q      Okay.  This is an 3/23/2018 at

       12       approximately 2:44 p.m., I secured a signed, sworn

       13       affidavit from LPD officer Zachary Beauchamp -- I

       14       got it that time -- the following is a verbatim

03:06  15       copy, and it relays your affidavit.

       16                 Do you see that?

       17        A      Yes, sir.

       18        Q      Okay.  Let me scroll down.  I just want

       19       you to take a look at it.

03:07  20                 Does that look like what was included

       21       in your affidavit to the Texas ranger?

       22        A      Yes, sir.

       23        Q      Did you have the assistance of counsel in

       24       preparing this affidavit?

03:07  25                 MR. KLEMENT:  I'm going to object
```

APPX 00054

```
              1              ** UNCERTIFIED DRAFT **
              2          just to say, Zach, you can generally
              3          answer the question, but I would instruct
              4          you against offering any specific
03:07         5          communications you had with counsel.
              6     BY MR. COYLE:
              7      Q      Yeah.  To be more specific, officer, I
              8     just want to know if you consulted with counsel in
              9     preparing this.  I don't want to know what you
03:07        10     said or what was discussed or anything like that.
             11     Just whether you consulted with counsel in
             12     preparing this?
             13      A      Yes, I did.
             14      Q      Okay.  And was it Mr. Klement or a
03:07        15     different counsel?
             16      A      I guess I have two.
             17      Q      Okay.  It was -- okay.
             18             Okay.  Let me take that down.
             19             Officer, in reflecting on the incident
03:08        20     with Mr. Brisco, do you think there's anything
             21     that you would have done differently, given
             22     another opportunity?
             23             MR. KLEMENT:  Objection; form.
             24     BY MR. COYLE:
03:08        25      Q      You can answer.
```

```
 1                    ** UNCERTIFIED DRAFT **

 2        A      No, sir.

 3        Q      Do you know how long -- strike that.

 4               My understanding is Officer Lemoine's

 5        not in Lancaster working for the Lancaster Police

 6        Department at this point in time.  Is that your

 7        understanding as well?

 8        A      Yeah.  That's fair to say.

 9        Q      Okay.  Do you know when he left -- when he

10        left town?

11        A      No, sir.

12        Q      Okay.  All right.  Okay.  I'm going to

13        take a minute and go through my notes, see if I

14        have any more questions for you.  In the meantime,

15        Chris might have some questions for you.  All

16        right?

17        A      Yes, sir.

18               MR. KLEMENT:  John, real quick, are

19            you passing or are we going on break for a

20            couple minutes for you to review your

21            notes.

22               MR. COYLE:  Well, I -- I just want

23            to make sure I don't have anything else.

24            You can ask him stuff in the meantime if

25            you want, or if you want me to conclude
```

03:08  5
03:09 10
03:09 15
03:09 20
03:09 25

```
                        ** UNCERTIFIED DRAFT **
 1
 2               then we can just take a break and you can
 3               do that.
 4                    MR. KLEMENT:  Well, it's -- I may
03:09  5         have questions for him, but let's -- I'd
 6               obviously like to be able to ask whatever
 7               questions in response to whatever you're
 8               asking.
 9                    MR. COYLE:  Sure.
03:09 10              MR. KLEMENT:  So why don't we take
11               a five-minute break for you to review your
12               notes.  If at that time you want to
13               continue to question, fine.  If not, then
14               we'll pass and I'll start questioning.
03:09 15         Sounds good to me.  All right, officer.
16               We'll take a little five-minute break here
17               and I'll see if I have anything else for
18               you.  All right.
19                    THE VIDEOGRAPHER:  The time is
03:10 20         3:09 p.m.  We are now off the record.
21                    (Recess from 3:10 p.m. to 3:13 p.m.).
22                    THE VIDEOGRAPHER:  We are back on
23               the record.  The time is 3:13 p.m.
24        BY MR. COYLE:
03:13 25         Q       Okay.  Officer Beauchamp, I just -- I just
```

                         ** UNCERTIFIED DRAFT **

  2    have one sort of additional area that I want to

  3    get into that -- I don't know if I really

  4    understood it?

03:13  5    Q      It sounds like there's you and at least

  6    one other marked unit out there looking for

  7    Mr. Pugh; is that fair to say?

  8    A      Yes, sir.

  9    Q      Do you remember how many other units were

03:14  10    out there?

  11    A      I don't know -- I know for sure there was

  12    Lieutenant Fine, Sergeant Logan, Brian Pate, and

  13    us -- me and Lemoine.  So that's the only ones I

  14    remember out there.

03:14  15    Q      So is that two other cars or three other

  16    cars?

  17    A      There was us and Brian Pate were stayed --

  18    that's two cars.  We were the closest together.

  19    And then the lieutenant and the sergeant were

03:14  20    somewhere else, but they were in the area.

  21    Q      Okay.  When you were checking out this

  22    quick stop where you thought Mr. Pugh was, had you

  23    planned to -- was that a planned surveillance

  24    operation?  Had you discussed that before your

03:15  25    shift?

|   |   |
|---|---|
|   | 1 |
|   | 2 |
|   | 3 |
|   | 4 |
| 03:15 | 5 |
|   | 6 |
|   | 7 |
|   | 8 |
|   | 9 |
| 03:15 | 10 |

** UNCERTIFIED DRAFT **

1

2      A      No, sir.  No, sir, it wasn't planned.

3      Q      Okay.  Was it -- how did it come about?

4      A      We had briefing every day before shift,

5  and so if there's certain intelligence that's

6  passed along, be on the lookout for, stuff like

7  that.

8      Q      Okay.  So -- so you think that they had

9  told you to be on the lookout for Mr. Pugh?

10      A      Yes, sir.

11      Q      Okay.  And when you say it was you and one

12  other vehicle that were directly there and then

13  two more in the vicinity, what do you mean by, you

14  know, "the vicinity"?  What do you mean by nearby?

15      A      I know that Sergeant Logan was at the Food

16  Mart at one time with us when we checked that.  I

17  know Lieutenant Fine was in the area.  He might

18  have been in the 7-Eleven, which was across the

19  pleasant run just south of the location.

20      Q      Okay.  Did he have any plain clothes or

21  under cover officers near the location?

22      A      Not that I -- to my knowledge.

23      Q      Okay.

24              MR. COYLE:  Okay.  I don't have any

25          more questions.  Chris may have some

```
              1                    ** UNCERTIFIED DRAFT **

              2          follow-up from you.

              3               MR. KLEMENT:  Before I get into the

              4          follow-up questions, on the record, I'm

03:16         5          requesting a read and review of the

              6          transcript of the deposition.

              7                          EXAMINATION

              8   BY MR. KLEMENT:

              9    Q      Officer Beauchamp, I have a few questions

03:16        10   to clarify with you.

             11               Earlier you spoke about observing the

             12   white SUV in the fire lane.  Did you personally

             13   observe that?

             14    A      Yes.

03:17        15    Q      Was there any other way that you were made

             16   aware of the white SUV?

             17    A      Yes, sir.  Officer Brian Pate acknowledged

             18   it.

             19    Q      And when you say acknowledged, what do you

03:17        20   mean?

             21    A      He came over the radio and said hey, do

             22   you see the white car over there?  And he's the

             23   one that called out no front license plate on the

             24   car.

03:17        25    Q      When you observed the white SUV -- and for
```

Deposition of Officer Beauchamp Document 31 Filed 03/04/21 of Marcus Bosch v. City of Irving, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 69 of 141 PageID 245

1                    ** UNCERTIFIED DRAFT **

2       the sake of clarity, when he say white SUV, are

3       you referring to Mr. Brisco's white SUV?

4          A       Yes, sir.

03:17   5          Q       When you observed Mr. Brisco's white SUV

6       when you were still driving on Dewberry, were you

7       able to see Mr. Brisco watching police cars?

8          A       Yes, sir.

9          Q       Was there any significance to that to you?

03:17   10         A       Yeah, just very strange.  Most people

11      don't normally watch cop cars in that manner.

12         Q       Earlier you had mentioned that Mr. Brisco

13      also had a cell phone with him watching the

14      vehicles with the cell phone.  Was that of any

03:18   15      significance to you?

16         A       Yeah.  I didn't know -- I didn't know if

17      there was a relation to the car and the --

18      Mr. Pugh's subject at the time, if he was maybe

19      calling him and telling him the cops were in the

03:18   20      area or whatever.  That was my initial thoughts.

21         Q       Separate and aside from Mr. Brisco

22      specifically, have you -- do you have any

23      experience working, you know, drug and addiction

24      or anything along those lines?

03:18   25         A       Yes, sir.

Deposition of Officer Kolton Champ Roughton of McAllen Police City of McAllen Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 70 of 141 PageID 246

** UNCERTIFIED DRAFT **

Q     When it comes to, you know, lookouts in those sort of situations, what sort of behavior do you commonly observe?

03:18   A     One of the most common -- the easiest communication is to pick up a cell phone, communicate and let people know what's in the area.

Q     And in those sort of issues, who's usually the person that's picking up the phone and making people aware of police in the area?

A     People that are engaged in criminal activity.

Q     Now, earlier you talked about the apartments where Mr. Brisco's white SUV was located, and you -- I believe you mentioned to Mr. Coyle that that's sort of known as a place where criminal activity occurs.  Are you aware of any sort of drug -- drug dealing or drug activity that occurs there?

A     Yes, sir.  We constant -- or I don't want to say constantly.  Multiple times drug arrests have been made there.  We've had a lot of robberies or narcotics transactions, shootings over narcotic transactions.  It's a known area for

Deposition of Officer Robert Champ Dougherty, 30(b)(6) of City of Mesquite, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 71 of 141 PageID 247

** UNCERTIFIED DRAFT **

2    that.

3    Q    I'd like to move forward and talk with you

4    a little bit about the initial stop of Mr. Brisco.

03:19  5    When you were reviewing the audio

6    files for dispatch and Mr. Coyle asked you if you

7    heard anything about the fire lane in that audio,

8    do you remember discussing that with Mr. Coyle?

9    A    Yes.

03:20  10    Q    Is it your common practice to announce

11    your reasonable suspicion for a traffic stop over

12    dispatch?

13    A    No.

14    Q    Moving forward into the stop, when you

03:20  15    made your decision to instruct Officer Lemoine to

16    ask Mr. Brisco to step out of his vehicle, what

17    motivated that decision for you?

18    A    The -- reaching, the nervousness, reaching

19    from the door pocket to the center console and the

03:20  20    narcotics in plain view.

21    Q    Would you say that the presence of

22    narcotics in plain view gave you reasonable

23    suspicion to prolong the stop?

24    A    Yes, sir.

03:21  25    Q    When you described Mr. Brisco as acting

```
                    ** UNCERTIFIED DRAFT **
 1
 2      nervous, would you mind describing that a little
 3      bit?
 4      A      As you see, he opens the door, gets out,
 5      and he's very fast talking, and then there's a lot
 6      of moving around in the car.  Those are some of
 7      the signs that we had learned over the years.
 8      Q      In your experience as a law enforcement
 9      officer, is it -- is it common for somebody to
10      open the door immediately before the officers
11      arrive at the vehicle?
12      A      No, sir, it's not common.
13      Q      How would you expect somebody to react to
14      an ordinary traffic stop?
15      A      Keep the door closed, roll the window
16      down.
17      Q      Now, moving forward, you discussed your
18      motivation for running back to the -- to your
19      patrol car.  One of the things that you mentioned
20      was hard to cover.  Would you mind describing what
21      hard cover is?
22      A      Hard cover is described as something --
23      you never know at the incident what's going to
24      take place.  So hard cover is what we consider
25      if -- worst case scenario, a shooting takes place
```

03:21  5
03:21  10
03:21  15
03:22  20
03:22  25

Deposition of Police Officer Luke Schilcamp Document 31    Filed 03/04/21 of Mesquite 73 of 141 City department, Texas, et. al.

Case 3:20-cv-00643-E Document 31    Filed 03/04/21    Page 73 of 141    PageID 249

** UNCERTIFIED DRAFT **

2    or something, we have hard cover to protect

3    ourselves.  It's a solid protection of you.

4    Q    Can hard cover be used to protect you from

03:22  5    an assault by a vehicle?

6    A    Yes.

7    Q    Now, at the time you were running back to

8    your -- to your patrol car, did you have any

9    concern that you might need hard cover from this

03:22  10    incident?

11    A    If he continued driving in reverse, yes,

12    sir.

13    Q    As the -- earlier you testified to the

14    fact that the vehicle struck you.  After you were

03:23  15    struck by Mr. Brisco's vehicle, did he accelerate,

16    decelerate?  How would you describe his driving?

17    A    Rapidly accelerating.

18    Q    Did he accelerate in a straight line?

19    A    No.  He turned with -- out of the parking

03:23  20    lot northbound on to Dewberry.

21    Q    Were you on the vehicle the entirety of

22    the time that he was pulling out of the parking

23    lot and turning right on to Dewberry?

24    A    Yes, sir.

03:23  25    Q    When you were on the hood of his vehicle

Case 3:20-cv-00643-E   Document 31   Filed 03/04/21   Page 74 of 141   PageID 250

```
1                ** UNCERTIFIED DRAFT **

2        and before you made the decision to discharge your

3        weapon, what was going through your mind?

4           A      That it's about to suck.  About to die.

03:23  5           Q      When you say you're "about to die," were

6        you -- were you in fear for your life?

7           A      Yes, sir.

8           Q      Were you -- were you in fear of serious

9        bodily injury?

03:24  10           A      Yes.

11           Q      When you turned on to Dewberry with still

12        being on the hood of the vehicle, did Mr. Brisco

13        make any attempt to stop the car or slow down or

14        anything along those lines with you on the hood of

03:24  15        the car?

16           A      No, sir.

17           Q      How would you describe his driving once he

18        turned on to Dewberry?

19           A      Pegged out, is what I call it.  The engine

03:24  20        was revved.  I remember that.  You could hear --

21        you couldn't hear anything over the motor.

22           Q      So you could hear the revving of the

23        motor?

24           A      Yes, sir.

03:24  25           Q      And in your experience, did that indicate
```

Deposition of Officer Richard Kemp Brought on Behalf of Margo Frasier, City of Austin Texas, et. al.

Case 1:20-cv-00643-E Document 31   Filed 03/04/21   Page 75 of 141   PageID 251

```
 1              ** UNCERTIFIED DRAFT **

 2      that the vehicle was accelerating?

 3       A      Yes, sir.

 4       Q      Would you mind describing, you know, the

03:25  5      moment that you were -- that you were hit by

 6      Mr. Brisco's vehicle?

 7       A      It was -- the only other option go on the

 8      hood or go underneath it, and that was -- those

 9      were my only two options.

03:25  10      Q      Now, when you say on the hood, are you

 11      referring to rolling up on the hood after you were

 12      struck?

 13       A      Yes, sir.

 14              MR. KLEMENT:  Pass the witness.

03:25  15              MR. COYLE:  I have no follow-up

 16          questions.  Thanks for your time today,

 17          officer.  We appreciate you coming in.

 18              THE VIDEOGRAPHER:  The time is

 19          3:25 p.m. we are now off the record.

03:25  20          (Off the record at 3:25 p.m.)

 21

 22

 23

 24

 25
```

## WORD INDEX

**< 0 >**
**0** 29:*21* 30:8
**00** 29:*21* 30:*9*
**00011** 34:*20* 36:*15*
**0009** 29:*4*
**0009.mp4** 29:*20*

**< 1 >**
**1** 48:*3, 5*
**1:04** 34:*24, 25*
**1:21** 45:*24*
**10** 20:*14* 47:*3*
**100** 20:*3*
**11** 7:*24*
**132** 46:*14*
**15** 39:*16*
**18th** 4:*9* 11:*16* 13:2, 21

**< 2 >**
**2:02** 2:*20* 3:*3, 7*
**2:24** 36:*15*
**2:44** 36:2, *3* 48:*12*
**2:49** 36:*3, 5*
**2:51** 37:*12*
**20** 7:*22* 9:*22* 20:7
**2007** 7:*12*
**2009** 9:*23*
**2010** 9:*23, 24*
**2013** 7:*15*
**2018** 4:*9* 11:*16* 13:2, *19, 21*
**2021** 2:*13, 20* 3:6
**23rd** 4:8
**24** 2:*13, 20* 32:8, *19*
**24th** 3:6
**25** 24:*10*
**28** 43:6

**< 3 >**
**3/23/2018** 48:*11*
**3:09** 51:*20*
**3:10** 51:*21*
**3:13** 51:*21, 23*
**3:20-cv-00643-E** 2:*6* 3:*14*
**3:25** 2:*20* 61:*19, 20*

**32** 7:5
**342** 38:*5*
**35** 43:*9*
**36** 43:*9*
**37** 29:*25*

**< 4 >**
**4:14** 39:*2* 40:*9*
**4:51** 39:*15*
**45** 35:*16*

**< 5 >**
**5:23** 39:*20* 40:*10, 18*
**50** 20:*3* 24:*10* 26:*13*

**< 6 >**
**6:00** 16:*10, 11*
**600** 15:*3*

**< 7 >**
**7-Eleven** 53:*18*

**< 8 >**
**80** 17:*20*

**< A >**
**able** 17:*16* 35:*12* 36:*8, 9, 20* 37:*14* 51:*6* 55:*7*
**abnormal** 22:*24*
**above-styled** 2:*19*
**academy** 9:*11, 15, 17* 10:*2*
**accelerate** 59:*15, 18*
**accelerating** 59:*17* 61:*2*
**accept** 8:*2*
**acceptable** 6:*2*
**accurate** 18:*17* 22:*15*
**accurately** 6:*8*
**acknowledged** 54:*17, 19*
**acting** 25:7 57:*25*
**active** 12:*10*
**activity** 56:*13, 18, 19*
**actual** 20:8 47:*6*
**addiction** 55:*23*
**additional** 52:*2*
**Administrator** 2:*4*
**advanced** 35:*11*

**affidavit** 48:*13, 15, 21, 24*
**afraid** 35:*6*
**afternoon** 4:5
**aggravate** 17:*13*
**ago** 10:*15*
**al** 2:7 3:*11*
**alcohol** 6:*6*
**AND/OR** 1:*17*
**angle** 31:*22* 32:*24* 43:*10*
**announce** 57:*10*
**answer** 5:*10, 11, 21* 6:2 13:*15* 28:*10* 49:*3, 25*
**anticipate** 5:*9*
**apartment** 18:*16, 25* 19:*3, 18* 20:*6, 20, 23* 21:*18* 22:2 26:*11*
**apartments** 56:*15*
**APPEARING** 1:*13* 3:*19*
**appears** 17:*22*
**appreciate** 61:*17*
**approached** 12:*20*
**approximately** 48:*12*
**area** 18:*10, 12* 21:*12* 25:*17* 52:2, *20* 53:*17* 55:*20* 56:8, *11, 25*
**areas** 37:*5*
**arising** 4:7
**arms** 46:*23*
**arrests** 56:*22*
**arrive** 58:*11*
**aside** 55:*21*
**asked** 12:*20* 44:*3* 57:6
**asking** 16:2 51:8
**assault** 59:*5*
**assistance** 48:*23*
**assume** 9:*11*
**attempt** 60:*13*
**attention** 37:*21*
**audio** 15:*12* 16:5 17:*21* 34:*18* 35:*10, 13* 36:*16* 38:7 39:*3, 18* 43:*22* 57:*5, 7*
**automatically** 43:*14*
**aware** 15:*14* 54:*16*

**56:*11, 18*

**< B >**
**back** 5:*12* 15:*11* 17:*23* 23:*23, 24* 25:*6, 22* 27:*4* 28:5 36:*11* 38:*13, 20* 43:*3* 44:*18* 45:*6, 9* 51:*22* 58:*18* 59:*7*
**backed** 34:*9* 44:*16*
**backtrack** 16:*4* 30:6
**bands** 27:7, *9, 10*
**bar** 10:7
**based** 29:8
**basis** 23:*12, 17* 44:*10*
**BEAUCHAMP** 2:*12, 17* 3:*9, 24* 4:5 6:*18* 47:*17, 18* 48:*3, 5, 13* 51:*25* 54:*9*
**B-e-a-u-c-h-a-m-p** 6:*19*
**Becky** 3:*18* 48:*3*
**began** 29:*22* 30:*10* 32:5 33:*20* 36:*16* 38:7 39:*3, 18* 43:7, *19* 44:*14* 45:*12, 22* 46:*12*
**beginning** 14:*22* 16:*15, 17* 30:8
**behavior** 13:*12* 56:*3*
**belief** 32:*16*
**believe** 12:*4* 17:6 21:*3* 25:*5, 9* 35:*10* 56:*16*
**best** 14:*5*
**better** 8:*4* 33:*19, 22*
**bit** 10:6 37:*10* 39:*24* 40:*4* 45:*18* 57:*4* 58:*3*
**block** 11:2 15:*3* 23:*22* 32:*20* 34:*12* 37:*25*
**blocking** 24:*18*
**bodily** 60:*9*
**body** 13:*18, 22* 14:*7, 19* 15:*8, 13, 15* 23:*5* 26:*24*
**body-worn** 13:*18* 14:*4, 10*
**box** 34:*5*

**break** 5:17, 21  35:17
39:9  50:19  51:2, 11,
16
**Brian** 52:12, 17
54:17
**brief** 10:21
**briefing** 53:4
**briefly** 47:25
**bring** 43:3
**BRISCO** 2:4  3:10
4:7  17:4  18:15  19:9
27:20  30:4, 18  31:4,
9, 13, 24  32:25  37:3
38:16  44:3, 8  49:20
55:7, 12, 21  57:4, 16,
25  60:12
**Brisco's** 32:8  37:20
44:21  55:3, 5  56:15
59:15  61:6
**broke** 9:13
**brothers** 36:23
**buildings** 19:4
**bumper** 33:15
**button** 41:16, 19
42:4, 7, 11

**< C >**
**call** 16:19, 23  27:10
39:25  41:19  46:9
60:19
**called** 11:2  54:23
**calling** 27:9  40:11
55:19
**camera** 13:19, 22
14:4, 7, 10, 20  15:8,
13, 15  30:21  31:3, 10,
21  43:10, 17
**cameras** 13:18
**car** 15:4  19:10, 13,
23  23:5  24:24  25:17,
20, 23, 24  27:15, 24
28:5, 13, 17  30:3
32:8, 9  33:15  41:5
44:3, 8, 18, 22, 24
45:2, 3, 6  54:22, 24
55:17  58:6, 19  59:8
60:13, 15
**cars** 22:14  23:21
24:20  52:15, 16, 18

55:7, 11
**Case** 2:5  3:14  58:25
**cause** 2:19
**cautiously** 23:9
**cell** 55:13, 14  56:6
**center** 10:6  25:14,
17  57:19
**central** 3:7
**certain** 53:5
**CERTIFIED** 1:2, 6,
10, 14, 19
**channel** 27:12, 17
**channels** 27:9, 11, 13
**charges** 8:25
**checked** 53:16
**checking** 37:5  52:21
**Chris** 14:6  29:3
50:15  53:25
**CITE** 1:22
**CITED** 1:4
**CITY** 2:7  3:11  6:22
7:2, 20  8:12, 15  9:7
17:13
**city's** 10:23  11:7
**Civil** 2:24  9:4  10:12
11:13
**clarify** 54:10
**clarity** 55:2
**click** 47:19
**close** 24:9
**closed** 58:15
**Closer** 8:3
**closest** 52:18
**clothes** 53:20
**Cockrell** 7:20
**college** 9:18, 20
**COMBINATIONS**
1:18
**come** 19:8  23:23, 24
39:21  53:3
**comes** 41:14  56:2
**coming** 12:21  32:14
61:17
**common** 56:5  57:10
58:9, 12
**commonly** 56:4
**communicate** 5:3
27:8  42:10  56:7
**communicating** 18:10

**communication** 4:25
41:22  56:6
**communications** 49:5
**complaint** 15:3, 19,
24  16:18
**completed** 7:7
**complex** 18:16, 25
19:3, 19  20:21, 23
21:18  22:2  26:11
**concern** 59:9
**conclude** 50:25
**condition** 6:6
**connects** 19:22
**consider** 58:24
**console** 25:14, 17
57:19
**constant** 56:21
**constantly** 30:22
41:17  56:22
**consulted** 49:8, 11
**contact** 15:11  24:13
**CONTAIN** 1:16
**continue** 51:13
**continued** 59:11
**CONTRADICT** 1:6
**conversation** 15:17
25:15  29:8  36:25
**cook** 36:23
**coordinator** 12:19
**cop** 55:11
**copper** 8:7
**cops** 55:19
**copy** 48:15
**correct** 9:12  11:24
17:7  40:12
**CORRECTED** 1:9,
14, 18
**correctly** 12:23  38:14
**counsel** 3:19  5:18
6:14  48:23  49:5, 8,
11, 15
**couple** 29:7, 16
34:14  36:19  50:20
**COURT** 1:22  2:2
3:12, 16, 17, 18, 21
4:19, 22
**cover** 28:17  53:21
58:20, 21, 22, 24  59:2,
4, 9

**COYLE** 4:4, 6  13:14
14:6, 14, 17, 18  16:7
23:16  28:11  29:2, 5,
19, 23  30:11  32:6
33:21  34:19  35:6, 19
36:6, 14, 17  38:4, 8,
24  39:8, 11, 19  41:2,
10  43:8, 20  44:15
45:13, 20, 23  46:13
48:2, 6  49:6, 24
50:22  51:9, 24  53:24
56:17  57:6, 8  61:15
**create** 23:12
**crime** 20:23
**criminal** 8:25  15:2,
18, 24  16:18, 22
56:12, 18
**CRR** 2:22
**CSR** 2:21
**cuff** 47:4
**curb** 33:3
**curious** 28:13
**current** 6:21
**currently** 17:12
**custody** 18:6

**< D >**
**dash** 30:21  31:3
**dashcam** 28:22  43:4
**date** 3:5  11:22  14:3
**day** 14:20, 21  16:8
53:4
**days** 14:20
**deal** 11:9  28:6
**dealing** 56:19
**decelerate** 59:16
**decide** 15:7
**decision** 28:14  57:15,
17  60:2
**defendant** 10:11
11:13
**Defendants** 2:8
**Defense** 29:4, 20
34:20  36:15
**Department** 7:14, 17
8:8  12:3  13:10, 12
50:6
**depends** 20:11

**DEPOSITION** 2:*12,
16* 3:*9* 4:*10* 6:*14*
14:*13* 54:6
**describe** 20:*5* 22:*25*
26:*23* 59:*16* 60:*17*
**described** 57:*25*
58:22
**describing** 58:*2, 20*
61:*4*
**details** 45:7
**Dewberry** 18:*24*
19:*2, 15, 16, 21, 22, 23*
20:*2, 7, 9, 16* 21:25
22:*3, 6, 9, 10, 11*
23:22 30:*15, 16* 31:8
55:6 59:*20, 23* 60:*11,
18*
**die** 60:*4, 5*
**different** 7:*17* 17:25
27:*15* 42:*11* 49:*15*
**differently** 49:*21*
**difficult** 33:*12*
**direction** 31:*14* 37:22
**directly** 18:*2* 33:*3*
45:*2* 53:*12*
**discharge** 24:*24*
26:*4* 40:*11* 60:2
**discharged** 11:*17*
26:*15, 18* 46:8
**discharging** 26:*24*
**DISCREPANCIES**
1:*7*
**DISCREPANCY** 1:*12*
**discussed** 49:*10*
52:*24* 58:*17*
**discussing** 40:*20* 57:8
**dispatch** 25:*10* 27:*5,
16* 41:*12* 42:*11, 17,
20* 57:*6, 12*
**distribution** 10:*6*
**DISTRICT** 2:*2* 3:*12,
13*
**document** 47:*14*
**door** 25:*5, 16* 30:*3*
57:*19* 58:*4, 10, 15*
**DRAFT** 1:*1, 4, 13, 16,
21* 2:*1, 12, 16* 3:*1*
4:*1* 5:*1* 6:*1* 7:*1* 8:*1*
9:*1* 10:*1* 11:*1* 12:*1*
13:*1* 14:*1* 15:*1* 16:*1*

17:*1* 18:*1* 19:*1* 20:*1*
21:*1* 22:*1* 23:*1* 24:*1*
25:*1* 26:*1* 27:*1* 28:*1*
29:*1* 30:*1* 31:*1* 32:*1*
33:*1* 34:*1* 35:*1* 36:*1*
37:*1* 38:*1* 39:*1* 40:*1*
41:*1* 42:*1* 43:*1* 44:*1*
45:*1* 46:*1* 47:*1* 48:*1*
49:*1* 50:*1* 51:*1* 52:*1*
53:*1* 54:*1* 55:*1* 56:*1*
57:*1* 58:*1* 59:*1* 60:*1*
61:*1*
**draw** 33:*13*
**driveway** 46:*15*
**driveways** 19:*5*
**driving** 15:*19* 19:*16*
20:*9, 18* 21:*3, 11, 14,
16, 17* 32:*13* 55:6
59:*11, 16* 60:*17*
**drug** 6:*6* 55:*23*
56:*19, 22*
**duly** 2:*18* 3:*23, 25*
**duty** 12:*10*

**< E >**
**Earlier** 54:*11* 55:*12*
56:*14* 59:*13*
**easiest** 56:*5*
**east** 18:*25*
**echoey** 45:*18*
**edge** 34:*5* 44:*17*
**edit** 45:*8*
**EDITED** 1:*9, 14*
**education** 7:*6*
**effect** 40:*5*
**email** 48:*3*
**employer** 6:*21*
**en** 15:*18*
**ends** 37:*16*
**enforcement** 58:*8*
**engaged** 56:*12*
**engine** 60:*19*
**enroll** 9:*21*
**entirety** 59:*21*
**ENTRIES** 1:*18*
**equipment's** 28:*18*
**equipped** 13:*18*
**ESTATE** 2:*4* 3:*10*
4:*6*

**et** 2:*7* 3:*11*
**evade** 25:*22*
**Everest** 3:*15, 18*
**exact** 13:*4* 16:*14*
25:*7* 47:2
**exactly** 34:*24* 46:*20*
**EXAMINATION** 4:*3*
54:*7*
**executing** 10:*24*
**exhibit** 29:*3* 48:*5*
**exit** 34:*5*
**expect** 58:*13*
**experience** 55:*23*
58:*8* 60:*25*
**explain** 18:*20*
**extent** 14:*9*

**< F >**
**faces** 48:*9*
**facility** 18:*16*
**facing** 22:*9, 11*
**fact** 59:*14*
**fair** 5:*22* 13:*6* 19:*6*
22:*5* 40:*21* 41:*6, 23*
44:*4* 50:*8* 52:7
**fall** 26:6
**far** 7:*21* 12:*24*
17:*18* 19:*21, 23* 24:7
26:*9* 44:*17* 46:*20*
**Farming** 10:*5*
**fast** 20:*10, 13* 58:*5*
**fear** 60:*6, 8*
**February** 2:*13, 20*
3:*6*
**Federal** 2:*23*
**Feet** 19:*25* 20:*3, 4, 7*
24:*9, 10*
**fell** 46:*17, 20*
**fellow** 12:*20*
**Ferris** 7:*10*
**figure** 48:*8*
**figured** 35:*23*
**file** 35:*14*
**files** 57:6
**FINAL** 1:*7, 14, 19*
**FINALIZED** 1:*9*
**fine** 5:*19* 45:*7*
51:*13* 52:*12* 53:*17*
**fingers** 26:*25*
**finish** 5:*10*

**fire** 19:*10, 13, 18, 21,
24* 21:*4, 8* 22:*5, 8*
23:*19* 24:*18, 21*
30:*18* 31:*4, 9, 13, 23*
32:*12, 17, 24* 42:*23*
54:*12* 57:7
**firearm** 11:*17* 26:*15,
18*
**fired** 39:*25* 40:*21*
46:*3*
**first** 3:*25* 4:*13, 18,
24* 16:*19* 18:*14* 23:*3*
29:*25* 31:*5, 9, 12*
34:*3, 8* 37:*19, 21*
40:*9, 20* 41:*4*
**five** 34:*14* 35:*22*
**five-minute** 51:*11, 16*
**fleeing** 28:7
**follow** 23:*3* 33:*15*
**following** 48:*14*
**follows** 3:*25*
**follow-up** 54:*2, 4*
61:*15*
**Food** 17:*7, 18* 18:*23*
19:*9* 31:*18* 53:*15*
**footage** 14:*8* 31:*3*
**force** 11:*10* 12:*25*
**FORM** 1:*7, 8* 13:*13*
23:*15* 28:*8* 40:*23*
41:*8* 49:*23*
**forms** 4:*25*
**forth** 17:*23*
**forward** 25:*24* 57:*3,
14* 58:*17*
**frequent** 20:*20*
**front** 19:*4* 22:*13*
27:*25* 30:*2* 32:*9*
44:*17* 54:*23*
**full** 6:*17*
**further** 31:*13* 33:*6*

**< G >**
**gear** 25:*13*
**general** 13:*10, 11, 17*
**generally** 42:*3* 49:*2*
**give** 5:*11* 10:*21*
13:*3* 15:*7* 47:*11*
**given** 14:*19* 37:22
49:*21*

**go** 4:*15*, *16* 5:*12* 7:*9*
9:*14* 15:*24* 16:*5*
21:*21*, *24*, *25* 22:*13*,
*14* 23:*21* 25:*17*, *22*
26:*2* 27:*4* 34:*11*
35:*10*, *20* 36:*11*
40:*17*, *20* 41:*12*, *16*
44:*21* 45:*2*, *9* 50:*13*
61:*7*, *8*
**goes** 25:*24* 46:*2*
**going** 4:*15* 10:*2*
15:*2* 19:*14* 20:*10*, *13*
21:*12* 24:*15*, *17* 29:*2*,
*6*, *11*, *15* 32:*22* 34:*17*
35:*7* 37:*8*, *11* 38:*6*,
*12*, *20*, *22* 39:*14* 43:*2*,
*21* 47:*9* 48:*2*, *25*
50:*12*, *19* 58:*23* 60:*3*
**Good** 4:*5* 8:*6* 51:*15*
**gotten** 29:*25*
**governing** 13:*11*, *17*
**graduate** 7:*11*
**granted** 42:*14*
**grass** 33:*23*
**Graziano** 2:*21* 3:*18*
**Great** 6:*16* 35:*20*
**guard** 10:*8*
**guess** 15:*25* 26:*12*
32:*19* 44:*2* 45:*8*
49:*16*
**guessing** 24:*9*
**guy** 8:*23*

**< H >**
**half** 8:*17* 16:*25* 41:*3*
**handcuffs** 8:*24*
**happen** 26:*9* 35:*7*
43:*14*
**happened** 10:*18* 44:*4*
**happens** 24:*23*
**hard** 28:*17* 58:*20*, *21*,
*22*, *24* 59:*2*, *4*, *9*
**head** 4:*25* 39:*6*
**heading** 26:*4* 31:*14*
**hear** 25:*14* 35:*2*, *4*
36:*8*, *9*, *20* 37:*9*, *14*,
*17* 38:*14* 39:*15* 40:*2*
41:*4* 42:*6*, *13*, *15*, *22*
43:*22* 45:*10*, *14*, *16*
46:*3* 60:*20*, *21*, *22*

**heard** 39:*21*, *25*
41:*15* 57:*7*
**hearing** 39:*5* 45:*19*
**heavily** 18:*12*
**helps** 45:*21*
**Hey** 35:*15* 54:*21*
**High** 7:*8*, *9*, *10* 9:*22*,
*25*
**highest** 7:*6*
**Hill** 7:*20* 8:*7*
**hit** 10:*23* 11:*4* 61:*5*
**hold** 9:*25* 13:*7*
40:*15*
**holding** 26:*25*
**honest** 41:*13*
**hood** 26:*17* 27:*2*, *20*
59:*25* 60:*12*, *14* 61:*8*,
*10*, *11*
**hopefully** 37:*9*
**hot** 20:*23*
**hour** 16:*25* 17:*2*
20:*14*
**hours** 5:*16*
**house** 10:*24* 11:*4*
**huh-uh** 5:*2*
**human** 5:*8*

**< I >**
**idea** 35:*20*
**immediately** 17:*3*
58:*10*
**incident** 9:*2*, *5* 11:*16*,
*23* 12:*15* 13:*2* 14:*3*
37:*11* 42:*3* 46:*22*
47:*12* 49:*19* 58:*23*
59:*10*
**included** 47:*23* 48:*20*
**independent** 23:*12*
**INDEXED** 1:*9*
**indicate** 60:*25*
**indicating** 33:*5*, *8*, *16*,
*25* 34:*4*
**individual** 17:*6*
**initial** 55:*20* 57:*4*
**initiate** 41:*6*
**injuries** 46:*21*
**injury** 60:*9*
**instance** 2:*18*
**instruct** 44:*7* 49:*3*

*57:15*
**instructed** 25:*6*, *18*
**instructions** 4:*16*
**intelligence** 53:*5*
**intending** 45:*2*
**intention** 24:*12*
27:*25* 28:*4*
**interacted** 18:*15*
**interaction** 17:*4*
**interactions** 17:*14*
**interacts** 15:*10*
**interference** 16:*5*
**interrupt** 35:*9*
**investigating** 17:*24*
**involved** 4:*8* 10:*25*
**involves** 10:*22*
**issues** 56:*9*
**its** 22:*21* 28:*2*

**< J >**
**job** 8:*2*
**jobs** 9:*25* 10:*7*
**John** 4:*6* 35:*5*, *15*
39:*4* 45:*17* 50:*18*
**jump** 5:*9*

**< K >**
**keep** 4:*24* 37:*8*
58:*15*
**kind** 35:*18*
**KLEMENT** 13:*13*
14:*12*, *15* 23:*15* 28:*8*
35:*4*, *15* 39:*4*, *10*
40:*23* 41:*8* 45:*16*
48:*25* 49:*14*, *23*
50:*18* 51:*4*, *10* 54:*3*,
*8* 61:*14*
**kneeling** 46:*15*
**knees** 46:*23*
**knew** 17:*12* 25:*21*
**know** 5:*7*, *20* 11:*9*,
*10* 12:*7*, *10*, *11*, *24*
16:*14* 17:*23* 20:*5*
25:*9* 28:*13* 30:*12*
31:*11* 33:*2*, *11*, *13*
39:*4* 41:*14*, *18*, *19*
42:*15* 44:*2*, *19* 45:*2*,
*6*, *10*, *18* 46:*6*, *7* 47:*2*,
*6* 49:*8*, *9* 50:*3*, *9*
52:*3*, *11* 53:*14*, *15*, *17*

55:*16*, *23* 56:*2*, *7*
58:*23* 61:*4*
**knowledge** 14:*5*
53:*22*
**known** 56:*17*, *25*

**< L >**
**LANCASTER** 2:*7*
3:*11* 6:*22* 7:*2*, *14*, *21*
8:*2*, *14* 11:*5*, *8* 12:*14*
13:*9* 18:*22* 28:*6*
50:*5*
**lane** 19:*10*, *13*, *18*, *21*,
*24* 21:*4*, *8* 22:*5*, *8*
23:*19* 24:*18*, *21*
30:*19* 31:*4*, *9*, *13*, *24*
32:*12*, *17*, *25* 42:*23*
54:*12* 57:*7*
**law** 4:*19* 58:*8*
**lawsuit** 10:*12*, *22*
11:*12*
**lawsuits** 11:*14*
**learned** 58:*7*
**leave** 8:*18* 19:*9*
**left** 31:*17*, *19* 50:*9*,
*10*
**legs** 5:*18*
**Lemoine** 11:*24* 12:*2*,
*22* 13:*25* 14:*4*, *9*, *20*
25:*6*, *15*, *18* 40:*7*
44:*2*, *7* 52:*13* 57:*15*
**Lemoine's** 50:*4*
**level** 7:*6*
**license** 27:*5* 42:*16*,
*20* 54:*23*
**Lieutenant** 52:*12*, *19*
53:*17*
**life** 47:*21* 60:*6*
**lights** 22:*18*
**limine** 8:*3*
**line** 59:*18*
**lines** 55:*24* 60:*14*
**listened** 17:*21* 41:*23*
**literally** 39:*11*
**litigation** 4:*7* 9:*4*
**little** 10:*6* 33:*6*
37:*10* 39:*9*, *24* 40:*4*,
*19* 45:*18* 51:*16* 57:*4*
58:*2*

lived 47:*21*
locate 18:*7*
located 56:*16*
location 17:*19* 27:*16*
53:*19*, *21*
Logan 52:*12* 53:*15*
long 5:*16* 6:*25* 7:*23*
8:*16* 12:*13*, *22*, *25*
13:*3*, *4* 15:*23* 16:*22*,
*24*, *25* 26:*4* 31:*8*
34:*11* 50:*3*
look 31:*17* 47:*18*
48:*19*, *20*
looked 25:*12*
Looking 20:*19* 21:*15*
22:*13* 31:*19* 37:*6*
52:*6*
lookout 17:*10* 53:*6*, *9*
lookouts 56:*2*
looks 18:*15* 32:*14*
lot 56:*23* 58:*5*
59:*20*, *23*
LPD 48:*13*

< M >
machine 2:*23*
main 18:*19*, *22*
making 15:*11* 56:*10*
manner 55:*11*
manually 43:*13*, *15*
March 4:*8*, *9* 13:*2*,
*21*
marijuana 25:*13*
Mark 3:*15* 29:*2*
47:*15* 48:*2*
marked 21:*14*, *21*, *24*
23:*2* 48:*5* 52:*6*
market 37:*5*
Mart 17:*7*, *18* 18:*23*
19:*9* 31:*18* 53:*16*
matter 3:*10*
mean 20:*2*, *3* 22:*25*
24:*9* 35:*8* 38:*19*
46:*25* 53:*13*, *14*
54:*20*
measure 26:*10*
meat 39:*12*
medic 39:*22* 40:*11*
medications 6:*6*

mentioned 55:*12*
56:*16* 58:*19*
metal 34:*4*
mic 41:*20*
MICHAEL 2:*4* 3:*10*
4:*7*
miles 7:*22* 20:*14*
military 12:*7*
mind 4:*24* 58:*2*, *20*
60:*3* 61:*4*
mine 14:*2*
minute 33:*18* 40:*19*
41:*4* 50:*13*
minutes 29:*21* 30:*8*
34:*14* 35:*16*, *23*
50:*20*
mischief 15:*2*, *18*, *24*
16:*18*, *23*
MISSPELLINGS
1:*17*
moment 37:*23* 61:*5*
money 8:*5*, *6*
month 10:*15*
months 7:*24* 13:*5*
motion 8:*3*
motivated 57:*17*
motivation 58:*18*
motor 60:*21*, *23*
mouse 33:*4*
move 24:*3*, *5* 43:*16*
48:*8* 57:*3*
moved 32:*16*
Moving 39:*6* 44:*25*
57:*14* 58:*6*, *17*
multi-agency 11:*10*
multiple 27:*13* 56:*22*

< N >
name 3:*15* 4:*6* 6:*17*
12:*23* 47:*16*
names 47:*8*
narcotic 56:*25*
narcotics 44:*11*
56:*24* 57:*20*, *22*
nature 5:*8*
Navarro 9:*18*, *20*
near 53:*21*
nearby 41:*23* 53:*14*
neat 5:*13*

necessary 28:*18*
neck 23:*4*
need 5:*17* 39:*22*
59:*9*
nervous 25:*7* 58:*2*
nervousness 57:*18*
never 10:*8* 58:*23*
new 12:*21*
nice 5:*12*
nods 4:*25*
NONSENSICAL 1:*17*
normal 4:*24*
normally 55:*11*
north 17:*18*
northbound 26:*2*, *4*
59:*20*
NORTHERN 2:*2*
3:*13*
nose-in 25:*3*
noted 3:*20*
notes 50:*13*, *21* 51:*12*
notice 43:*10*
noticed 37:*2*
Number 3:*14* 18:*9*
19:*4*
numbered 2:*19*
NUMBERS 1:*13*

< O >
Oak 8:*12*, *16*, *18* 9:*7*,
*10*, *14*
object 48:*25*
Objection 13:*13*
23:*15* 28:*8* 40:*23*
41:*8* 49:*23*
obligated 4:*19*
observe 27:*21* 31:*12*
54:*13* 56:*4*
observed 19:*12*, *24*
20:*13* 30:*18* 31:*9*, *24*
34:*3*, *8* 40:*10* 54:*25*
55:*5*
observing 27:*20*
31:*4* 54:*11*
obviously 51:*6*
occupant 21:*13*, *20*
22:*12*, *21* 23:*20*
24:*13* 25:*5*
occur 16:*13*, *23*

occurred 17:*19*
occurs 56:*18*, *20*
odd 10:*7*
offering 49:*4*
OFFICER 2:*12*, *17*
3:*9*, *24* 4:*5*, *8* 6:*23*
7:*2*, *17* 8:*9* 9:*8*
10:*19* 11:*23*, *24* 12:*2*,
*14*, *18*, *22* 13:*25* 14:*3*,
*9*, *19*, *20* 19:*14* 21:*12*,
*19* 25:*18* 27:*15*
28:*21* 29:*6*, *13*, *24*
34:*22* 35:*2*, *22* 36:*7*,
*18* 37:*13* 38:*10*
39:*15*, *22* 40:*7* 44:*2*,
*7* 47:*11* 48:*7*, *13*
49:*7*, *19* 50:*4* 51:*15*,
*25* 54:*9*, *17* 57:*15*
58:*9* 61:*17*
officers 12:*21* 17:*25*
21:*11*, *14* 22:*13*
41:*22* 53:*21* 58:*10*
officer's 39:*2*
Oh 20:*14* 33:*8* 35:*6*
Okay 4:*15* 5:*5*, *15*,
*24* 6:*10*, *13*, *20* 7:*9*,
*16*, *23* 8:*3*, *20* 9:*10*,
*17* 10:*8*, *11*, *14*, *17*
11:*12* 12:*5*, *9*, *25*
13:*7*, *17*, *21* 14:*17*, *24*
15:*14* 16:*18* 17:*16*
18:*3*, *14*, *19* 19:*8*, *12*,
*23* 20:*9*, *15*, *18* 21:*16*,
*20* 22:*4*, *8*, *12* 23:*7*,
*11*, *20*, *24* 24:*3*, *7*, *11*,
*17* 26:*3*, *6*, *14*, *17*, *20*
27:*4*, *14* 28:*25* 29:*9*,
*13*, *19*, *24* 30:*6*, *21*, *25*
31:*3*, *7*, *12*, *18*, *20*, *23*
32:*4*, *7*, *12*, *16*, *19*, *22*
33:*17*, *22* 34:*3*, *16*, *17*
36:*22*, *25* 37:*4*, *8*, *11*,
*13*, *16*, *23* 38:*3*, *16*, *19*
39:*10*, *17*, *20* 40:*7*, *9*
41:*11*, *15*, *21* 42:*6*, *13*,
*19*, *22* 43:*9*, *13*, *16*, *21*,
*25* 44:*13*, *25* 45:*8*, *24*
46:*5*, *7*, *11*, *14*, *17*, *21*
47:*4*, *7*, *22*, *25* 48:*11*,
*18* 49:*14*, *17*, *18* 50:*9*,

*12* 51:*25* 52:*21* 53:*3*,
*8*, *11*, *20*, *23*, *24*
**old** 7:*4*
**once** 60:*17*
**ones** 52:*13*
**open** 30:*3* 58:*10*
**opens** 25:*5* 58:*4*
**operate** 27:*12*
**operation** 18:*5* 52:*24*
**opportunity** 49:*22*
**option** 35:*11* 61:*7*
**options** 61:*9*
**order** 13:*17* 44:*7*
**orders** 13:*10*, *11*
**ordinary** 58:*14*
**outside** 14:*13*
**overseas** 12:*6*
**overview** 10:*21*

**< P >**
**p.m** 2:*20* 3:*3*, *7*
*16*:*10*, *11* 36:*2*, *3*, *5*
48:*12* 51:*20*, *21*, *23*
61:*19*, *20*
**PAGE** 1:*12*
**parked** 19:*10* 23:*19*
24:*20* 25:*4* 30:*18*
32:*25* 34:*4*
**parking** 19:*4* 24:*6*, *7*,
*18* 25:*3* 32:*14*, *17*
34:*9* 59:*19*, *22*
**part** 33:*11*
**pass** 51:*14* 61:*14*
**passed** 21:*12* 53:*6*
**passenger** 15:*20*, *22*
**passenger's** 25:*4*, *8*,
*11* 44:*21*, *23*
**passing** 50:*19*
**Pate** 19:*14* 21:*12*
52:*12*, *17* 54:*17*
**path** 28:*2*
**patrol** 58:*19* 59:*8*
**pause** 38:*9*
**pay** 8:*4*
**PD** 34:*20*
**Pegged** 60:*19*
**people** 55:*10* 56:*7*,
*11*, *12*
**pepper** 8:*23*

**percent** 47:*3*
**perfectly** 5:*19*, *25*
**perpendicular** 22:*5*
**person** 11:*18* 56:*10*
**personally** 54:*12*
**phase** 15:*9*, *21*
**phone** 22:*22* 55:*13*,
*14* 56:*6*, *10*
**physical** 6:*6*
**pick** 56:*6*
**picking** 56:*10*
**picture** 33:*13*
**place** 56:*17* 58:*24*, *25*
**plain** 44:*12* 53:*20*
57:*20*, *22*
**Plaintiff** 2:*18*
**Plaintiffs** 2:*5*
**planned** 18:*5*, *8*
52:*23* 53:*2*
**plate** 25:*10* 27:*6*
42:*16*, *20* 54:*23*
**plates** 27:*17*
**play** 29:*15* 33:*18*
34:*21* 35:*18* 36:*10*
38:*6*, *22* 43:*6*
**playback** 29:*22*
30:*10* 32:*5* 33:*20*
36:*16* 38:*7* 39:*3*, *18*
43:*7*, *19* 44:*14* 45:*12*,
*22* 46:*12*
**played** 29:*24* 30:*7*
**playing** 36:*15* 37:*9*,
*12* 43:*23*
**Pleasant** 15:*3* 18:*21*
53:*19*
**please** 3:*21*
**pocket** 25:*16* 57:*19*
**point** 5:*17* 20:*12*
25:*21*, *23* 26:*6* 27:*19*
30:*2*, *17* 32:*10* 44:*5*
45:*25* 46:*7* 50:*6*
**pointing** 33:*10*
**police** 6:*23*, *25* 7:*14*,
*17* 8:*8* 9:*8*, *11*, *15*, *17*
10:*2*, *19* 12:*2* 13:*10*,
*12* 17:*21* 22:*17* 23:*6*,
*10*, *11* 41:*11* 50:*5*
55:*7* 56:*11*
**policed** 18:*12*

**policies** 13:*11*
**policy** 8:*21*, *22*
**posed** 5:*20*
**positioning** 26:*24*
**possible** 4:*17* 42:*19*
**possibly** 24:*19*
**practice** 57:*10*
**prepare** 6:*14*
**preparing** 48:*24*
49:*9*, *12*
**presence** 57:*21*
**press** 41:*19* 42:*3*, *11*
**pressing** 41:*16* 42:*7*
**Pretty** 24:*9*
**Prior** 7:*16* 8:*7* 9:*7*,
*14* 11:*16* 12:*14*
14:*20* 17:*14* 39:*24*
40:*4*
**prison** 10:*8*
**Probably** 5:*16* 12:*16*
20:*14* 41:*3*
**Procedure** 2:*24*
**PROCEEDING** 1:*1*,
*22*
**PROCEEDINGS** 1:*6*
3:*2*
**process** 37:*24*
**PRODUCED** 1:*2*
2:*17* 14:*8* 29:*4*
**prolong** 57:*23*
**pronounce** 47:*16*
**pronouncing** 12:*23*
**PROOFREAD** 1:*9*, *14*
**protect** 59:*2*, *4*
**protection** 59:*3*
**provisions** 2:*24*
**public** 15:*10*, *12*
**Pugh** 17:*6*, *11*, *24*
18:*6* 20:*19*, *20* 21:*3*,
*15* 31:*19* 37:*6* 52:*7*,
*22* 53:*9*
**Pugh's** 27:*15* 55:*18*
**pull** 13:*8* 23:*12*
24:*24* 25:*2*, *18* 34:*17*
41:*5*
**pulled** 24:*6*, *11* 37:*25*
**pulling** 59:*22*
**pulls** 24:*8* 25:*3*
**pursuant** 2:*23*

**pursue** 28:*19*
**put** 27:*24*

**< Q >**
**question** 5:*9*, *11*, *21*
49:*3* 51:*13*
**questioning** 51:*14*
**questions** 6:*10* 29:*7*,
*16* 36:*11*, *19* 50:*14*,
*15* 51:*5*, *7* 53:*25*
54:*4*, *9* 61:*16*
**quick** 35:*17* 36:*19*
50:*18* 52:*22*
**quickly** 4:*17*

**< R >**
**radio** 34:*21* 40:*20*
41:*4*, *12*, *17*, *20* 42:*4*,
*8*, *20* 46:*2* 54:*21*
**radioing** 27:*16*
**ranger** 48:*21*
**Rangers** 47:*12*, *23*
**Rapidly** 59:*17*
**rash** 46:*23*
**reach** 25:*16* 43:*16*
**reaching** 57:*18*
**react** 58:*13*
**read** 5:*12* 42:*16*, *21*
47:*25* 48:*7* 54:*5*
**real** 50:*18*
**really** 33:*12* 52:*3*
**REALTIME** 1:*2*, *8*
**rear** 33:*15*
**reason** 6:*5*, *7* 7:*25*
8:*4*, *6* 21:*2*, *6* 24:*14*
**reasonable** 57:*11*, *22*
**Rebecca** 2:*21*
**REBUT** 1:*5*
**recall** 5:*25* 16:*12*
**Recess** 36:*3* 51:*21*
**recognize** 17:*16*
**record** 2:*25* 3:*3*, *5*,
*20* 4:*23* 5:*4*, *8* 6:*17*
29:*20* 34:*20*, *23*
35:*20* 36:*2*, *5*, *14*
38:*4*, *25* 51:*20*, *23*
54:*4* 61:*19*, *20*
**recorded** 3:*8* 41:*17*

**recording** 38:*5*
40:*18* 41:*11, 14*
42:*14, 23*
**Recruit** 13:*25*
**Red** 8:*12, 16, 18* 9:*7,*
*10, 14*
**reference** 8:*13* 30:*7*
37:*10*
**referring** 38:*16* 55:*3*
61:*11*
**reflecting** 49:*19*
**relation** 47:*12* 55:*17*
**relays** 48:*15*
**remember** 5:*24* 7:*13*
16:*9* 18:*2* 24:*22*
26:*14, 25* 42:*24* 45:*5*
47:*19* 52:*9, 14* 57:*8*
60:*20*
**remotely** 2:*21*
**report** 47:*24*
**reported** 2:*22*
**reporter** 3:*17, 21*
4:*22* 16:*6*
**Reporting** 3:*16, 19*
**represent** 4:*6*
**request** 14:*11*
**requesting** 54:*5*
**reservist** 12:*9*
**response** 51:*7*
**restroom** 5:*18*
**result** 9:*2, 4* 46:*22*
**reverse** 25:*20, 21*
27:*24* 59:*11*
**review** 50:*20* 51:*11*
54:*5*
**reviewing** 13:*7, 9*
57:*5*
**revved** 60:*20*
**revving** 60:*22*
**right** 5:*7, 13* 6:*3, 5,*
*16* 9:*22* 12:*6* 14:*12*
20:*2* 29:*11, 15, 17*
31:*16, 19, 25* 32:*9, 15*
33:*8, 15, 23* 34:*2*
36:*12* 37:*8* 38:*22*
39:*12* 42:*25* 43:*2, 5*
44:*11* 45:*20* 47:*9*
48:*10* 50:*12, 16*
51:*15, 18* 59:*23*

**road** 11:*2* 18:*19*
25:*10* 26:*9* 27:*5*
31:*14, 15* 46:*23*
**roadway** 20:*8*
**robberies** 56:*24*
**robbery** 17:*13*
**RODNEY** 2:*4*
**roll** 58:*15*
**rolling** 20:*15* 61:*11*
**rotator** 47:*4*
**ROUGH** 1:*1, 4, 13,*
*16, 21* 2:*12, 16*
**Roughly** 7:*3, 24*
9:*23* 10:*15* 20:*7*
**route** 15:*18*
**RPR** 2:*21*
**Rules** 2:*23*
**Run** 15:*3* 18:*21*
25:*22* 30:*21* 53:*19*
**running** 28:*12* 40:*5*
44:*20* 58:*18* 59:*7*
**runs** 18:*24*

**< S >**
**sake** 55:*2*
**Santos** 3:*15*
**saw** 17:*5* 19:*10*
23:*2* 25:*9, 11, 16, 19*
37:*19*
**saying** 5:*2* 38:*12*
39:*21*
**says** 46:*3*
**scenario** 58:*25*
**school** 7:*8, 9, 10*
9:*23, 25*
**screen** 29:*11* 35:*11*
40:*15*
**scroll** 48:*18*
**se** 46:*19*
**search** 10:*24*
**seat** 25:*6*
**Second** 4:*22* 5:*7*
13:*8* 32:*23* 37:*14*
38:*10*
**Seconds** 26:*5* 29:*16,*
*21, 25* 30:*9* 32:*8, 19*
39:*16* 43:*6, 9*
**section** 34:*21*
**secured** 48:*12*
**security** 10:*7*

**see** 13:*8* 14:*7* 23:*5,*
*20* 24:*15* 25:*12*
29:*13* 32:*24* 33:*14,*
*22* 40:*15* 44:*16*
45:*21* 48:*10, 16*
50:*13* 51:*17* 54:*22*
55:*7* 58:*4*
**seen** 28:*23*
**segment** 36:*10*
**separate** 27:*7, 11*
55:*21*
**Sergeant** 52:*12, 19*
53:*15*
**series** 4:*15*
**serious** 60:*8*
**served** 10:*16*
**serving** 11:*7* 12:*13*
**set** 18:*20* 26:*11*
**setting** 35:*12*
**share** 29:*11* 35:*9, 10,*
*13*
**sharing** 45:*9*
**shift** 14:*22* 16:*8, 15,*
*16, 20* 25:*13* 52:*25*
53:*4*
**shooting** 4:*8* 15:*23*
16:*13, 23* 17:*19, 22*
58:*25*
**shootings** 56:*24*
**shorthand** 2:*23*
**shot** 27:*3*
**shots** 39:*25* 40:*21*
46:*3*
**shoulder** 46:*24, 25*
47:*3*
**shoulders** 5:*2*
**show** 28:*21* 29:*6*
40:*14* 47:*14, 24*
**shrugs** 5:*2*
**side** 18:*21, 25* 25:*4,*
*8, 11* 39:*6, 7* 44:*21,*
*23*
**sight** 44:*17*
**sign** 33:*14, 24*
**signed** 48:*12*
**significance** 55:*9, 15*
**signs** 34:*15* 58:*7*
**simply** 17:*10* 18:*9*
**sir** 4:*12, 14, 21* 5:*6,*
*14, 23* 6:*4, 9, 12, 15,*

*24* 7:*4, 18* 8:*10* 9:*3,*
*6, 9, 16* 10:*3, 10, 13,*
*20* 11:*6, 15, 19, 21, 25*
12:*4, 11, 24* 13:*6, 16,*
*20, 23* 14:*5, 23* 15:*6*
16:*21* 17:*8, 9, 15, 17*
18:*4, 7, 11, 13, 18*
19:*7, 17, 20* 20:*17, 22,*
*25* 21:*5, 9, 23* 22:*7,*
*16, 19* 23:*14* 24:*2, 4,*
*19* 26:*8, 16, 19, 22*
27:*18, 23* 28:*3, 24*
29:*10, 14, 18* 30:*5, 13,*
*20* 31:*2, 6* 32:*3, 11,*
*18, 21* 33:*6, 23* 34:*2,*
*7, 10* 35:*3* 36:*13, 21,*
*24* 37:*7, 15, 18, 22*
38:*2, 15, 18, 21* 39:*23*
40:*3, 6, 8, 13, 24* 41:*9,*
*25* 42:*5, 9, 12, 18, 24*
43:*12, 18* 44:*6, 9*
45:*15* 46:*4, 9, 16*
47:*6, 13* 48:*10, 17, 22*
50:*2, 11, 17* 52:*8*
53:*2, 10* 54:*17* 55:*4,*
*8, 25* 56:*21* 57:*24*
58:*12* 59:*12, 24* 60:*7,*
*16, 24* 61:*3, 13*
**sits** 18:*25*
**situations** 56:*3*
**six** 7:*3* 13:*5* 38:*13,*
*19*
**slow** 20:*18* 60:*13*
**slowing** 27:*2*
**small** 19:*4, 5*
**smoothly** 4:*17*
**soft** 42:*14*
**solid** 59:*3*
**somebody** 58:*9, 13*
**soon** 23:*2*
**sorry** 4:*9* 9:*13, 19*
27:*10* 33:*9* 38:*24*
43:*4* 47:*16, 20*
**sort** 13:*11* 17:*4*
18:*16, 20* 19:*5* 20:*15*
26:*23* 34:*5* 37:*4, 23*
52:*2* 56:*3, 9, 17, 19*
**sound** 36:*8* 39:*7*
45:*10*

APPX 00074

**sounded** 36:22 39:24 41:21
**sounds** 35:19 38:11 45:25 51:15 52:5
**south** 8:15 18:21, 24 53:19
**speak** 6:13 14:13 20:24 21:19
**speaking** 17:24
**specialist** 3:17
**specific** 49:4, 7
**specifically** 55:22
**spoke** 54:11
**spot** 20:24 23:25 24:6, 7 25:3 32:15, 17 34:9
**sprayed** 8:23
**squad** 25:23 28:5, 13, 16 44:17, 22, 24 45:6
**squared** 35:21
**stand** 15:11
**start** 34:25 37:12 39:14 51:14
**started** 6:11 7:14 9:10 37:24
**starting** 9:14 29:20 34:23 36:15
**State** 2:22
**stated** 2:24
**statement** 38:17 39:2 47:11, 23
**STATES** 2:2 3:12
**stayed** 52:17
**STENO** 1:17
**stenographic** 3:20
**step** 57:16
**stick** 17:11
**stood** 23:7
**stop** 21:7 24:16 28:2 32:22 34:15 37:13 41:6 43:21 52:22 57:4, 11, 14, 23 58:14 60:13
**stopped** 32:7 38:25 39:20 40:17 46:14
**stopping** 23:17 45:24
**straight** 59:18
**strain** 23:4
**strange** 22:20 55:10

**street** 26:12 30:12 34:6
**street's** 30:14
**stretch** 5:18
**strictly** 35:13
**strike** 50:3
**struck** 25:25 26:20 59:14, 15 61:12
**stuff** 50:24 53:6
**subject** 55:18
**suck** 60:4
**suffer** 46:21
**Sure** 14:14 15:17 16:3 34:13, 24 50:23 51:9 52:11
**surrounding** 17:21 37:5
**surveillance** 17:5 43:3 52:23
**suspicion** 57:11, 23
**SUV** 20:13 37:10, 16, 20 40:10, 21 41:5 54:12, 16, 25 55:2, 3, 5 56:15
**SWAT** 10:23 11:3, 7, 11
**swear** 3:22
**swing** 38:13, 20
**switch** 7:25 43:10
**sworn** 2:18 3:23, 25 4:19 48:12

**< T >**
**tacked** 12:17
**take** 5:17, 21 18:6 34:11, 13 35:17, 22 44:20 47:9 48:19 49:18 50:13 51:2, 10, 16 58:24
**taken** 2:19 4:10
**takes** 58:25
**talk** 5:18 14:15 57:3
**talked** 16:19 56:14
**talking** 17:23 27:14 36:23 41:16 42:2, 7 58:5
**tape** 26:10
**task** 11:10
**team** 10:23 11:3, 7,

*11*
**tear** 46:24, 25 47:3
**tell** 4:19 12:8 22:22 45:17 46:19
**telling** 55:19
**terminated** 8:19, 20
**testified** 3:25 59:13
**testify** 6:7
**TEXAS** 2:2, 7, 22 3:11, 13 47:12, 23 48:21
**Thanks** 61:16
**things** 4:24 5:5 33:12 58:19
**think** 5:15 7:15 15:16 25:9, 11 36:7 43:5 49:20 53:8
**third** 15:9, 21
**thoroughfare** 18:22
**thought** 32:25 45:5 52:22
**thoughts** 45:4 55:20
**three** 52:15
**ticket** 24:18
**TIME** 1:5 3:6 5:17 6:13 12:19 16:8, 12, 14 20:12 26:6 27:19 30:17 31:5 34:8 35:25 36:5 37:19, 21 40:9 41:4 42:6 45:4, 25 46:8 47:8 48:14 50:6 51:12, 19, 23 53:16 55:18 59:7, 22 61:16, 18
**times** 26:14 56:22
**timing** 29:8 40:16
**today** 3:17, 19 5:16 6:8 61:16
**Today's** 3:5
**told** 15:16 53:9
**top** 25:25 26:3
**tops** 17:2
**town** 50:10
**traffic** 24:16 41:6 57:11 58:14
**train** 12:20 28:6
**trained** 28:15, 16
**training** 11:23 12:14, 18, 19 15:9, 21
**transactions** 56:24, 25

**TRANSCRIPT** 1:19 5:12 54:6
**TRANSCRIPTION** 1:4, 6, 8, 16, 21
**translate** 5:4
**travel** 23:22
**truth** 4:20
**truthfully** 6:8
**try** 5:5, 10 18:5 35:21, 23
**trying** 44:20, 23
**turn** 23:4 30:23, 24 31:10 45:20
**turned** 22:23 30:25 59:19 60:11, 18
**turning** 59:23
**turns** 20:6 25:23, 24
**two** 24:4 5:16 8:17 27:7, 11 49:16 52:15, 18 53:13 61:9
**type** 8:22
**typed** 47:22

**< U >**
**uh-huh** 5:3
**UNCERTIFIED** 2:1 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1
**underneath** 61:8
**understand** 4:20 15:25
**understanding** 11:22 12:5 17:3 50:4, 7
**Understood** 12:12 42:25 52:4
**UNEDITED** 1:1, 13

unholstered 27:*3*
unit 52:*6*
UNITED 2:*2* 3:*12*
units 52:*9*
UNTRANSLATED
1:*17*
use 5:*17* 28:*17, 18,*
*19*
usually 5:*3* 33:*13*
56:*9*

< V >
vehicle 21:*4, 7, 13, 21*
22:*4, 9, 21* 23:*6, 13,*
*18, 20, 25* 24:*3* 25:*4,*
*5, 7, 10, 19, 25* 26:*3, 7,*
*17, 21* 27:*20, 21, 25*
28:*22* 30:*2, 4, 22*
32:*2, 9* 44:*16, 18*
46:*18* 53:*12* 57:*16*
58:*11* 59:*5, 14, 15, 21,*
*25* 60:*12* 61:*2, 6*
vehicles 18:*3, 9*
21:*21, 24* 22:*17, 23*
23:*3* 28:*7, 20* 55:*14*
vehicle's 44:*25*
verbatim 48:*14*
version 47:*22*
versus 3:*11*
vicinity 53:*13, 14*
video 3:*8, 16* 15:*12*
28:*21, 23* 29:*22, 25*
30:*10* 31:*18* 32:*5, 7*
33:*18, 20* 36:*11* 43:*3,*
*4, 7, 19* 44:*14* 45:*12,*
*22* 46:*12* 47:*10*
VIDEOGRAPHER
3:*4* 35:*8, 25* 36:*4*
51:*19, 22* 61:*18*
view 31:*21* 44:*12*
57:*20, 22*
violation 19:*11* 24:*15*
violations 8:*21, 22*
voice 36:*23* 38:*11*
39:*21* 42:*6*

< W >
wait 5:*10*
Walgreens 10:*5*

Walk 24:*23*
walked 25:*8, 12*
wand 17:*12*
want 4:*23* 5:*9* 9:*23*
17:*5* 27:*4* 28:*21*
29:*7, 17* 30:*6* 34:*21,*
*25* 35:*22* 36:*10, 18*
37:*13* 38:*9* 47:*14*
48:*18* 49:*8, 9* 50:*22,*
*25* 51:*12* 52:*2* 56:*21*
wanted 21:*6* 42:*10*
warn 13:*19*
warrant 10:*24* 11:*8*
watch 22:*14, 23*
23:*21* 37:*16* 55:*11*
watched 21:*21* 22:*12*
watching 21:*13* 23:*5,*
*9, 11* 38:*12* 55:*7, 13*
WAY 1:*5* 5:*3, 11*
15:*11* 22:*23* 28:*9*
40:*15* 54:*15*
weapon 46:*8* 60:*3*
weapons 27:*21*
wearing 13:*22* 14:*4,*
*10*
well 5:*4* 20:*12*
21:*20* 23:*11* 25:*20*
28:*12* 31:*12* 36:*9*
40:*2, 16* 50:*7, 22*
51:*4*
went 9:*11* 14:*6*
16:*20, 22* 21:*19* 23:*5,*
*6, 10, 12* 25:*20, 21*
37:*24*
We're 28:*16* 29:*20*
31:*18* 33:*9* 35:*16*
38:*12, 19* 48:*2*
West 15:*3*
we've 29:*25* 36:*7*
56:*23*
white 20:*13* 21:*3, 7,*
*21* 22:*4, 8, 21* 23:*25*
24:*3* 30:*2* 31:*25*
32:*2, 8* 37:*10, 16*
40:*10, 21* 41:*5* 54:*12,*
*16, 22, 25* 55:*2, 3, 5*
56:*15*
window 58:*15*
windshield 22:*14*

witness 2:*17* 3:*22,*
*23* 28:*9* 35:*3* 39:*6*
40:*24* 41:*9* 61:*14*
WORD 1:*18*
worked 10:*5, 6*
working 10:*18* 14:*2*
15:*15* 50:*5* 55:*23*
works 41:*18*
worst 33:*11* 58:*25*
write 24:*17*
written 4:*23* 5:*4, 8*
wrong 10:*24*

< Y >
yards 17:*20* 26:*13*
Yeah 27:*10* 38:*12*
49:*7* 50:*8* 55:*10, 16*
year 7:*13* 12:*16*
years 7:*3* 8:*17* 58:*7*

< Z >
Zach 49:*2*
ZACHARY 2:*12, 17*
3:*9, 24* 6:*18* 48:*13*
Z-a-c-h-a-r-y 6:*18*
Zach's 45:*18*
Zane 17:*6* 20:*19*
zoom 33:*2, 9, 11*

APPX 00076

Deposition of Brian Beauchamp Rough Draft Case No. 3:20-cv-00643-E City of Mesquite vs. City of Balch Springs, Texas, et al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 85 of 141 PageID 261

## WORD LIST

**< 0 >**
**0**  (2)
**00**  (2)
**00011**  (2)
**0009**  (1)
**0009.mp4**  (1)

**< 1 >**
**1**  (2)
**1:04**  (2)
**1:21**  (1)
**10**  (2)
**100**  (1)
**11**  (1)
**132**  (1)
**15**  (1)
**18th**  (4)

**< 2 >**
**2:02**  (3)
**2:24**  (1)
**2:44**  (3)
**2:49**  (2)
**2:51**  (1)
**20**  (4)
**2007**  (1)
**2009**  (1)
**2010**  (2)
**2013**  (1)
**2018**  (5)
**2021**  (3)
**23rd**  (1)
**24**  (4)
**24th**  (1)
**25**  (1)
**28**  (1)

**< 3 >**
**3/23/2018**  (1)
**3:09**  (1)
**3:10**  (1)
**3:13**  (2)
**3:20-cv-00643-E**  (2)
**3:25**  (3)
**32**  (2)
**342**  (1)
**35**  (1)

**36**  (1)
**37**  (1)

**< 4 >**
**4:14**  (2)
**4:51**  (1)
**45**  (1)

**< 5 >**
**5:23**  (3)
**50**  (3)

**< 6 >**
**6:00**  (2)
**600**  (1)

**< 7 >**
**7-Eleven**  (1)

**< 8 >**
**80**  (1)

**< A >**
**able**  (8)
**abnormal**  (1)
**above-styled**  (1)
**academy**  (4)
**accelerate**  (2)
**accelerating**  (2)
**accept**  (1)
**acceptable**  (1)
**accurate**  (2)
**accurately**  (1)
**acknowledged**  (2)
**acting**  (2)
**active**  (1)
**activity**  (3)
**actual**  (2)
**addiction**  (1)
**additional**  (1)
**Administrator**  (1)
**advanced**  (1)
**affidavit**  (4)
**afraid**  (1)
**afternoon**  (1)
**aggravate**  (1)
**ago**  (1)
**al**  (2)
**alcohol**  (1)

**AND/OR**  (1)
**angle**  (3)
**announce**  (1)
**answer**  (8)
**anticipate**  (1)
**apartment**  (10)
**apartments**  (1)
**APPEARING**  (2)
**appears**  (1)
**appreciate**  (1)
**approached**  (1)
**approximately**  (1)
**area**  (11)
**areas**  (1)
**arising**  (1)
**arms**  (1)
**arrests**  (1)
**arrive**  (1)
**aside**  (1)
**asked**  (3)
**asking**  (2)
**assault**  (1)
**assistance**  (1)
**assume**  (1)
**attempt**  (1)
**attention**  (1)
**audio**  (13)
**automatically**  (1)
**aware**  (4)

**< B >**
**back**  (19)
**backed**  (2)
**backtrack**  (2)
**bands**  (3)
**bar**  (1)
**based**  (1)
**basis**  (3)
**BEAUCHAMP**  (13)
**B-e-a-u-c-h-a-m-p**  (1)
**Becky**  (2)
**began**  (14)
**beginning**  (4)
**behavior**  (2)
**belief**  (1)
**believe**  (7)
**best**  (1)
**better**  (3)
**bit**  (7)

**block**  (6)
**blocking**  (1)
**bodily**  (1)
**body**  (9)
**body-worn**  (3)
**box**  (1)
**break**  (8)
**Brian**  (3)
**brief**  (1)
**briefing**  (1)
**briefly**  (1)
**bring**  (1)
**BRISCO**  (27)
**Brisco's**  (8)
**broke**  (1)
**brothers**  (1)
**buildings**  (1)
**bumper**  (1)
**button**  (5)

**< C >**
**call**  (7)
**called**  (2)
**calling**  (3)
**camera**  (15)
**cameras**  (1)
**car**  (39)
**cars**  (8)
**Case**  (3)
**cause**  (1)
**cautiously**  (1)
**cell**  (3)
**center**  (4)
**central**  (1)
**certain**  (1)
**CERTIFIED**  (5)
**channel**  (2)
**channels**  (4)
**charges**  (1)
**checked**  (1)
**checking**  (2)
**Chris**  (4)
**CITE**  (1)
**CITED**  (1)
**CITY**  (9)
**city's**  (2)
**Civil**  (4)
**clarify**  (1)
**clarity**  (1)

click  *(1)*
close  *(1)*
closed  *(1)*
Closer  *(1)*
closest  *(1)*
clothes  *(1)*
Cockrell  *(1)*
college  *(2)*
COMBINATIONS  *(1)*
come  *(5)*
comes  *(2)*
coming  *(3)*
common  *(4)*
commonly  *(1)*
communicate  *(4)*
communicating  *(1)*
communication  *(3)*
communications  *(1)*
complaint  *(4)*
completed  *(1)*
complex  *(9)*
concern  *(1)*
conclude  *(1)*
condition  *(1)*
connects  *(1)*
consider  *(1)*
console  *(3)*
constant  *(1)*
constantly  *(3)*
consulted  *(2)*
contact  *(2)*
CONTAIN  *(1)*
continue  *(1)*
continued  *(1)*
CONTRADICT  *(1)*
conversation  *(4)*
cook  *(1)*
coordinator  *(1)*
cop  *(1)*
copper  *(1)*
cops  *(1)*
copy  *(1)*
correct  *(4)*
CORRECTED  *(3)*
correctly  *(2)*
counsel  *(8)*
couple  *(5)*
COURT  *(9)*

cover  *(9)*
COYLE  *(50)*
create  *(1)*
crime  *(1)*
criminal  *(8)*
CRR  *(1)*
CSR  *(1)*
cuff  *(1)*
curb  *(1)*
curious  *(1)*
current  *(1)*
currently  *(1)*
custody  *(1)*

< D >
dash  *(2)*
dashcam  *(2)*
date  *(3)*
day  *(4)*
days  *(1)*
deal  *(2)*
dealing  *(1)*
decelerate  *(1)*
decide  *(1)*
decision  *(4)*
defendant  *(2)*
Defendants  *(1)*
Defense  *(4)*
Department  *(7)*
depends  *(1)*
DEPOSITION  *(7)*
describe  *(5)*
described  *(2)*
describing  *(3)*
details  *(1)*
Dewberry  *(26)*
die  *(2)*
different  *(5)*
differently  *(1)*
difficult  *(1)*
direction  *(2)*
directly  *(4)*
discharge  *(4)*
discharged  *(4)*
discharging  *(1)*
DISCREPANCIES  *(1)*
DISCREPANCY  *(1)*
discussed  *(3)*

discussing  *(2)*
dispatch  *(9)*
distribution  *(1)*
DISTRICT  *(4)*
document  *(1)*
door  *(7)*
DRAFT  *(67)*
draw  *(1)*
driveway  *(1)*
driveways  *(1)*
driving  *(14)*
drug  *(6)*
duly  *(3)*
duty  *(1)*

< E >
Earlier  *(4)*
easiest  *(1)*
east  *(1)*
echoey  *(1)*
edge  *(2)*
edit  *(1)*
EDITED  *(2)*
education  *(1)*
effect  *(1)*
email  *(1)*
employer  *(1)*
en  *(1)*
ends  *(1)*
enforcement  *(1)*
engaged  *(1)*
engine  *(1)*
enroll  *(1)*
entirety  *(1)*
ENTRIES  *(1)*
equipment's  *(1)*
equipped  *(1)*
ESTATE  *(3)*
et  *(2)*
evade  *(1)*
Everest  *(2)*
exact  *(4)*
exactly  *(2)*
EXAMINATION  *(2)*
executing  *(1)*
exhibit  *(2)*
exit  *(1)*
expect  *(1)*
experience  *(3)*

explain  *(1)*
extent  *(1)*

< F >
faces  *(1)*
facility  *(1)*
facing  *(3)*
fact  *(1)*
fair  *(10)*
fall  *(1)*
far  *(9)*
Farming  *(1)*
fast  *(3)*
fear  *(2)*
February  *(3)*
Federal  *(1)*
Feet  *(7)*
fell  *(2)*
fellow  *(1)*
Ferris  *(1)*
figure  *(1)*
figured  *(1)*
file  *(1)*
files  *(1)*
FINAL  *(3)*
FINALIZED  *(1)*
fine  *(5)*
fingers  *(1)*
finish  *(1)*
fire  *(23)*
firearm  *(3)*
fired  *(3)*
first  *(18)*
five  *(2)*
five-minute  *(2)*
fleeing  *(1)*
follow  *(2)*
following  *(1)*
follows  *(1)*
follow-up  *(3)*
Food  *(6)*
footage  *(2)*
force  *(2)*
FORM  *(8)*
forms  *(1)*
forth  *(1)*
forward  *(4)*
frequent  *(1)*
front  *(7)*

Deposition of Officer Jackdrum Champ Dougherty — In the matter of Murder of Vincent City of Dallas, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 87 of 141 PageID 263

**full**  *(1)*
**further**  *(2)*

**< G >**
**gear**  *(1)*
**general**  *(3)*
**generally**  *(2)*
**give**  *(5)*
**given**  *(3)*
**go**  *(31)*
**goes**  *(3)*
**going**  *(32)*
**Good**  *(3)*
**gotten**  *(1)*
**governing**  *(2)*
**graduate**  *(1)*
**granted**  *(1)*
**grass**  *(1)*
**Graziano**  *(2)*
**Great**  *(2)*
**guard**  *(1)*
**guess**  *(6)*
**guessing**  *(1)*
**guy**  *(1)*

**< H >**
**half**  *(3)*
**handcuffs**  *(1)*
**happen**  *(3)*
**happened**  *(2)*
**happens**  *(1)*
**hard**  *(8)*
**head**  *(2)*
**heading**  *(2)*
**hear**  *(25)*
**heard**  *(4)*
**hearing**  *(2)*
**heavily**  *(1)*
**helps**  *(1)*
**Hey**  *(2)*
**High**  *(5)*
**highest**  *(1)*
**Hill**  *(2)*
**hit**  *(3)*
**hold**  *(3)*
**holding**  *(1)*
**honest**  *(1)*
**hood**  *(9)*
**hopefully**  *(1)*

**hot**  *(1)*
**hour**  *(4)*
**hours**  *(1)*
**house**  *(2)*
**huh-uh**  *(1)*
**human**  *(1)*

**< I >**
**idea**  *(1)*
**immediately**  *(2)*
**incident**  *(14)*
**included**  *(2)*
**independent**  *(1)*
**INDEXED**  *(1)*
**indicate**  *(1)*
**indicating**  *(5)*
**individual**  *(1)*
**initial**  *(2)*
**initiate**  *(1)*
**injuries**  *(1)*
**injury**  *(1)*
**instance**  *(1)*
**instruct**  *(3)*
**instructed**  *(2)*
**instructions**  *(1)*
**intelligence**  *(1)*
**intending**  *(1)*
**intention**  *(3)*
**interacted**  *(1)*
**interaction**  *(1)*
**interactions**  *(1)*
**interacts**  *(1)*
**interference**  *(1)*
**interrupt**  *(1)*
**investigating**  *(1)*
**involved**  *(2)*
**involves**  *(1)*
**issues**  *(1)*
**its**  *(2)*

**< J >**
**job**  *(1)*
**jobs**  *(2)*
**John**  *(6)*
**jump**  *(1)*

**< K >**
**keep**  *(3)*
**kind**  *(1)*

**KLEMENT**  *(21)*
**kneeling**  *(1)*
**knees**  *(1)*
**knew**  *(2)*
**know**  *(50)*
**knowledge**  *(2)*
**known**  *(2)*

**< L >**
**LANCASTER**  *(16)*
**lane**  *(23)*
**law**  *(2)*
**lawsuit**  *(3)*
**lawsuits**  *(1)*
**learned**  *(1)*
**leave**  *(2)*
**left**  *(4)*
**legs**  *(1)*
**Lemoine**  *(15)*
**Lemoine's**  *(1)*
**level**  *(1)*
**license**  *(4)*
**Lieutenant**  *(3)*
**life**  *(2)*
**lights**  *(1)*
**limine**  *(1)*
**line**  *(1)*
**lines**  *(2)*
**listened**  *(2)*
**literally**  *(1)*
**litigation**  *(2)*
**little**  *(11)*
**lived**  *(1)*
**locate**  *(1)*
**located**  *(1)*
**location**  *(4)*
**Logan**  *(2)*
**long**  *(17)*
**look**  *(4)*
**looked**  *(1)*
**Looking**  *(6)*
**lookout**  *(3)*
**lookouts**  *(1)*
**looks**  *(2)*
**lot**  *(4)*
**LPD**  *(1)*

**< M >**
**machine**  *(1)*

**main**  *(2)*
**making**  *(2)*
**manner**  *(1)*
**manually**  *(2)*
**March**  *(4)*
**marijuana**  *(2)*
**Mark**  *(4)*
**marked**  *(6)*
**market**  *(1)*
**Mart**  *(6)*
**matter**  *(1)*
**mean**  *(10)*
**measure**  *(1)*
**meat**  *(1)*
**medic**  *(1)*
**medications**  *(1)*
**mentioned**  *(3)*
**metal**  *(1)*
**mic**  *(1)*
**MICHAEL**  *(3)*
**miles**  *(2)*
**military**  *(1)*
**mind**  *(5)*
**mine**  *(1)*
**minute**  *(4)*
**minutes**  *(6)*
**mischief**  *(5)*
**MISSPELLINGS**  *(1)*
**moment**  *(2)*
**money**  *(2)*
**month**  *(1)*
**months**  *(2)*
**motion**  *(6)*
**motivated**  *(1)*
**motivation**  *(1)*
**motor**  *(2)*
**mouse**  *(1)*
**move**  *(5)*
**moved**  *(1)*
**Moving**  *(5)*
**multi-agency**  *(1)*
**multiple**  *(2)*

**< N >**
**name**  *(5)*
**names**  *(1)*
**narcotic**  *(1)*
**narcotics**  *(4)*
**nature**  *(1)*

Deposition of Officer Daniel Kemp Rought Transcript of Meghan Bass, et al. vs. City of Pleasant, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 88 of 141 PageID 264

Navarro (2)
near (1)
nearby (2)
neat (1)
necessary (1)
neck (1)
need (3)
nervous (2)
nervousness (1)
never (2)
new (1)
nice (1)
nods (1)
NONSENSICAL (1)
normal (1)
normally (1)
north (1)
northbound (3)
NORTHERN (2)
nose-in (1)
noted (1)
notes (3)
notice (1)
noticed (1)
Number (3)
numbered (1)
NUMBERS (1)

< O >
Oak (6)
object (1)
Objection (6)
obligated (1)
observe (4)
observed (11)
observing (3)
obviously (1)
occupant (7)
occur (2)
occurred (1)
occurs (2)
odd (1)
offering (1)
OFFICER (57)
officers (9)
officer's (1)
Oh (3)
Okay (143)
old (1)

once (1)
ones (1)
open (2)
opens (2)
operate (1)
operation (2)
opportunity (1)
option (2)
options (1)
order (2)
orders (2)
ordinary (1)
outside (1)
overseas (1)
overview (1)

< P >
p.m (17)
PAGE (1)
parked (7)
parking (10)
part (1)
pass (2)
passed (2)
passenger (2)
passenger's (5)
passing (1)
Pate (5)
path (1)
patrol (2)
pause (1)
pay (1)
PD (1)
Pegged (1)
people (4)
pepper (1)
percent (1)
perfectly (2)
perpendicular (1)
person (2)
personally (1)
phase (2)
phone (5)
physical (1)
pick (1)
picking (1)
picture (1)
place (3)
plain (4)

Plaintiff (1)
Plaintiffs (1)
planned (5)
plate (5)
plates (1)
play (8)
playback (14)
played (2)
playing (4)
Pleasant (3)
please (1)
pocket (2)
point (13)
pointing (1)
police (25)
policed (1)
policies (1)
policy (2)
posed (1)
positioning (1)
possible (2)
possibly (1)
practice (1)
prepare (1)
preparing (3)
presence (1)
press (3)
pressing (2)
Pretty (1)
Prior (10)
prison (1)
Probably (4)
Procedure (1)
PROCEEDING (2)
PROCEEDINGS (2)
process (1)
PRODUCED (4)
prolong (1)
pronounce (1)
pronouncing (1)
PROOFREAD (2)
protect (2)
protection (1)
provisions (1)
public (2)
Pugh (13)
Pugh's (2)
pull (8)
pulled (3)

pulling (1)
pulls (2)
pursuant (1)
pursue (1)
put (1)

< Q >
question (5)
questioning (1)
questions (13)
quick (4)
quickly (1)

< R >
radio (12)
radioing (1)
ranger (1)
Rangers (2)
Rapidly (1)
rash (1)
reach (2)
reaching (2)
react (1)
read (6)
real (1)
really (2)
REALTIME (2)
rear (1)
reason (8)
reasonable (2)
Rebecca (1)
REBUT (1)
recall (2)
Recess (2)
recognize (1)
record (22)
recorded (2)
recording (6)
Recruit (1)
Red (6)
reference (3)
referring (3)
reflecting (1)
relation (2)
relays (1)
remember (14)
remotely (1)
report (1)
reported (1)

| | | | |
|---|---|---|---|
| reporter (4) | security (1) | speak (4) | sworn (5) |
| Reporting (2) | see (20) | speaking (1) | |
| represent (1) | seen (1) | specialist (1) | < T > |
| request (1) | segment (1) | specific (2) | tacked (1) |
| requesting (1) | separate (3) | specifically (1) | take (16) |
| reservist (1) | Sergeant (3) | spoke (1) | taken (2) |
| response (1) | series (1) | spot (8) | takes (1) |
| restroom (1) | serious (1) | sprayed (1) | talk (3) |
| result (3) | served (1) | squad (8) | talked (2) |
| reverse (4) | serving (2) | squared (1) | talking (7) |
| review (3) | set (2) | stand (1) | tape (1) |
| reviewing (3) | setting (1) | start (4) | task (1) |
| revved (1) | share (4) | started (4) | team (4) |
| revving (1) | sharing (1) | starting (4) | tear (1) |
| right (39) | shift (8) | State (1) | tell (5) |
| road (8) | shooting (7) | stated (1) | telling (1) |
| roadway (1) | shootings (1) | statement (4) | terminated (2) |
| robberies (1) | shorthand (1) | STATES (2) | testified (2) |
| robbery (1) | shot (4) | stayed (1) | testify (1) |
| RODNEY (1) | shots (3) | STENO (1) | TEXAS (8) |
| roll (1) | shoulder (3) | stenographic (1) | Thanks (1) |
| rolling (2) | shoulders (1) | step (1) | things (4) |
| rotator (1) | show (6) | stick (1) | think (9) |
| ROUGH (7) | shrugs (1) | stood (1) | third (2) |
| Roughly (5) | side (9) | stop (15) | thoroughfare (1) |
| route (1) | sight (1) | stopped (5) | thought (3) |
| RPR (1) | sign (2) | stopping (2) | thoughts (2) |
| Rules (1) | signed (1) | straight (1) | three (1) |
| Run (5) | significance (2) | strain (1) | ticket (1) |
| running (5) | signs (2) | strange (2) | TIME (36) |
| runs (1) | simply (2) | street (3) | times (2) |
| | sir (147) | street's (1) | timing (2) |
| < S > | sits (1) | stretch (1) | today (5) |
| sake (1) | situations (1) | strictly (1) | Today's (1) |
| Santos (1) | six (4) | strike (1) | told (2) |
| saw (8) | slow (2) | struck (5) | top (2) |
| saying (3) | slowing (1) | stuff (2) | tops (1) |
| says (1) | small (2) | subject (1) | town (1) |
| scenario (1) | smoothly (1) | suck (1) | traffic (4) |
| school (5) | soft (1) | suffer (1) | train (2) |
| screen (3) | solid (1) | Sure (8) | trained (2) |
| scroll (1) | somebody (2) | surrounding (2) | training (6) |
| se (1) | soon (1) | surveillance (3) | transactions (2) |
| search (1) | sorry (9) | suspicion (2) | TRANSCRIPT (3) |
| seat (1) | sort (16) | SUV (14) | TRANSCRIPTION |
| Second (6) | sound (3) | SWAT (4) | (5) |
| Seconds (10) | sounded (3) | swear (1) | translate (1) |
| section (1) | sounds (5) | swing (2) | travel (1) |
| secured (1) | south (4) | switch (2) | truth (1) |

Deposition of Michael Thomas Murphy Rough Draft - In re: Death of Marvin Scott, III by County of McLennan, Texas, et. al.

Case 3:20-cv-00643-E Document 31 Filed 03/04/21 Page 90 of 141 PageID 266

**truthfully** *(1)*
**try** *(5)*
**trying** *(2)*
**turn** *(5)*
**turned** *(5)*
**turning** *(1)*
**turns** *(3)*
**two** *(10)*
**type** *(1)*
**typed** *(1)*

**< U >**
**uh-huh** *(1)*
**UNCERTIFIED** *(60)*
**underneath** *(1)*
**understand** *(2)*
**understanding** *(5)*
**Understood** *(3)*
**UNEDITED** *(2)*
**unholstered** *(1)*
**unit** *(1)*
**UNITED** *(2)*
**units** *(1)*
**UNTRANSLATED**
 *(1)*
**use** *(4)*
**usually** *(3)*

**< V >**
**vehicle** *(46)*
**vehicles** *(10)*
**vehicle's** *(1)*
**verbatim** *(1)*
**version** *(1)*
**versus** *(1)*
**vicinity** *(2)*
**video** *(23)*
**VIDEOGRAPHER**
 *(7)*
**view** *(4)*
**violation** *(2)*
**violations** *(2)*
**voice** *(4)*

**< W >**
**wait** *(1)*
**Walgreens** *(1)*
**Walk** *(1)*
**walked** *(2)*

**wand** *(1)*
**want** *(26)*
**wanted** *(2)*
**warn** *(1)*
**warrant** *(2)*
**watch** *(5)*
**watched** *(2)*
**watching** *(7)*
**WAY** *(8)*
**weapon** *(2)*
**weapons** *(1)*
**wearing** *(3)*
**well** *(13)*
**went** *(12)*
**We're** *(8)*
**West** *(1)*
**we've** *(4)*
**white** *(26)*
**window** *(1)*
**windshield** *(1)*
**witness** *(9)*
**WORD** *(1)*
**worked** *(2)*
**working** *(5)*
**works** *(1)*
**worst** *(2)*
**write** *(1)*
**written** *(3)*
**wrong** *(1)*

**< Y >**
**yards** *(2)*
**Yeah** *(6)*
**year** *(2)*
**years** *(3)*

**< Z >**
**Zach** *(1)*
**ZACHARY** *(6)*
**Z-a-c-h-a-r-y** *(1)*
**Zach's** *(1)*
**Zane** *(2)*
**zoom** *(3)*

# Exhibit 5

Lancaster PD
Investigative
Findings



# CITY OF LANCASTER
## SHINING STAR OF TE★AS

Lancaster Police Department

### INVESTIGATIVE FINDINGS

TO:   S. URBANSKI, CHIEF OF POLICE

FROM:   J. BEESLEY, INTERNAL AFFAIRS *JBeesley1271*

DATE:   NOVEMBER 11, 2019

SUBJECT:   OIS INQUIRY 18-002 MARCH 18, 2018

On March 18, 2019, Officer Beauchamp was working as a training unit with Recruit Officer Lemoine. They were working as unit 313 and marked out on a suspicious vehicle in the parking lot of the Dewberry apartments at approximately 18:55 hours. When the stop was made, the white Ford Escape with TX JZH1357 turned left from the driveway into a parking space, and Lemoine made contact at the driver's window while Beauchamp went to the passenger side.

Driver Brisco, Michael E. B/M , TX ID ███████

After officers made contact, Brisco suddenly reversed out of the parking space, backing to the left, at a high rate of speed. This caused the front of the vehicle to swing past Beauchamp where he was standing at the right front. Beauchamp had to jump back and scramble to his rear to get away from the swinging vehicle. After backing out, Brisco accelerated at Beauchamp in the driveway where he had retreated in his attempt to get away from the moving vehicle.

Brisco struck Beauchamp with his vehicle causing Beauchamp to be on the hood. Brisco then fled the parking lot at a high rate of speed, turning north onto Dewberry Blvd with Beauchamp on the hood.

As a result of Brisco's actions, Officer Beauchamp, in fear for his life on the hood of the vehicle, fired his handgun at Brisco. Brisco sustained a gunshot wound to his right arm and torso. Officer Beauchamp was thrown from the hood of the vehicle as it traveled northbound on Dewberry Blvd. The vehicle drove through a power pole, rolled side over side and came to rest in a private driveway on its roof.

Briscoe was transported to Methodist Charlton by LFD Med 352 where he was later pronounced deceased. Beauchamp was transported to Baylor Hospital in Waxahachie where he was treated for his injuries and subsequently released.

The scene was processed by Texas Ranger David Armstrong at the request of Lancaster PD with the assistance of CID Sergeant Alexander and his unit.

Video evidence from patrol unit 1481 (Beauchamp/Lemoine) and body camera 19 (Lemoine), and evidence located collected at the scene by investigators, supported statements given by Beauchamp and Lemoine.

DEF 00001 [1]

Upon the presentation of all of the evidence to the Dallas County Grand Jury, Officer Beauchamp was No Billed.

Policy 6.01.1 states:

**Objectively Reasonable:** the reasonableness of an officer's use of force is based upon the totality of the circumstances known by the officer at the moment the force is used, and the officer's recovery time based on the suspect's action(s). Officers will consider the severity of the crime an issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to flee. This standard is based on what a reasonable officer would do under similar circumstances.

**Reasonable Force:** the amount of force deemed necessary by the officer to overcome resistance, effect a lawful arrest or any other lawful objective.

Deadly Force

1.  Use of Deadly Force

Police officers are authorized to use deadly force to protect the public, other officers, and themselves in situations where the officer has an objectively reasonable belief that there exists an immediate threat of death or serious bodily injury

B.  DEADLY FORCE RESTRICTIONS

3. Firing at or from a moving vehicle, except:

a.  when an occupant of the vehicle is using or attempting to use deadly force on an officer or other persons; or

b.  as a last resort to prevent death or substantial harm to the officer or other person and/or at the direction of an on-duty supervisor who has been made aware of the situation

Upon review of the videos and reports, I found that Officer Beauchamp made every effort to get out of the way when Brisco began trying to flee the scene. Beauchamp only used force after he found himself on the hood and in fear for his life when Brisco hit him with the vehicle and began carrying him out of the parking lot at a high rate of speed.

No indication of policy violations by either Officer Beauchamp or Officer Lemoine were found.

## Exhibit 6

Grand Jury No-Bill



**JOHN CREUZOT**
**DISTRICT ATTORNEY**
**DALLAS COUNTY, TEXAS**
**PUBLIC INTEGRITY DIVISION**

June 10, 2019

Ranger David Armstrong
Texas Ranger – TX DPS
350 W. IH-30
Garland, TX 75043
David.Armstrong@dps.texas.gov

Re:     Officer Involved Shooting – Officer Zachary Beauchamp, Lancaster PD

Ranger Armstrong,

This letter is to inform you that the Dallas County Grand Jury returned a No-Bill in the above-referenced case on June 10, 2019.  Please let me know if you have any questions or need any further information.

Sincerely,

George Lewis
Chief, Civil Rights Unit
Dallas County Criminal District Attorney
133 N. Riverfront Blvd., LB19
Dallas, TX  75207
Direct: (214) 653-3713

DEF 00003

APPX 00085

# Exhibit 7

Texas Rangers
Report of
Investigation

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGERS

**THIS REPORT IS THE PROPERTY OF THE TEXAS RANGERS. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED.**

| | | | |
|---|---|---|---|
| **LEAD INVESTIGATOR:** | **DAVID ARMSTRONG** | **INVEST#:** | **2018I-TRB-50023163** |
| **SUPERVISOR:** | **SCOTT STEVENSON** | **OPENED:** | **03/26/2018** |
| **TITLE:** | **OFFICER INVOLVED SHOOTING, DALLAS COUNTY, LANCASTER POLICE DEPARTMENT, 03-18-2018** | **FILE STATUS:** | **OPEN** |
| **TYPE:** | **CRIMINAL** | **DIVISION:** | **TEXAS RANGERS** |
| **SERVICE:** | | **REGION:** | **B** |
| **DISTRICT:** | | **AREA:** | |
| **SUBTYPE:** | **OTHER - OFFICER INVOLVED SHOOTING** | **SPURS URN:** | **CMIV50023163** |
| **CATEGORY:** | | **REVIEW DATE:** | **09/23/2019** |
| **SPECIAL APPROVAL:** | | **LEGACY REF:** | |
| **PROGRAM:** | **CRIMES AGAINST PERSON** | **SUBPROGRAM:** | **FELONY** |
| **CASE#:** | | | |

## INVESTIGATION SYNOPSIS

On 03-18-2018, I, Texas Ranger David Armstrong was requested by Lancaster Police Department (LPD) Criminal Investigation Division (CID) Sergeant Eric Alexander to assist with investigating an officer involved shooting in their city. I was advised that Officer Zachary Beauchamp was involved in the shooting. Texas Rangers J Odom, Adam Sweaney, and Laura Simmons were requested to assist Ranger Armstrong.

## SUPPLEMENTAL SYNOPSES

**S1 03/26/2018 Report Writer: David Armstrong**
**03/29/2018 Approved by: Scott Stevenson**
On 03-18-2018, I, Texas Ranger David Armstrong was requested by Lancaster Police Department (LPD) Criminal Investigation Division (CID) Sergeant Eric Alexander to assist with investigating an officer-involved shooting in their city. I was advised that LPD Officer Zachary Beauchamp was involved in the shooting. Texas Rangers J Odom, Adam Sweaney, and Laura Simmons were requested to assist Ranger Armstrong.

**S4 01/07/2019 Report Writer: David Armstrong**
**02/06/2019 Approved by: J Rodney Odom**
This report will detail the continued investigation of the crime scene and the seizure of evidence.

**S5 01/07/2019 Report Writer: David Armstrong**
**02/06/2019 Approved by: J Rodney Odom**
This report will detail the documentation and seizure of evidence at the crime scene.

**S6 01/14/2019 Report Writer: David Armstrong**
**02/06/2019 Approved by: J Rodney Odom**
This report will detail the autopsy and seziure of evidence from it.

**S7 02/04/2019 Report Writer: David Armstrong**
**02/13/2019 Approved by: Jason Bobo**
This supplement will detail the processing of the suspect vehicle pursuant to a search warrant.

**S8 02/18/2019 Report Writer: David Armstrong**
**02/28/2019 Approved by: Jason Bobo**
This report will document the submission of evidence to the Garland lab.

**S9 02/18/2019 Report Writer: David Armstrong**

*DPS SENSITIVE*

F D    TIAL ATTORNEY EY    Y    DEF 00091
FORM   TI    UBJECT TO PRO   E    RDER
APPX 00086

**03/01/2019 Approved by: Jason Bobo**
This report will document the interview with a witness and her mother and photographs taken to corroborate that statement.

**S10**  **03/18/2019 Report Writer: David Armstrong**
**03/21/2019 Approved by: J Rodney Odom**
This report will detail the review of evidence received from Texas Ranger Adam Sweaney.

**S11**  **03/26/2019 Report Writer: David Armstrong**
**03/27/2019 Approved by: J Rodney Odom**
This report will detail the receipt and review of all Lancaster Police Department in-car and body worn camera footage.

**S12**  **03/26/2019 Report Writer: David Armstrong**
**03/27/2019 Approved by: J Rodney Odom**
This report will detail the sworn affidavits submitted by Lancaster Police Department Officers Lemoine and Beauchamp.

**S13**  **03/27/2019 Report Writer: David Armstrong**
**03/27/2019 Approved by: J Rodney Odom**
This supplement will detail the autopsy report for Brisco.

**S14**  **03/27/2019 Report Writer: David Armstrong**
**03/27/2019 Approved by: J Rodney Odom**
This report will detail the review of a Firearms and Toolmarks Laboratory Report submitted by the Texas Department of Public Safety Crime Lab.

**S2**  **04/20/2018 Report Writer: J Rodney Odom**
**04/23/2018 Approved by: Scott Stevenson**
On 03-18-2018, I, Texas Ranger J. Rodney Odom was contacted by Texas Ranger David Armstrong and advised of an Officer Involved Shooting that had occurred in Lancaster, Dallas County, Texas that evening. At that time Ranger Armstrong requested I respond to Lancaster to assist him document and process the crime scene.

**S3**  **07/17/2018 Report Writer: Adam Sweaney**
**08/03/2018 Approved by: J Rodney Odom**
On 03-18-2018, I, Texas Ranger Adam Sweaney was contacted by Texas Ranger Company B Headquarters and requested to assist Ranger David Armstrong with an Officer Involved Shooting Investigation involving the Lancaster Police Department. Ranger Armstrong requested me to obtain the clothing of Lancaster Officer Zachery Beauchamp at the Baylor Scott & White Medical Center. I also obtained the clothing of Michael Brisco at the Methodist Charlton Medical Center in Dallas. Following the collection of the clothing, I responded to the scene and assisted Ranger Armstrong with the processing of the scene.

## SUPPLEMENTAL DETAILS

**S1**  1.1  On 03-18-2018, at approximately 7:22 PM, I, Texas Ranger David Armstrong was requested by Lancaster Police Department (LPD) Criminal Investigation Division (CID) Sergeant Eric Alexander to assist with investigating an officer-involved shooting in their city. Texas Rangers J Odom, Adam Sweaney, and Laura Simmons were requested to assist me.

1.2  I arrived at the scene at approximately 8:38 PM, which was in the 1600 block of Dewberry Blvd in Lancaster.

1.3  I met with Detective Alexander and learned that LPD Officer Zachary Beauchamp (W/M DOB: ████-1989) had conducted a traffic stop at approximately 6:55 PM. Officer Beauchamp and his partner, Shane Lemoine (W/M DOB: ████-1977) were

*DPS SENSITIVE*                                         11/18/2019 10:27

patrolling an area plagued by violent crimes; including robbery, narcotics sales, aggravated assault, and homicide.

1.4  At some point during their patrol, Officer Beauchamp conducted a traffic stop on a white Ford Escape bearing Texas LP# JZH-1357 (SV1) and driven by Michael Brisco (B/M DOB: ████/1981). Brisco was the lone occupant of the vehicle.

1.5  During the traffic stop, Brisco reversed his vehicle striking Officer Beauchamp who attempted to escape the vehicle's path. Brisco then drove at Officer Beauchamp causing him to jump on the hood of Brisco's vehicle.

1.6  Brisco fled the parking lot at a high rate of speed with Officer Beauchamp on the hood. As a result of Brisco's actions, Officer Beauchamp fired his handgun several times at Brisco. Brisco sustained a gunshot wound to his right arm and torso. Officer Beauchamp was thrown from the hood of the vehicle as it traveled northbound on Dewberry Blvd. The vehicle drove through a power pole, rolled side over side and came to rest in a private driveway on its roof.

1.7  Brisco was transported from the scene by local paramedics to Charlton Methodist Hospital, where he was pronounced deceased by attending physicians. Officer Beauchamp was transported to Baylor Hospital in Waxahachie where he was treated for his injuries and subsequently released.

1.8  During an initial walk-through of the scene, I observed numerous items of potential evidence near 1607 Dewberry Blvd including .40 S&W cartridge casings, a Glock handgun consistent with LPD Officer's issued handgun, handcuffs, and sunglasses.

1.9  Near the driveway of 635 Laurel Lane, I observed bullet defects to SV1, blood in and about SV1, an extended Glock handgun magazine loaded with 9mm cartridges near SV1, a plastic baggie with a white powder like substance in plain view in SV1, a switchblade knife in the driver side door pocket and a .40 S&W cartridge casing.

1.10  It should be noted that 1607 Dewberry Blvd and 635 Laurel Lane are approximately 200 yards apart from north to south.

1.11  I noted the weather on this date and near the time of the incident was partly cloudy, approximately 70-75 degrees Fahrenheit and sunset was at approximately 7:37 PM.

**S4**  4.1  On 03-18-2018 at approximately 8:58 PM, I, Texas Ranger David Armstrong
continued processing the crime scene by taking photographs (S4.P1) of the evidence
to document the evidence as it was observed upon my arrival.


4.2  At approximately 11:30 PM, I received several items of evidence from Texas
Ranger Adam Sweaney. It should be noted that the following items were Michael
Brisco's clothing, which was seized from the hospital Brisco was admitted to. The
following list will detail those items:

A.  Shoes (S4.P2)

B.  Socks (S4.P3)

C.  Long underwear (S4.P4)

D.  Blue underwear (S4.P5)

E.  White shirt (S4.P6)

F.  White undershirt (S4.P7)

G.  Blue pants with belt (S4.P8)


4.3  At approximately 11:58 PM, I met with Lancaster Police Department Officer
Shane Lemoine to document the condition of his handgun and ammunition. Officer
Lemoine possessed a Glock Model 22 .40S&W caliber handgun bearing serial number
BECV905. An inspection of his handgun showed to have one Speer .40 S&W caliber
unfired cartridge in the handgun chamber. The magazine that was inserted in the
handgun contained 15 Speer .40 S&W, unfired cartridges. The two additional
magazines Officer Lemoine possessed were loaded identically and with the same
ammunition to the magazine that was in the handgun. After photographs of the
handgun, magazines and unfired cartridges were taken, I returned Officer Lemoine's
handgun to him. I observed no evidence indicating Officer Lemoine had fired his
weapon during this incident.


**S5**  5.1  On 03-19-2018 at approximately 2:43 AM, I, Texas Ranger David Armstrong,
began collecting evidence at the crime scene. I used a Texas Rangers Field
Evidence Log (S5.P1) to list the description, location, date/time, and other
detailed information relating to each piece of evidence. The following is a list
of the evidence seized from the scene:

*DPS SENSITIVE*                                                    11/18/2019 10:27

F D    TIAL ATTORNEY EY         Y      DEF 00094
FORM  TI    UBJECT TO PRO  E         RDER
                                                              APPX 00089

A.  .380 unfired cartridge (S5.P2)

B.  Speer .40 S&W fired cartridge case (S5.P3)

C.  Speer .40 S&W fired cartridge case (S5.P4)

D.  Speer .40 S&W fired cartridge case (S5.P5)

E.  Speer .40 S&W fired cartridge case (S5.P6)

F.  Speer .40 S&W fired cartridge case (S5.P7)

G.  Speer .40 S&W fired cartridge case (S5.P8)

H.  Glock model 22 .40 S&W S/N: BECV897 w/ Streamlight TLR-HL Light (S5.P9)

I.  Speer .40 S&W fired cartridge case (S5.P10)

J.  Speer .40 S&W fired cartridge case (S5.P11)

K.  Large capacity Glock magazine with 26 FMJ 9mm unfired cartridges (S5.P12)

L.  Speer .40 S&W fired cartridge case (S5.P13)

M.  White Ford Escape SUV (S5.P14)

N.  One unfired 9mm cartridge (S5.P15)

O.  Cigar containing substance with odor of marijuana (S5.P16)

5.2  At approximately 3:42 AM, I photographed Lancaster Police Department Officer Zachary Beauchamp's uniform and items that were brought to the scene by Texas Ranger Adam Sweaney. Those items and their condition were documented and released to Lancaster Police Department Sergeant Michelle McAnally at approximately 4:14 AM.

5.3  At approximately 5:15 AM, S5.P14 was secured by 24 Hour Wrecker and towed to Lancaster Police Department. The transport of S5.P14 was filmed by Lancaster Police Department during the escort to the police department.

5.4  After S5.P14 was towed from the scene, I performed a follow up walkthrough of the scene for additional evidentiary items, yielding nothing additional. At 5:44 AM, I cleared the crime scene.

**S6**  6.1  On 03-19-2018 at approximately 8:00 AM, I, Texas Ranger David Armstrong attended the autopsy for Michael Brisco at the Southwest Institute of Forensic Science (SWIFS) in Dallas, Texas.

6.2  The pathologist assigned to the autopsy was Janis K Townsend-Parchman, M.D.

6.3  During the autopsy, Dr. Townsend-Parchman advised Brisco suffered two gunshot wounds, one to his right forearm and one to his torso. During the autopsy, a single projectile was recovered from the L5 vertebrae of Brisco. It should be noted that the projectile from the gunshot wound to Brisco's right arm exited when he was shot. Therefore it was not recovered during the autopsy.

*DPS SENSITIVE*                                    11/18/2019 10:27

F D    TIAL ATTORNEY EY              Y        DEF 00095
FORM  TI    UBJECT TO PRO  E              RDER
                                                          APPX 00090

6.4  Dr. Townsend-Parchman stated Brisco died as a result of his gunshot wounds.

6.5  At approximately 10:40 AM, the following evidentiary items were released to me by Dr. Townsend-Parchman:

A.  Gunshot residue kit stub (S6.P1)

B.  Projectile (S6.P2)

C.  Head hair standard (S6.P3)

D.  Blood standard (S6.P4)

E.  Bags from Brisco's hands (S6.P5)

**S7**  7.1   On 03-20-2018 at approximately 11:11 AM, I, Texas Ranger David Armstrong secured a signed search warrant (S7.P1) from 292nd Dallas District Court Judge Brandon Birmingham.

7.2   The search warrant was secured for the purpose of searching the vehicle (SV1) Brisco was driving and seizing all relevant evidence from it.

7.3   After securing the search warrant, I traveled to Lancaster Police Department where SV1 was secured in their locked vehicle evidence bay. At approximately 2:28 PM, I took photographs (S7.P2) of the undisturbed seals on SV1.

7.4   At approximately 2:29 PM, 24 Hour Wrecker service relocated SV1 from the evidence bay to the Lancaster Fire Department (LFD) garage. It should be noted that LFD shares a building with the Lancaster Police Department (LPD), but their vehicle bays are separated by a parking lot.

7.5   At approximately 2:45 PM, I began processing SV1 for evidence. I was assisted by Texas Rangers J Odom and Laura Simmons. The following is a list of evidence seized from SV1:

A.  Projectile from rear side door (S7.P3)

B.  Projectile from driver seat (S7.P4)

7.5.B.1  It should be noted that this projectile likely corresponds to the gunshot wound Brisco's right forearm sustained

C.  Cigar containing suspected marijuana (S7.P5)

D.  Unfired 9mm cartridge (S7.P6)

E.  Large capacity magazine with 26 unfired cartridges (S7.P7)

*DPS SENSITIVE*                          11/18/2019 10:27

F D     TIAL ATTORNEY EY        Y      DEF 00096
FORM  TI    UBJECT TO PRO  E         RDER
APPX 00091

F.  Blood swab (S7.P8)

G.  Projectile from driver side of rear hatch (S7.P9)

H.  Glock 19 9mm containing magazine with 12 unfired 9mm cartridges SN: KBU676 from center armrest (S7.P10)

7.5.H.1  It should be noted that S7.P10 had one of the twelve unfired 9mm cartridges loaded in its chamber at the time of seizure

I.  LG Smartphone from cup holder (S7.P11)


7.6   While processing SV1, I noted and photographed other items that were not seized. The following is a list:

A.  Black ski mask found in front passenger floorboard

B.  Plastic flask containing yellow liquid with temperature gauge on it, consistent with synthetic urine used for passing drug tests found in front passenger floorboard

C.  Switchblade knife found in front driver side door pocket


7.7   During the processing of SV1, I noted and photographed black streaks. The streaks originated at the front of the hood above the grill and extended in a swipe pattern towards the windshield. I further noted that the streak was concentrated in the middle of the hood. I noted this due to the abrasions on Officer Beauchamp's duty belt and that it was consistent with him being struck by the vehicle, traveling up the hood and into the windshield before being thrown off.


7.8   Additionally, I observed that the bug deflector that was once attached to the hood had been broken in a manner consistent with Officer Beauchamp striking it upon being hit by SV1.


7.9   At approximately 3:41 PM, a copy of the search warrant and inventory were left in the vehicle, and it was released for storage to Lancaster Police Department.


7.10  At approximately 4:30 PM, I received the following items of evidence from Sergeant Eric Alexander:

A.  DVD containing LPD dispatch recordings (S7.P12)

B.  10 DVDs In-car and body worn camera footage (S7.P13)

F D    TIAL ATTORNEY EY         Y      DEF 00097
FORM  TI    UBJECT TO PRO  E         RDER
                                              APPX 00092

8.1   On 03-22-2018, I, Texas Ranger David Armstrong submitted the following items of evidence to the Texas Department of Public Safety Crime Lab in Garland. It should be noted that all items listed below were assigned evidence numbers in previous reports; therefore this list will document the submission of those items only.

A.   Unfired .380 cartridge

B.   Speer .40 S&W fired cartridge case

C.   Speer .40 S&W fired cartridge case

D.   Speer .40 S&W fired cartridge case

E.   Speer .40 S&W fired cartridge case

F.   Speer .40 S&W fired cartridge case

G.   Speer .40 S&W fired cartridge case

H.   Glock 22 .40 S&W pistol with magazine, tactical pistol light, and 7 unfired .40 S&W cartridges

I.   Speer .40 S&W fired cartridge case

J.   Speer .40 S&W fired cartridge case

K.   Large capacity magazine with 26 unfired cartridges

L.   Speer .40 S&W fired cartridge case

M.   Unfired 9mm cartridge

N.   Cigar containing marijuana scented substance

O.   Projectile

P.   Projectile

Q.   Blood swab

R.   Glock 19 9mm pistol with empty magazine and 12 unfired 9mm cartridges

S.   Shoes

T.   Socks

U.   Long underwear

V.   Blue underwear

W.   White shirt

X.   White undershirt

Y.   Blue pants

Z.   Gunshot residue kit

AA.   Projectile from Brisco's body

BB.   Head hair

*DPS SENSITIVE*                                          11/18/2019 10:27

F D     TIAL ATTORNEY EY          Y       DEF 00098
FORM  TI     UBJECT TO PRO  E          RDER
                                              APPX 00093

CC.  Blood standard

DD.  Bags from hands

EE.  Projectile from suspect vehicle

**S9**  9.1    On 03-22-2018 at approximately 6:38 PM, I traveled to the residence of Bethany W███████ (W/F DOB: ███/1992) and her daughter J███ W███████ (B/F DOB: ███/2009) and conducted an audio-recorded interview (S9.P1). The following is a summary of the interview with them. The summary does not contain all comments made during the interview, nor does it necessarily reflect the chronology of the discussion. The audio recording of the interview contains a verbatim account of the interview. It should be noted that J███ W███████ witnessed the incident and the interview was focused on her recollection of the events.

9.2    J███ recalled the incident occurring on Monday (03/19/2018) rather than on Sunday (03/18/2018). She recalled that she was helping her mother and aunt move and load their belongings as they prepared to move to where they currently lived.

9.3    J███ stated, "One of the police officers jumped on the guy's car and started shooting at the window and the guy inside was like saying, "Oh, oh, oh" because he (police officer) was shooting and the police officer, he rolled off the car, and then he (police officer) started shooting."

9.4    She stated she was outside when she observed those events. When asked where she was standing, she stated she was standing by her aunt's door. She recalled it had a sign that says' "God bless America" on it, but did not recall numbers or letters on the door. She added that there was a screen door as well.

9.5    J███ stated, "The police officer and the man driving were in the apartments by 7-11…the man was parked there and started driving off." She added, "The man was parked and then got in the car, then was driving, trying to get away."

9.6    I asked her to describe the vehicle the man was driving, and she stated, "It was kind of like a van, but it was all white, kind of like a police car, but with no thingy on the headlights…it was a white car."

9.7    She described the man driving the white car as, "He had the same skin tone as my dad (African-American), but darker and I didn't see anything else..." After witnessing the shooting, J███'s mother and aunt pulled her into the apartment and made her stay in the shower until it was safe and secure.

9.8    J███ described the driver of the white car as wearing a white shirt and black pants. She further stated, "He (police officer) was trying to stop the guy so he could take him to jail."

*DPS SENSITIVE*                                                    11/18/2019 10:27

F D    TIAL ATTORNEY EY        Y      DEF 00099
FORM  TI    UBJECT TO PRO  E        RDER
APPX 00094

9.9   I asked her to describe the police officer's actions, and she stated, "Well, he was running, then he jumped on the car, then he put his gun on the window…after that, he rolled off and then the guy kept wanting to go and then he (police officer) kept on shooting."

9.10  I asked J███ what she saw before the police officer got on the hood of the car and she stated, "He was trying to tell him to get in the police car, so he could take him and see why he was trying to go somewhere else." She then clarified by saying, "Get away from him so he wouldn't go to jail."

9.11  J███ stated she did not see the other police officer, just the one that was on the hood. She also did not recall seeing anyone else around the vehicle when this occurred.

9.12  I asked J███ to describe where the police officer rolled off the car, and she stated, "There was like a corner, and he almost rolled off, and then he got in the street…he um…he was trying to catch him so he could take him to jail…he rolled off on the street."

9.13  I asked her if she heard the police officer saying anything and she did not recall hearing him say anything. She did state, "I thought that he might have got hurt…because I don't like seeing people get hurt."

9.14  She added that the police officer was standing when he shot at the vehicle as it drove away.

9.15  I asked her if she recalled anything else and she added, "He was driving straight, and I think he was trying to like, turn into the curb so the police officer wouldn't catch him…because um, there's like to curbs to turn to either, he went to the right or left…he didn't fully make it."

9.16  She concluded by stating that the white car "was not really loud" and she could not hear any music coming from it.

9.17  End of summary.

9.18  At the conclusion of the interview, I traveled back to the crime scene and took digital photographs (S9.P2) depicting the crime scene from J███'s point of view.

*DPS SENSITIVE*                                                11/18/2019 10:27

F D    TIAL ATTORNEY EY         Y    DEF 00100
FORM  TI    UBJECT TO PRO  E         RDER
                                                          APPX 00095

**S10**  10.1  On 03-23-2018 at approximately 9 AM, I received photographs (S10.P1) of Officer Zachary Beauchamp's injuries and a video recorded interview (S10.P2) with Brisco's family from Texas Ranger Adam Sweaney.

10.2  I reviewed S10.P1 and noted the following:

A.  Officer Beauchamp was shown seated on a hospital bed. He was dressed in a hospital gown but wore black and gray socks. Both of his knees showed obvious bloody abrasions, scrapes, and bruises that appeared to be fresh.

B.  Officer Beauchamp also showed extensive fresh, bloody abrasions, scrapes and bruising to his right forearm, elbow, and hand.

10.3  I reviewed S10.P2 and observed several unidentified family members of Brisco in a waiting room as they attempted to learn detailed information of the investigation from Ranger Sweaney and Lancaster Police Department Detective Joseph Brickett.

10.4  Despite numerous family members being present, no information of evidentiary value was learned.

10.5  As Ranger Sweaney began to leave the waiting room, an unidentified female family member stated, "He (Brisco) did that to himself when he ran from the police, so I don't know what he was hiding, so it's out of our hands, but God don't make no mistakes, He has to get our attention one way or the other."

**S11**  11.1  On 03-23-2018, I, Texas Ranger David Armstrong, received and later reviewed Lancaster Police Department (LPD) in car and body worn camera footage (S11.P1) of the shooting.

11.2  It should be noted that S11.P1 contains eight DVD's and each DVD contains multiple videos. I reviewed the footage of each video and prepared detailed notes of each video as needed. After reviewing the footage, I found it to be consistent with witness statements and evidence found at the scene and elsewhere. The following is a summary of S11.P1. The summary does not contain all comments made during the captured footage, nor does it necessarily reflect the chronology of the events. The actual footage contains a verbatim account of the events. It should be further noted that all times and dates reflected on the footage was reasonably accurate.

A.  Disc 1 of 2: Officer Lemoine 1481

11.2.A.1  It should be noted that this video reflects the initial interaction between LPD Officers Lemoine and Beauchamp with Brisco.

*DPS SENSITIVE*                                    11/18/2019 10:27

F D     TIAL ATTORNEY EY        Y      DEF 00101
FORM  TI     UBJECT TO PRO  E        RDER
APPX 00096

11.2.A.2  Officer Lemoine driving through the apartment parking lot.

11.2.A.3  A conversation is overheard between Officer Lemoine and Officer Beauchamp, "he's got no seatbelt on."

11.2.A.4  As officers got out and approached, Brisco opened his door, leaned out, while looking back at officers and indicated he was waiting for someone while pointing with his left hand. His right hand was out of view.

11.2.A.5  Brisco showed Officer Lemoine an object, possibly a cell phone.

11.2.A.6  Officer Lemoine stated they were checking on him.

11.2.A.7  Officer Beauchamp moved to the passenger side of Brisco's vehicle as Brisco closed his door.

11.2.A.8  Officer Lemoine asked for Brisco's license, Brisco said, "Where'd I put it at…oh, here it go, right here." It should be noted that Brisco put his vehicle in reverse (reverse lights were seen coming on) while stating the above. Brisco also handed something to Officer Lemoine at that point.

11.2.A.9  Officer Lemoine stated, "Go ahead and step out of the vehicle for me." Brisco then opened his door while handing an ID to Officer Lemoine and saying again, "Here it go right here."

11.2.A.10  Officer Lemoine asked Brisco again to step out of the car, and Brisco replied, "What'd I do, sir?" He stated this while quickly backing out of the parking space and holding his door.

11.2.A.11  Officer Lemoine was heard exclaiming "whoa" three times.

11.2.A.12  Brisco's vehicle engine is heard revving loudly as the vehicle backed out of the space quickly and with the driver door open.

11.2.A.13  Officer Beauchamp was out of view of the camera, but Brisco was observed looking in the direction Officer Beauchamp was positioned.

11.2.A.14  Video captured audio of Officer Beauchamp grunting or yelling as he was struck by Brisco's vehicle.

11.2.A.15  Officer Lemoine was observed returning to his patrol vehicle, and shots are heard being fired by Officer Beauchamp.

11.2.A.16  As Officer Lemoine gave chase in his vehicle, dust kicked up by Brisco's acceleration was observed.

11.2.A.17  Officer Lemoine chased Brisco, and Officer Beauchamp was heard shooting multiple times.

11.2.A.18  Officer Beauchamp was then observed kneeling in the street with his gun in his hand after being thrown from the vehicle. He radioed, "Officer down, I been ran over." He is obviously dazed and radioed again, "Get EMS." Officer Beauchamp fell over to his left side, pointed in the direction of Brisco's escape and said, "Go get him, he ran me over, shots fired, I been ran over….I'm at Dewberry, I need everybody here, I been ran over."

11.2.A.19  A nearby female was overheard yelling, "Are you okay, are okay?!" She yelled at another nearby officer, "Is he (Beauchamp) okay?!"

11.2.A.20  Additional LPD Officers began arriving at the scene.

11.2.A.21  Officer Beauchamp attempted to get up while stumbling, nearly falling,

F D      TIAL ATTORNEY EY          Y      DEF 00102
FORM  TI      UBJECT TO PRO  E          RDER
APPX 00097

but he finally stood. He gave a physical description of Brisco.

11.2.A.22  Officer Lemoine then guarded Officer Beauchamp's pistol, which was on the ground.

11.2.A.23  Officer Lemoine was overheard describing Brisco's suspicious behaviors to another officer and gave a general description of the incident. He stated, "He (Brisco) struck Beauchamp behind the Durango…it knocked him onto the hood."

B.  Disc 1 of 2: Lieutenant Fine 1482

11.2.B.1  An officer was overheard on Lieutenant Fine's police radio exclaiming, "He's taking off!" The same officer says something unintelligible.

11.2.B.2  Lieutenant Fine was seen turning north onto Dewberry; Officer Lemoine was seen turning out of the apartment complex onto Dewberry while chasing Brisco.

11.2.B.3  Officer Beauchamp was overheard on the radio saying he'd been run over.

11.2.B.4  Brisco was seen crashing in the distance. Lieutenant Fine arrived at Brisco's vehicle, which was overturned and smoking. The right rear wheel of the vehicle was still spinning.

11.2.B.5  Lieutenant Fine asked Brisco if he's okay and received no verbal response.

11.2.B.6  Lieutenant Fine tried to open the driver door and then radioed the crash location while requesting a helicopter.

11.2.B.7  An unidentified LPD Officer is overheard stating, "We got a bullet right there."

11.2.B.8  An unidentified LPD Officer was overheard stating, "They're keeping cover on him because there's a live bullet outside the vehicle right there."

11.2.B.9  A knife was observed by an LPD Officer in the driver side door pocket.

11.2.B.10  Brisco was patted down before being transported by ambulance to the hospital.

11.2.B.11  An extended pistol magazine was observed by one of the officers.

11.2.B.12  Lieutenant Fine was overheard on the phone stating, "He was conscious and breathing, but he was (responding)…he had several spots on his shirt where there was blood…" Officers on the scene seemed to believe Brisco had a weapon due to the ammunition and magazine observed outside of his vehicle. Only one occupant in the vehicle. End of the phone call.

11.2.B.13  Lieutenant Fine sent other officers to walk both sides of the street between the two scenes to ensure a suspect weapon was not lying in the street.

C.  Disc 1 of 2: Officer B. Pate 1484

11.2.C.1  Officer Pate arrived at the scene, and his video captured Lieutenant Fine opening the driver door of Brisco's vehicle

11.2.C.2  Officer Pate stated, "Beauchamp shot through the fucking windshield, look…Hey, I think Beauchamp hit him…He's moving; he's moving, he's moving…"

11.2.C.3  Unidentified officer stated, "We got two rounds through the windshield… we got rounds on the ground."

D.  Disc 2 of 2: Sergeant McAnally 1483

*DPS SENSITIVE*                                        11/18/2019 10:27

F D    TIAL ATTORNEY EY        Y      DEF 00103
FORM  TI     UBJECT TO PRO  E         RDER
                                                              APPX 00098

11.2.D.1  Sergeant McAnally stated, "Beauchamp, where are you" while responding to the scene.

11.2.D.2  Upon arriving at the scene, Officer Beauchamp told McAnally, "He handed me a DL, and then he drug me over here, you know, I didn't have a choice, I had to, I shot him (while breathing heavily)."

11.2.D.3  An officer advised Officer Beauchamp, "Don't you say shit to anybody, that includes Mack (Sergeant McAnally)."

11.2.D.4  Sergeant McAnally stated, "Don't you say anything; we're gonna get you a medic and get TMPA (Texas Municipal Police Association) and meet you at the hospital."

11.2.D.5  Officer Beauchamp complained of leg, knee, wrist, and shoulder pain. Sergeant McAnally rode in the ambulance with Officer Beauchamp to the hospital.

11.2.D.6  Officer Beauchamp stated, "I'm not dying; I'm just hurting."

E.  Disc 2 of 2 Officer Lemoine 19 (body worn camera)

11.2.E.1  Footage picked up where Officer Beauchamp was sitting on the ground and captured him state, "I just got ran over, I think my arm's broke." Officer Beauchamp is seen rolling side to side in obvious pain. He is shown trying to get up on camera as previously described.

11.2.E.2  Camera became dysfunctional at that point and turned to a pink screen, which was a known issue with that brand of body worn camera.

11.2.E.3  Officer Lemoine recounted to another officer, Beauchamp was pretty much on his back on the windshield, his feet were to the driver side…struck him with the front of the vehicle."

F.  Disc 2 of 2 Officer Lemoine 1481

11.2.F.1  Picked up where Officer Lemoine was guarding Officer Beauchamp's gun.

11.2.F.2  Officer Lemoine left the scene with a companion officer and returned to LPD to await TMPA.

G.  Disc 2 of 8 Officer Hightower 1412

11.2.G.1  Upon arriving at the crash scene, an officer was heard exclaiming to Brisco, "Don't reach for it." Unknown what the officer was referring to.

H.  Disc 2 of 8 Officer Serrano 1495

11.2.H.1  Officer Serrano was heard asking what kind of car they were looking for, while he was responding to the scene.

11.2.H.2  Upon arriving at the crash scene, Officer Serrano wanted to clear the car of weapons. Moaning can be heard coming from Brisco's vehicle.

11.2.H.3  Unknown officer stated, "He has a pulse."

I.  Disc 2 of 8 Sergeant McAnally

11.2.I.1  Nothing of evidentiary value

J.  Disc 2 of 8 Officer Lemoine 19

11.2.J.1  Nothing of evidentiary value

*DPS SENSITIVE*                                    11/18/2019 10:27

F D      TIAL ATTORNEY EY          Y        DEF 00104
FORM  TI      UBJECT TO PRO  E          RDER
                                                                    APPX 00099

K.  Disc 3 of 8 Officer Warren 1489

11.2.K.1  Arrived at scene one, and Officer Beauchamp is observed standing.

L.  Disc 3 of 8 Officer Salazar 1491

11.2.L.1  Arrived well after the scenes were secured.

11.2.L.2  Left the scene and returned to LPD with Officer Lemoine. He was the companion officer for Officer Lemoine.

M.  Disc 3 of 8 Officer Serrano 1495

11.2.M.1  Nothing of evidentiary value.

N.  Disc 3 of 8 Officer Lemoine 1481

11.2.N.1  Nothing of evidentiary value.

O.  Disc 4 of 8 Lieutenant Fine 1482

11.2.O.1  Lieutenant Fine was overheard stating, "I could actually see him (Beauchamp) on the hood of the car."

P.  Disc 4 of 8 Officer Warren 1489

11.2.P.1  Nothing of evidentiary value.

Q.  Disc 4 of 8 Officer Pate 1484

11.2.Q.1  Nothing of evidentiary value.

R.  Disc 4 of 8 Officer Hightower

11.2.R.1  Nothing of evidentiary value.

S.  Disc 5 of 8 Sergeant McAnally 1483

11.2.S.1   Nothing of evidentiary value.

T.  Disc 5 of 8 Officer Serrano 1495

11.2.T.1   Nothing of evidentiary value.

U.  Disc 5 of 8 Officer Warren 1489

11.2.U.1  Nothing of evidentiary value.

V.  Disc 5 of 8 Lieutenant Fine 1482

11.2.V.1  Gave account that corroborated evidence.

W.  Disc 5 of 8 Officer Hightower 1412

11.2.W.1  Nothing of evidentiary value.

X.  Disc 6 of 8 Sergeant McAnally 1483

11.2.X.1  Nothing of evidentiary value.

Y.  Disc 6 of 8 Sergeant McAnally 1483

*DPS SENSITIVE*

F D      TIAL ATTORNEY EY          Y      DEF 00105
FORM  TI      UBJECT TO PRO  E          RDER
APPX 00100

11.2.Y.1   Nothing of evidentiary value.

Z.  Disc 6 of 8 Officer Pate 1484

11.2.Z.1   Nothing of evidentiary value.

AA.  Disc 7 of 8 Sergeant McAnally 1483

11.2.AA.1   Nothing of evidentiary value.

BB.  Disc 7 of 8 Officer Pate 1484

11.2.BB.1   Nothing of evidentiary value.

CC.  Disc 7 of 8 Sergeant McAnally 1483

11.2.CC.1   Nothing of evidentiary value.

DD.  Disc 8 of 8 Sergeant McAnally 1483

11.2.DD.1   Nothing of evidentiary value.

EE.  Disc 8 of 8 Lieutenant Fine 1482

11.2.EE.1   Nothing of evidentiary value.

FF.  Disc 8 of 8 Officer Hightower 1412

11.2.FF.1   Video of Brisco's vehicle being towed from scene to LPD secure storage and then locked and secured in the single-vehicle bay at LPD.


11.3   End of summary.


**S12**   12.1   On 03-23-2018 at approximately 2:16 PM, I, Texas Ranger David Armstrong secured a signed, sworn affidavit (S12.P1) from Lancaster Police Department (LPD) Officer Shane Lemoine. The following is a verbatim copy of S12.P1:

A.  BEFORE ME, the undersigned authority, on this day personally appeared, Shane Lemoine, who being duly sworn on oath states:

B.  I was born on ▉▉▉▉/1977. I currently work as a police officer for the city of Lancaster, Texas. I started working for the Lancaster Police Department in December 2017. I am currently in my third (of four) phase of training. My telephone number is ▉▉▉▉▉▉▉▉.

C.  I am voluntarily submitting this statement to Ranger David Armstrong. I am giving this statement without any threats or promises and on my own free will. He may use this statement for whatever purpose he or the State of Texas deem necessary. (INITIALS:__)

D.  On March 18, 2018, I was patrolling the City of Lancaster with my training officer, Officer Zac Beauchamp. I was wearing my fully issued Lancaster Police Department uniform that clearly identified me as a police officer. I was driving a fully marked Lancaster Police Department Chevrolet Tahoe (1481) while Officer Beauchamp rode in the passenger seat. Our vehicle was equipped with emergency

*DPS SENSITIVE*                                              11/18/2019 10:27

F D      TIAL ATTORNEY EY           Y      DEF 00106
FORM  TI      UBJECT TO PRO  E           RDER
                                                        APPX 00101

lights and a dash camera.

E.  After detail my trainer and I took a marked vehicle to fleet services to be repaired. We then answered a criminal mischief call at Pleasant Run and Dewberry. Shortly after we cleared the call, my trainer observed someone he believed to have an arrest warrant go in the OK Food Mart on the northeast corner of Pleasant Run and Dewberry. We briefly parked at a nearby church behind the OK Food Mart with a view of the OK Food Mart's back door. Other Lancaster officers arrived in the area as well. We then moved to the 7-11 so we could see the front door of the OK Food Mart. Shortly thereafter, I went into the store with Officer Beauchamp and Sergeant Logan to see if the wanted suspect was still inside or hiding. It appeared that the wanted suspect was no longer in the area.

F.  At approximately 7PM we began to leave the area. I was driving northbound on Dewberry with Officer Beauchamp. We passed the OK Food Mart. As we were passing the church, I observed a white SUV illegally parked in a fire lane at the apartments located at 1600 Dewberry. There were still police vehicles in the area. The driver was on the phone and appeared to be relaying our location and activity to someone on the other end of the phone. Officer Beauchamp instructed me to circle around and head back towards the apartment complex.

G.  I made right turns on Arbor, Elm, and Pleasant Run and then a right turn back on Dewberry. I entered the apartment complex through the south entrance and noticed the suspect was still parked in the fire lane at the north entrance. I drove around the building. As we were coming up behind the suspect vehicle, the suspect pulled into a parking spot.

H.  We exited the patrol vehicle and approached the suspect. I approached on the driver side while Officer Beauchamp approached on the passenger side. I made contact with the suspect and asked for his driver's license. The suspect appeared very nervous and was shaking as he attempted to remove his license from his wallet. The suspect then handed me a Texas identification card. I heard Officer Beauchamp instruct me to have the suspect exit the vehicle. I ordered the suspect out of the vehicle. As I was opening the driver's door, the driver quickly backed out of the spot. I had to move out of the way of the open door to avoid getting knocked over.

I.  The suspect backed up straight into a vacant spot on the other side of the parking lot. I ran back towards our patrol vehicle because I thought we were about to pursue the suspect. The suspect put his SUV in driver and drove directly at Officer Beauchamp. I could no longer see Officer Beauchamp. Almost immediately, I heard a thud which I believe was the suspect hitting Officer Beauchamp with the SUV. I observed Officer Beauchamp on the hood of the suspect's SUV as the suspect turned right on Dewberry. The suspect appeared to be accelerating. I was afraid the suspect was going to continue accelerating north on Dewberry. I was terrified that I was about to watch Officer Beauchamp die. I heard multiple gun shots and wasn't sure if the suspect was shooting at Officer Beauchamp or if Officer Beauchamp was shooting to try and save his own life. As I turned right on Dewberry, I saw Officer Beauchamp kneeling in pain on the pavement. The suspect continued driving north on Dewberry at a very high rate of speed. I observed the suspect swerve and flip over.

J.  Several Lancaster officers arrived on scene almost immediately. I stayed with Officer Beauchamp until he was taken away in an ambulance. I then went back to the police station to wait for further instructions.

K.  END OF STATEMENT

L.  I would like to state that everything I have stated to Ranger David Armstrong is true and correct to the best of my knowledge. (INITIALS:__)

*DPS SENSITIVE*                                                    11/18/2019 10:27

F D    TIAL ATTORNEY EY            Y       DEF 00107
FORM  TI    UBJECT TO PRO  E            RDER
                                                          APPX 00102

12.2   On 03-23-2018 at approximately 2:44 PM, I, secured a signed, sworn affidavit (S12.P2) from LPD Officer Zachary Beauchamp. The following is a verbatim copy of S12.P2:

A.   BEFORE ME, the undersigned authority, on this day personally appeared, Zachary Beauchamp, who being duly sworn on oath states:

B.   I was born on ██████/1989. I currently work as a police officer for the city of Lancaster, Texas. My telephone number is ████████.

C.   I am voluntarily submitting this statement to Ranger David Armstrong. I am giving this statement without any threats or promises and on my own free will. He may use this statement for whatever purpose he or the State of Texas deem necessary. (INITIALS:__)

D.   My name is Zachary Beauchamp. I am a police officer with the city of Lancaster, Texas. I have been with the Lancaster Police Department for approximately 3 years. I am currently assigned to the patrol division.

E.   On Sunday, March 18, 2018, I was assigned as a patrol officer. My duty hours were 6P-6A. I was wearing my full issued Lancaster Police Department uniform that clearly identified me as a Lancaster police officer. I was patrolling the city with Recruit Officer Shane Lemoine. Recruit Officer Lemoine was in his third phase of training. He had one more phase remaining. I was responsible for training Recruit Officer Lemoine during his third phase. We were driving a fully marked Lancaster Police Department Chevrolet Tahoe which was equipped with emergency lights and an in-dash camera system.

F.   I began the shift by taking our normal vehicle (1487) to our fleet maintenance facility for repair. Recruit Officer Lemoine followed in vehicle 1481 to pick me up. We got into vehicle 1481. I was planning on going back to the station to grab my duty bag and other equipment.

G.   As we were headed back to the station, a criminal mischief call came out in the 600 block of W. Pleasant Run Road. We told the dispatcher that we would go to the call. We were able to quickly clear the call.

H.   After we cleared the call, I observed a male who looked to be Zane Pugh, a suspected aggravated robbery suspect, walk into the OK Food Mart (701 W. Pleasant Run) across the street. I also saw Javier Martinez and the Cooks brothers in the parking lot. Pugh, Martinez, and the Cooks are known to associate with each other and are known to engage in criminal activity. I told Recruit Officer Lemoine to pull into a nearby church with a view of the OK Food Mart's back door. Other officers quickly arrived in the area. After a few moments at the church, Recruit Officer Lemoine and I relocated to the 7-11 across the street so we could watch the front door of the OK Food Mart. When we got to the 7-11 moments later, Martinez and the Cooks brothers were gone. A short time later, Sergeant Logan, RO Lemoine, and I went into the store to see if we could locate Pugh. The suspect was not there and we could not locate him.

I.   We left the OK Food Mart and drove northbound on Dewberry towards the station. We were following Officer Pate. As we were following Officer Pate northbound on Dewberry, I noticed a white SUV illegally parked in a fire lane at the Dewberry Apartments. The Dewberry Apartments is a well known location for storing and selling dangerous narcotics. The driver was on the phone and appeared to be very concerned to see Officer Pate drive by. The suspect was fixated on Officer Pate, and turned his head almost all the way around to track where Officer Pate was headed. Officer Pate came over the radio to ask me if I observed the white SUV. I told him that I did and that we would circle back and make contact with the driver.

J.   I instructed Recruit Officer Lemoine to turn right on Arbor Lane, right on Elm Street, and right again on Pleasant Run Road. We pulled into a parking lot to the

*DPS SENSITIVE*                                                    11/18/2019 10:27

F D        TIAL ATTORNEY EY              Y        DEF 00108
FORM  TI      UBJECT TO PRO  E                 RDER
                                                          APPX 00103

south of the suspect's location to see if we could observe him. Our view was blocked by a privacy fence.

K.  Recruit Officer Lemoine continued a short distance north on Dewberry and pulled into the south entrance of the complex. The suspect was still parked in the fire lane. We circled around to pull up behind the suspect vehicle. As we were pulling behind him he pulled front first into a parking spot. We got out of the car to make contact with the suspect.

L.  Recruit Officer Lemoine approached the vehicle on the driver side and made contact with the suspect. I observed the suspect was fixated on RO Lemoine as he approached. I approached the vehicle on the passenger side and observed that the front passenger side window was partially rolled down. I don't think the suspect knew I was there. I immediately smelled the odor of marijuana and observed what appeared to be a marijuana cigar right above the gear shifter.

M.  While staring at Recruit Officer Lemoine, the suspect handed him his ID with one hand while carefully and gradually reaching for the center console with the other. The suspect was able to open the center console. A moment later, the suspect reached into the center console. I was concerned that the suspect may be retrieving a pistol. I instructed Lemoine to get the suspect out of the SUV. The suspect looked up and stared right at me. I could tell he was surprised to see me. He immediately and quickly backed out of the spot.

N.  My instinct was to run back to our squad car to pursue the suspect. As I was running towards our squad car, I heard the suspect rev the engine of his SUV. The next thing I know the suspect put the car in drive and hit me with the SUV knocking me off of my feet. I landed on the hood. The suspect continued to drive while I was stuck on the hood. I looked the suspect straight in the eye. The suspect distinctly and intentionally gunned the engine and accelerated the vehicle. I was convinced if I fell off the hood the suspect was going to run me over and kill me.

O.  As the suspect continued to increase his speed, I thought that I was about to die. I thought I was never going to see my wife or two children again. I was somehow able to retrieve my department issued pistol and fire at the suspect to try and stop him from continuing to accelerate and killing me. I don't know if he swerved or hit the curb, but all of a sudden my momentum shifted and I fell off the side of the hood. As I fell off the hood, the suspect missed running me over by just a few inches.

P.  I immediately experienced excruciating pain throughout my entire body. I experienced severe sharp shooting pains in my shoulder, ribs, elbows, and knees. Other officers quickly came to my aid. I was quickly transported by ambulance to the emergency room at Baylor Scott and White Hospital in Waxahachie.

Q.  END OF STATEMENT

R.  I would like to state that everything I have stated to Ranger David Armstrong is true and correct to the best of my knowledge. (INITIALS:___)

**S13**  13.1  On 06-05-2018 at approximately 1:32 PM, I Texas Ranger David Armstrong received and reviewed the autopsy report (S13.P1) for Brisco from Southwestern Institute of Forensic Sciences (SWIFS).

*DPS SENSITIVE*                                            11/18/2019 10:27

13.2  The following are key facts from S13.P1, for detail refer to S13.P1:

A.  Date and Time of Death: 03-18-2018 at 7:41 PM

B.  Examination performed on 03-19-2018 at 8:00 AM

C.  Gunshot wounds: Two, one to the abdomen and one to the right forearm

D.  Toxicology (Blood, postmortem):

13.2.D.1  Acid/Neutral Screen: Negative

13.2.D.2  Alcohols/Acetone: Negative

13.2.D.3  Carbon Monoxide: Carboxyhemoglobin: 3%

13.2.D.4  Cocaine and Opiates:

A.  Cocaine: 58.5 ng/mL

B.  Ecgonine methyl ester: 236.7 ng/mL

C.  Benzoylecgonine: 1032.5 ng/mL

13.2.D.5  Marihuana/Cannabinoids:

A.  Tetrahydrocannabinol: 26.0 ng/mL

B.  Carboxytetrahydrocannibinol: 90.9 ng/mL

E.  Findings:

13.2.E.1  Gunshot wound of abdomen:

A.  Entrance wound: right epigastric area

B.  Apparent range of fire: indeterminate, based on presence of interposed target (windshield)

C.  Injuries: perforations of omentum, small intestine, mesentery and right common iliac artery, with a 2,480 mL hemoperitoneum

D.  Recovery: moderately deformed, jacketed, large caliber bullet from L5

E.  Path: front to back, downward, and right to left

13.2.E.2  Gunshot wound through forearm:

A.  Entrance wound: anterior right forearm

B.  Apparent range of fire: indeterminate, based on presence of interposed target (windshield)

C.  Injuries: perforations of soft tissues of right forearm

D.  Exit wound: medial proximal right forearm

E.  Path: upward, right to left and slightly front to back

13.2.E.3  History that the deceased was the driver of a motor vehicle who was shot by a police officer whom he had run under.

F.  Conclusions: It is our opinion that Michael Earl Brisco, a 36 year old black

*DPS SENSITIVE*                                              11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY    DEF 00110
INFORMATION SUBJECT TO PROTECTIVE ORDER
APPX 00105

male, died as a result of gunshot wounds.

G.  Manner of death: Homicide

H.  Medical Examiner: Janis K Townsend-Parchman, M.D.


**S14**   14.1  On 12/20/2018 at approximately 2:31 PM, I Texas Ranger David Armstrong received a firearms and toolmarks laboratory report (S14.P1) from the Texas Department of Public Safety Crime Lab in Garland. It should be noted that all item numbers referred to below are in reference to the lab submission form that was used for submitting the evidence. The following is a summary of that report, for detail refer to S14.P1:


14.2  6x9 yellow envelope

A.  One unfired 380 Auto caliber cartridge (Item 1)


14.3  6x9 yellow envelope

A.  One fired 40 S&W caliber cartridge case (Item 12)

B.  One fired 40 S&W caliber cartridge case (Item 2)

C.  One fired 40 S&W caliber cartridge case (Item 3)

D.  One fired 40 S&W caliber cartridge case (Item 4)

E.  One fired 40 S&W caliber cartridge case (Item 5)

F.  One fired 40 S&W caliber cartridge case (Item 6)

G.  One fired 40 S&W caliber cartridge case (Item 7)

H.  One fired 40 S&W caliber cartridge case (Item 9)

I.  One fired 40 S&W caliber cartridge case (Item 10)

J.  One fired bullet fragment (Item 15)


14.4  Pistol box

A.  Glock Model 22 Gen 4, 40 S&W caliber pistol, S/N BECV897, submitted with an attached flashlight, submitted with a magazine and 7 unfired 40 S&W caliber cartridges (3 cartridges were used during testing) (Item 8)(Officer Beauchamp's issued Pistol)


14.5  Yellow envelope

A.  One pistol magazine and 26 unfired 9mm Luger caliber cartridges (Item 11)


14.6  Pistol Box

*DPS SENSITIVE*        11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY     DEF 00111
INFORMATION SUBJECT TO PROTECTIVE ORDER

A.  Glock Model 19, 9mm Luger caliber pistol, S/N KBU676, submitted with a magazine and 12 unfired 9mm Luger caliber cartridges (Item 18)(Stolen pistol recovered from Brisco's center console)

14.7  6x9 Yellow envelope

A.  One fire bullet (Item 16)

B.  One fired bullet (Item 31)

C.  One unfired 9mm Luger caliber cartridge (Item 13)

D.  One fired bullet (Item 27)

14.8  Both Glock pistols were each operational with no malfunctions detected during testing.

14.9  No analysis was performed on Item 1, Item 11, or Item 13.

14.10  The following items were identified as having been fired from Item 8:

A.  Item 2

B.  Item 3

C.  Item 4

D.  Item 5

E.  Item 6

F.  Item 7

G.  Item 9

H.  Item 10

I.  Item 12

14.11  Item 15 was unable to be identified or eliminated as having been fired from either Glock pistol, or the same firearm that fired Items 16, 27, and 31, due to damage and a lack of reproducible marks.

14.12  Item 11 fits and functions in Item 18.

14.13  Items 16, 27, and 31 were identified as having been fired from Item 8.

*DPS SENSITIVE*                                        11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY        DEF 00112
INFORMATION SUBJECT TO PROTECTIVE ORDER

14.14  End of summary.

**S2**  2.1 On 03-18-2018, at approximately 7:59 PM, I, Texas Ranger J. Rodney Odom was contacted by Texas Ranger David Armstrong and advised of an Officer Involved Shooting that had occurred in Lancaster, Dallas County, Texas. At that time Ranger Armstrong requested I respond to Lancaster and assist him with processing the crime scene. I was contacted by my supervisor a short time later and was advised Texas Ranger Laura Simmons was also responding to the scene and would be retrieving the Texas Ranger Co. "B" Leica P20 ScanStation to forensically document the crime scene.

2.2 While en-route to Lancaster I contacted Ranger Armstrong who advised the shooting appeared to have occurred in the area of 1607 Dewberry Blvd. in Lancaster, Dallas County, Texas. I arrived at that location that evening around 9:58 PM. I observed the crime scene was cordoned off with crime scene tape. I was requested to provide my information to an officer holding a crime scene log as I entered the scene. I later learned there were two crime scene logs one at each end of the crime scene. As I entered the scene I observed Ranger Armstrong near an overturned small white Ford sport utility vehicle (SUV). We walked the crime scene at that time. I was told, contact was made with the driver of the overturned SUV at the other end of the scene.

2.3 Information provided to Ranger Armstrong at that time indicated two officers in one police vehicle had made contact with the driver of the white Ford SUV in an apartment complex (Bel Air Place Apartments Building #1504). At some point during that contact the driver/suspect fled striking one of the officers. That officer ended up on top of the SUV'S hood. While on the hood the officer was believed to have fired multiple rounds through the glass of the SUV striking the suspect. The officer fell or was thrown off of the vehicle a short time later and was believed to have been injured. That same officer was believed to have fired additional rounds at the SUV at that time. The suspect then fled down the street, where his vehicle struck a telephone pole severing it into pieces and causing the vehicle to overturn.

2.4 Texas Ranger Laura Simmons arrived a short time later with the Leica P20 ScanStation. I explained to Ranger Simmons what I had been told by Ranger Armstrong. I then walked her through the scene. Texas Ranger Adam Sweaney arrived a short time later. Yellow evidence placards had been previously placed by items of evidential value. I then deployed and operated the Leica P20 ScanStation (3D Laser scanner), serial #1840329 and completed and assisted Ranger Simmons complete a total of eight scans of the scene. I used a National Institute of Science and Technology (NIST) Twin Target Pole, serial #BWDTP0007, to document the accuracy of the scanner.

2.5 The Leica P20 ScanStation is a device capable of using both panoramic photography and three dimensional laser scanning to capture measurements. These measurements can be used to create a three dimensional representation of the crime scene. Single images, witness viewpoints, and images with measurements can be

*DPS SENSITIVE*                                                    11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY                DEF 00113
INFORMATION SUBJECT TO PROTECTIVE ORDER

generated. The computerized scan data has been retained on an external hard drive
by the Company "B" Texas Rangers (S2.P1). I did not collect or package any items
of evidence on this date.


2.6 On 03-20-2017, Texas Ranger Laura Simmons and I returned to Lancaster to
assist Ranger Armstrong collect additional evidence from the suspect vehicle
involved in this investigation. Ranger Simmons and I arrived at the Lancaster
Police Department located at 1650 N Dallas Ave. in Lancaster, Dallas County, Texas
at approximately 1:30 PM, that day. At approximately 2:32 PM, a wrecker unloaded
the suspect vehicle in a bay at the Fire Department which is in the same parking
lot as the Police Department. We began processing the suspect vehicle at
approximately 2:40 PM.


2.7 All of the photographs taken and the evidence collected will be documented by
Ranger Armstrong in his investigative report.


**S3**  1.1 On Thursday, 03-18-2018, at approximately 7:30 PM, I, Texas Ranger Adam
Sweaney was contacted by Texas Ranger Company B Headquarters and requested to
assist Texas Ranger David Armstrong with an Officer Involved Shooting
Investigation involving the Lancaster Police Department (LPD). I contacted Ranger
Armstrong, and he requested me to make contact with LPD Officer Zachery Beauchamp
at the Baylor Scott & White Medical Center in Waxahachie, Texas and obtain his
clothing.


1.2 At 8:42 PM, I made contact with Officer Beauchamp in room T2 at the Baylor
Scott & White Medical Center. Officer Beauchamp informed me of the following:


A) Officer Beauchamp stated the suspect attempted to run him over.

B) Officer Beauchamp said he ended up on the hood of the suspect car.

C) Officer Beauchamp stated he thought the suspect was going to kill him.

D) Officer Beauchamp said he fired some rounds from his pistol.


1.3 I observed and photographed (S3.P1) the following injuries on Officer Zachery
Beauchamp:

A) Abrasions on knees

B) Abrasions on the right shoulder

C) Abrasions on the ribs on his right side


1.4 I collected the following evidence from Officer Zachery Beauchamp at the

*DPS SENSITIVE*                                          11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY         DEF 00114
INFORMATION SUBJECT TO PROTECTIVE ORDER
APPX 00109

Baylor Scott & White Medical Center in Waxahachie:

A) Pair of black in color boots. Collected at 8:52 PM from Room T2.

B) Black in color Bulletproof vest/earpiece. Collected at 8:58 PM from PD Room.

C) Blue in color Lancaster Police Department uniform. Collected at 8:58 PM from PD Room.

D) Gun belt - asp baton/holder, holster, magazine holder. Collected at 8:58 PM from PD Room.


1.5 Let it be noted I released Officer Beauchamp's keys back into his possession. Let it also be noted that I will not be assigning the evidence numbers in my supplement due to Ranger Armstrong being the lead investigator who will assign the numbers in his supplement.


1.6 At 9:20 PM, I left the Baylor Scott & White Medical Center in Waxahachie and contacted Ranger Armstrong. Ranger Armstrong requested me to obtain the clothing of Michael Brisco at the Methodist Charlton Medical Center in Dallas, Texas.


1.7 At 9:50 PM, I arrived at the Methodist Charlton Medical Center and learned Rodney Odeal Brisco (B/M, DOB: ████-1972), was the brother of Michael Brisco had identified him as the deceased. The following is a summary of the conversation with Rodney. The summary does not contain all comments made during the conversation, nor does it necessarily reflect the chronology of the conversation. The video recording contains a verbatim account of the conversation with Rodney:


A) Rodney stated he observed Michael to be fine with no problems.

B) Rodney said Michael went to the store to get cigarettes when he was shot.

C) Rodney stated Michael did not carry any weapons on him.

D) Rodney said the Ford Escape vehicle belonged to Michael's girlfriend.

E) Rodney stated Michael's girlfriend said he went to get cigarettes and come back home.


1.8 I talked with Melvin Delane Grant (B/M, DOB: ████/1961) at the Charlton Medical Center. Grant is the uncle of Michael Brisco. The following is a summary of the conversation with Grant. The summary does not contain all comments made during the conversation, nor does it necessarily reflect the chronology of the conversation. The video recording contains a verbatim account of the conversation with Grant:

A) Grant said he observed Michael to be fine.

B) Grant stated he was with Michael a few days ago at a garage sale.

C) Grant said he and Michael prayed together.


**DPS SENSITIVE**                                                     11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER                    DEF 00115

APPX 00110

1.9 I talked with Tamicka Yvonne Boutte (B/F, DOB: ███-1979) at the Charlton Medical Center. Boutte is the cousin of Michael Brisco. The following is a summary of the conversation with Boutte. The summary does not contain all comments made during the conversation, nor does it necessarily reflect the chronology of the conversation. The video recording contains a verbatim account of the conversation with Boutte:

A) Boutte said everything was good with Michael.

B) Boutte stated Michael just started working at Hobby Lobby.

C) Boutte said she saw him yesterday, and she usually stops by every day.


1.10 Let it be noted the contact with the family of Michael Brisco was video recorded (S3.P2) using a MUVI digital camera. For further details on my conversations with the family members refer to (S3.P2).


1.11 At 11:00 PM, I obtained the following items from the trunk of Lancaster Police Department Detective Joseph Brickett at the Methodist Charlton Medical Center:

A) Pair of black in color shoes.

B) Pair of white in color socks.

C) Black in color long underwear.

D) Black in color underwear.

E) White in color t-shirt.

F) White in color undershirt.

G) Blue in color pants with a belt.


1.12 I left the Methodist Charlton Medical Center at 11:02 PM, and responded to the scene located at 1600 Dewberry Blvd. in Lancaster, Dallas County, Texas. At 11:15 PM, I arrived on the scene and assisted Ranger Armstrong with the processing of the scene, and Ranger Rodney Odom and Ranger Laura Simmons with the scan of the scene.


1.13 On 03-19-2018, at approximately 5:10 AM, I transferred all evidentiary items collected in Details 1.4 and 1.10 to Ranger Armstrong. At 5:22 AM, I left the scene and traveled back to my assigned area.


1.14 I did not collect any evidence at the scene and transferred all evidentiary items I collected at the Baylor Scott & White Medical Center and Charlton Medical Center to Ranger Armstrong. I do not maintain any evidence and expect no further involvement in the investigation.


**DPS SENSITIVE**

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00116

APPX 00111

## INVESTIGATION REQUESTED BY

LANCASTER POLICE DEPT.
LANCASTER,
75134

## SUSPECTS

**S1    Brisco, Michael Earl - Black/Male - █████/1981**
Hair: Black                Eyes: Brown            Weight: 200 lbs        Height: 5' 08"
SSN:                       SID:                   DL#: █████             DL State: TX
Home:                      Cell:                  Work: █████            Email:

## VICTIMS

**S1    Beauchamp, Zachary - White/Male - █████/1989**
Hair: Brown                Eyes: Brown            Weight: 245 lbs        Height: 6' 05"
SSN:                       SID:                   DL# █████              DL State: TX
Home:                      Cell:                  Work:                  Email:
**Lemoine, Shane - White/Male - █████/1977**
Hair: Blond or Strawberry  Eyes: Blue             Weight: 195 lbs        Height: 6' 02"
SSN: █████                  SID:                   DL#: █████             DL State: TX
Home: █████                 Cell:                  Work:                  Email:

## WITNESSES

**S9    W█████, J█████ - Black/Female - █████/2009**
Home:                      Cell:                  Work:                  Email:

**S3    Brisco, Rodney Odeal - Black/Male - █████/1972**
Home:                      Cell:                  Work:                  Email:
**Grant, Melvin Delane - Black/Male - █████/1961**
Home:                      Cell:                  Work:                  Email:
**Boutee, Tamicka Yvonne - Black/Female - █████/1979**
Home:                      Cell:                  Work:                  Email:

## INVOLVED

**S9    W█████, B█████ - White/Female - █████/1992**
Hair: Brown                Eyes: Hazel            Weight: 250 lbs        Height: 5' 04"
SSN:                       SID:                   DL#:                   DL State: TX
Home: █████                 Cell:                  Work:                  Email:

## INVOLVED LOCATIONS

**S1    Crime Scene**
**1600 Dewberry Blvd.**
Lancaster, TX 75134

**S6    Southwest Institute of Forensic Science**
**2355 N. Stemmons Freeway**

*DPS SENSITIVE*

11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00117

APPX 00112

Dallas, TX 75201
Activity Location

## INVOLVED VEHICLES

**S1**  **White 2004 Ford Escape**
Status: Suspect          VIN: 1FMYU03154KA95236          State: TX          Plate: JZH-1357

## OFFENSES

**S1**  **CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN 19.03(a)(1) PC FX (Attempt to Commit)**
Dallas County, Lancaster, TX, US
03/18/2018 ( Sunday )

## CHARGES

**S1**  **CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN 19.03(a)(1) PC FX (Attempt to Commit)**
**Location:**               Dallas County, Lancaster, TX, US
**Date of Offense:**      03/18/2018

**Arrest Date:**          03/18/2018                      **Arrested By:**          Lancaster Police Department


**Death:** ☐          **Life:** ☐

*Defendant: Brisco, Michael*
*Offense: S1 - 9990020 CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN 19.03(a)(1) FX (Attempt to Commit)*

## PERSONNEL

**S1**  **David Armstrong, Texas Rangers "B"**
Texas Dept of Public Safety
214 861 2372_____

**Laura Simmons, Texas Rangers "B"**
Texas Dept of Public Safety

**Adam Sweaney, Texas Rangers "B"**
Texas Dept of Public Safety

**J Rodney Odom, Texas Rangers "B"**
Texas Dept of Public Safety

**S4**  **David Armstrong, Texas Rangers "B"**
Texas Dept of Public Safety

**Adam Sweaney, Texas Rangers "B"**
Texas Dept of Public Safety
(972) 923-6670

**S5**  **Michelle McAnally,**
Lancaster Police Department

**S6**  **Dr. Janis Townsen, Medical Examiner**
SWIFS

*DPS SENSITIVE*

11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00118

APPX 00113

S7 **J Rodney Odom, Texas Rangers "B"**
Texas Dept of Public Safety
(214) 861-2366

**Laura Simmons, Texas Rangers "B"**
Texas Dept of Public Safety
(903) 453-6882

S10 **Joseph Brickett,**
Lancaster Police Department

S13 **Janis K Townsen, Medical Examiner**
SWIFS


## EVIDENCE

S2.P1 **Evidence:**        Other
      **Seizure Date:**    03/18/2018
      **Description:**     Texas Ranger Co. "B"s external hard drive containing this shootings scan data.
      **Address:**        , TX
      **By:**             J Rodney Odom

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Retained through Appeal/Sentence Duration | | 03/18/2018 |

**Released To/Destroyed Location:**
Location: Texas Rangers Headquarters Office
Released To: Ranger Armstrong
Address: 350 W. IH 30 Garland, TX, 75043
Telephone: (214) 861-2366

S3.P1 **Evidence:**        Other
      **Seizure Type:**    Consent
      **Seizure Date:**    03/18/2018
      **Description:**     Black boots
      **Address:**        ,
      **By:**             Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

S3.P2 **Evidence:**        Other
      **Seizure Type:**    Consent
      **Seizure Date:**    07/17/2018
      **Description:**     Bullet proof vest with ear piece
      **Address:**        , TX
      **By:**             Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

*DPS SENSITIVE*                     11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY              DEF 00119
INFORMATION SUBJECT TO PROTECTIVE ORDER
APPX 00114

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P3** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Officer Beauchamp's Lancaster Police Departemnt Unifrom
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P4** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Officer Beauchamp's gun belt
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P5** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Pair of black in color shoes from Brisco
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P6** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Pair of white in color socks from Brisco

*DPS SENSITIVE*                                      11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime scene (Vehicle) | 03/19/2018 0510 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P7**   **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Black in color underwear from Brisco
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2019 0510 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P8**   **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Black in color underwear from Brisco
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P9**   **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** White in color t-shirt from Brisco
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|

*DPS SENSITIVE*                                         11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P10** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** White in color undershirt
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P11** **Evidence:** Other
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Blue in color pants from Brisco
**Address:** , TX
**By:** Adam Sweaney

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (Vehicle) | 03/19/2018 0510 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S3.P12** **Evidence:** Audio and/or Video recording (other)
**Seizure Type:** Consent
**Seizure Date:** 07/17/2018
**Description:** Video recording of contact with Brisco's family
**Address:** , TX
**By:** Adam Sweaney

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/17/2018 0000 |

**S4.P1** **Evidence:** Photograph
**Seizure Date:** 03/18/2018 2058
**Description:** Crime Scene Photographs
**Address:** , TX
**By:** David Armstrong

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/18/2018 2058 |

**S4.P2** **Evidence:** Other
**Seizure Date:** 03/18/2018 2300

*DPS SENSITIVE*                                   11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY                DEF 00122
INFORMATION SUBJECT TO PROTECTIVE ORDER

**Description:** Shoes of Brisco
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS ) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S4.P3**  **Evidence:** Other
**Seizure Date:** 03/18/2018 2300
**Description:** Socks from Brisco
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S4.P4**  **Evidence:** Other
**Seizure Date:** 03/18/2018 2300
**Description:** Long underwear from Brisco
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S4.P5**  **Evidence:** Other
**Seizure Date:** 03/18/2018 2300
**Description:** Blue underwear from Brisco
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

*DPS SENSITIVE*                                    11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER
DEF 00123
APPX 00118

**S4.P6**

| | |
|---|---|
| **Evidence:** | Other |
| **Seizure Date:** | 03/18/2018 2300 |
| **Description:** | White shirt from Brisco |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S4.P7**

| | |
|---|---|
| **Evidence:** | Other |
| **Seizure Date:** | 03/18/2018 2300 |
| **Description:** | White undershirt from Brisco |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S4.P8**

| | |
|---|---|
| **Evidence:** | Other |
| **Seizure Date:** | 03/18/2018 2300 |
| **Description:** | Blue pants with belt from Brisco |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - Crime Scene (DPS) | 03/18/2018 2330 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P1**

| | |
|---|---|
| **Evidence:** | Written document (other) |
| **Seizure Date:** | 03/19/2018 0243 |
| **Description:** | Field Evidence Log |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/19/2018 0243 |

**S5.P2**

| | |
|---|---|
| **Evidence:** | Ammunition |

*DPS SENSITIVE*                    11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00124

APPX 00119

**Seizure Date:** 01/07/2019
**Description:** .380 unfired cartridge
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P3**  **Evidence:** Ammunition
**Seizure Date:** 01/07/2019
**Description:** Speer .40 S&W fired cartridge case
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P4**  **Evidence:** Ammunition
**Seizure Date:** 01/07/2019
**Description:** Speer .40 S&W fired cartridge case
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P5**  **Evidence:** Ammunition
**Seizure Date:** 01/07/2019
**Description:** Speer .40 S&W fired cartridge case
**Address:** , TX
**By:** David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

*DPS SENSITIVE*                                      11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

**S5.P6**   **Evidence:**        Ammunition
            **Seizure Date:**     01/07/2019
            **Description:**      Speer .40 S&W fired cartridge case
            **Address:**         , TX
            **By:**              David Armstrong

   **Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

   **Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab |  | 03/22/2018 1200 |

**S5.P7**   **Evidence:**        Ammunition
            **Seizure Date:**     01/07/2019
            **Description:**      Speer .40 S&W fired cartridge case
            **Address:**         , TX
            **By:**              David Armstrong

   **Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

   **Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab |  | 03/22/2018 1200 |

**S5.P8**   **Evidence:**        Ammunition
            **Seizure Date:**     01/07/2019
            **Description:**      Speer .40 S&W fired cartridge case
            **Address:**         , TX
            **By:**              David Armstrong

   **Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

   **Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab |  | 03/22/2018 1200 |

**S5.P9**   **Evidence:**        Firearm
            **Seizure Date:**     01/07/2019
            **Description:**      Glock Model 22 .40 S&W with Streamlight TLR-HL Light
                                  S/N: BECV897
            **Address:**         , TX
            **By:**              David Armstrong

   **Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

*DPS SENSITIVE*                                              11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00126

APPX 00121

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P10**

| | | |
|---|---|---|
| **Evidence:** | Ammunition | |
| **Seizure Date:** | 01/07/2019 | |
| **Description:** | Speer .40 S&W fired cartridge case | |
| **Address:** | , TX | |
| **By:** | David Armstrong | |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P11**

| | | |
|---|---|---|
| **Evidence:** | Ammunition | |
| **Seizure Date:** | 01/07/2019 | |
| **Description:** | Speer .40 S&W fired cartridge case | |
| **Address:** | , TX | |
| **By:** | David Armstrong | |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P12**

| | | |
|---|---|---|
| **Evidence:** | Ammunition | |
| **Seizure Date:** | 01/07/2019 | |
| **Description:** | Large capacity magazine containing 26 9mm unfired cartridges | |
| **Address:** | , TX | |
| **By:** | David Armstrong | |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P13**

| | | |
|---|---|---|
| **Evidence:** | Ammunition | |
| **Seizure Date:** | 01/07/2019 | |
| **Description:** | Speer .40 S&W fired cartridge case | |
| **Address:** | , TX | |
| **By:** | David Armstrong | |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| | |

*DPS SENSITIVE*

11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00127

APPX 00122

| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P14**

| | |
|---|---|
| **Evidence:** | Motor Vehicle |
| **Seizure Date:** | 01/07/2019 |
| **Description:** | Ford Escap SUV |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Released to other Gov Entity | | 03/19/2018 0515 |

**S5.P15**

| | |
|---|---|
| **Evidence:** | Ammunition |
| **Seizure Date:** | 01/07/2019 |
| **Description:** | Unfired 9mm cartridge |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S5.P16**

| | |
|---|---|
| **Evidence:** | Marijuana |
| **Seizure Date:** | 01/07/2019 |
| **Description:** | Cigar containing substance with odor of marijuana |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Destroyed | | 03/22/2018 1200 |

**S6.P1**

| | |
|---|---|
| **Evidence:** | Other |
| **Seizure Date:** | 03/19/2018 |
| **Description:** | Gunshot Residue Kit |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

***DPS SENSITIVE***    11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00128

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S6.P2**    **Evidence:**    Other
          **Seizure Date:**    03/19/2018
          **Description:**    Projectile from Brisco
          **Address:**    , TX
          **By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S6.P3**    **Evidence:**    Biological
          **Seizure Date:**    03/18/2018
          **Description:**    Head Hair Standard
          **Address:**    , TX
          **By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S6.P4**    **Evidence:**    Biological
          **Seizure Date:**    03/19/2018
          **Description:**    Blood Standard
          **Address:**    , TX
          **By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Crime Lab (Lab) | 03/22/2018 1200 |

Disposition:

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S6.P5**    **Evidence:**    Biological
          **Seizure Date:**    03/19/2018
          **Description:**    Bags from Brisco's Hands
          **Address:**    , TX
          **By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| | |

*DPS SENSITIVE*

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00129

APPX 00124

| Lynda Posey - DPS Crime Lab (Lab) | | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/19/2018 1200 |

**S7.P1** | **Evidence:** | Search Warrants |
| **Seizure Date:** | |
| **Description:** | Search Warrant |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/20/2018 1111 |

**S7.P2** | **Evidence:** | Photograph |
| **Seizure Date:** | 02/04/2019 |
| **Description:** | Digital Photographs |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/20/2018 1428 |

**S7.P3** | **Evidence:** | Ammunition |
| **Seizure Date:** | 02/04/2019 |
| **Description:** | Projectile from rear side door |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transferred To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S7.P4** | **Evidence:** | Ammunition |
| **Seizure Date:** | 02/04/2019 |
| **Description:** | Projectile from driver seat |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transferred To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

*DPS SENSITIVE*

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER
DEF 00130
APPX 00125

**S7.P5**    **Evidence:**    Marijuana
**Seizure Date:**    02/04/2019
**Description:**    Cigar containing marijuana
**Address:**    , TX
**By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | Ranger Armstrong | 03/22/2018 1200 |

**S7.P6**    **Evidence:**    Ammunition
**Seizure Date:**    02/04/2019
**Description:**    Unfired 9mm Cartridge
**Address:**    , TX
**By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1200 |

**S7.P7**    **Evidence:**    Ammunition
**Seizure Date:**    02/04/2019
**Description:**    Extended magazine with 26 unfired 9mm cartridges
**Address:**    , TX
**By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Retained through Appeal/Sentence Duration | | 03/22/2018 1200 |

**S7.P8**    **Evidence:**    Biological
**Seizure Date:**    02/04/2019
**Description:**    Swab for Blood
**Address:**    , TX
**By:**    David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

DEF 00131

APPX 00126

| | | 03/22/2018 1200 |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S7.P9**

| **Evidence:** | Ammunition |
|---|---|
| **Seizure Date:** | 02/04/2019 |
| **Description:** | Porjectile from Rear Hatch |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/22/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S7.P10**

| **Evidence:** | Firearm |
|---|---|
| **Seizure Type:** | Search Warrant |
| **Seizure Date:** | 02/04/2019 |
| **Description:** | Glock 19 9mm pistol contianing magazine with 12 unfired 9mm cartridges<br>Serial Number: KBU676 |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| Lynda Posey - DPS Garland (Crime Lab) | 03/20/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Transferred to DPS Crime Lab | | 03/22/2018 1200 |

**S7.P11**

| **Evidence:** | Cell phone |
|---|---|
| **Seizure Date:** | 02/04/2019 |
| **Description:** | LG Smartphone |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| Retained through Appeal/Sentence Duration | | 03/20/2018 1600 |

**S7.P12**

| **Evidence:** | Audio and/or Video recording (other) |
|---|---|
| **Seizure Date:** | 02/04/2019 |
| **Description:** | DVD containing LPD Dispatch Recordings |
| **Address:** | , TX |
| **By:** | David Armstrong |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/20/2018 1600 |

**S7.P13**

| **Evidence:** | Audio and/or Video recording (other) |
|---|---|
| **Seizure Date:** | 02/04/2019 |
| **Description:** | 10 DVD's containing LPD In-car and body worn camera footage |

*DPS SENSITIVE*                                                        11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY          DEF 00132
INFORMATION SUBJECT TO PROTECTIVE ORDER
APPX 00127

**Address:**      , TX
**By:**      David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/20/2018 1600 |

**S9.P1**    **Evidence:**      Audio and/or Video recording (other)
         **Seizure Date:**      03/22/2018 1838
         **Description:**      Audio Recorded Interview
         **Address:**      , TX
         **By:**      David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1838 |

**S9.P2**    **Evidence:**      Photograph
         **Seizure Date:**      02/18/2019
         **Description:**      Digital Photographs (Witness POV)
         **Address:**      , TX
         **By:**      David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/22/2018 1838 |

**S10.P1**    **Evidence:**      Photograph
         **Seizure Date:**      03/18/2018
         **Description:**      Digital Photographs of Officer Beauchamp's Injuries
         **Address:**      , TX
         **By:**      David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - DPS Garland (Office) | 03/18/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2018 1200 |

**S10.P2**    **Evidence:**      Audio and/or Video recording (other)
         **Seizure Date:**      03/18/2018
         **Description:**      Video Recorded Interview with Brisco's Family
         **Address:**      , TX
         **By:**      David Armstrong

**Chain of Custody:**

| Transfered To: | Date/Time: |
|---|---|
| David Armstrong - DPS Garland (Office) | 03/23/2018 1200 |

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2018 1200 |

*DPS SENSITIVE*      11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY
INFORMATION SUBJECT TO PROTECTIVE ORDER

REPORT OF INVESTIGATION

**S11.P1**   **Evidence:**          Audio and/or Video recording (other)
             **Seizure Date:**      03/23/2018
             **Description:**       In-car and body worn camera footage
             **Address:**           , TX
             **By:**                David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2018 1200 |

**S12.P1**   **Evidence:**          Witness Statement (written)
             **Seizure Date:**      03/23/2018
             **Description:**       Officer Lemoine Sworn Affidavit
             **Address:**           , TX
             **By:**                David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2018 1416 |

**S12.P2**   **Evidence:**          Witness Statement (written)
             **Seizure Date:**      03/23/2018
             **Description:**       Officer Beauchamp Sworn Affidavit
             **Address:**           , TX
             **By:**                David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2018 1444 |

**S13.P1**   **Evidence:**          Written document (other)
             **Seizure Date:**      06/05/2018
             **Description:**       AUtopsy Report for Brisco
             **Address:**           , TX
             **By:**                David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 06/05/2018 0800 |

**S14.P1**   **Evidence:**          Witness Statement Audio and/or Video recording (statement)
             **Seizure Date:**      12/20/2018
             **Description:**       DPS Crime Lab Firearms and Toolmarks Exam Report
             **Address:**           , TX
             **By:**                David Armstrong

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 12/20/2018 0800 |

**ATTACHMENT NAME(S)**

*END OF REPORT*

*DPS SENSITIVE*                                          11/18/2019 10:27

CONFIDENTIAL ATTORNEY EYES ONLY         DEF 00134
INFORMATION SUBJECT TO PROTECTIVE ORDER

# Exhibit **8**

Lancaster Police Department radio
from March 18, 2018